## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## GAINESVILLE DIVISION

| | |
|---|---|
| ALACHUA COUNTY EDUCATION ASSOCIATION, <br><br> UNITED FACULTY OF FLORIDA–UNIVERSITY OF FLORIDA, <br><br> UNITED FACULTY OF FLORIDA, <br><br> and <br><br> FLORIDA EDUCATION ASSOCIATION, <br><br> *Plaintiffs*, <br><br> v. <br><br> DONALD J. RUBOTTOM, in his official capacity as chair of the Florida Public Employees Relations Commission, <br><br> JEFF AARON, in his official capacity as commissioner of the Florida Public Employees Relations Commission, <br><br> and <br><br> MICHAEL SASSO, in his official capacity as commissioner of the Florida Public Employees Relations Commission, <br><br> *Defendants*. | Civil Action No. _____ |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## I.     NATURE OF THE ACTION

1.     In this action, the Plaintiffs challenge provisions of Florida Senate Bill 256 ("SB 256" or "the Act") under the First Amendment, the Fourteenth Amendment, and Article I, Section 10 ("the Contracts Clause") of the United States Constitution.  The Act, a copy of which is attached to this Complaint as Exhibit A, is a top priority of Governor Ron DeSantis.  In a bid to punish the "school unions" and other public employee unions who have opposed him ("disfavored unions"), Governor DeSantis pushed for "unprecedented" changes to Florida's collective bargaining law to harm disfavored unions while exempting those unions representing law enforcement, corrections, and firefighter employees who have supported him ("favored unions").  The Act imposes a variety of draconian restrictions on the Governor's union opponents—including by compelling them to deliver a government drafted script on their union membership cards with which they fundamentally disagree—while leaving unions that supported the Governor free to conduct their affairs in accordance with ordinary labor relations principles of long standing.  The Act violates the Plaintiffs' fundamental right to freedom of speech and association, their right to equal protection of the laws, and their right to be free from legislative impairments of their contractual rights.

2.      Plaintiffs challenge the following restrictions that the Act imposes solely on disfavored unions:

(a) Section 1 of the Act forces disfavored unions to include in all their membership applications a government-drafted, 91-word "right-to-work" affirmation in 14-point type, along with an accounting of the compensation of the union's five highest-paid officers and employees, in violation of the disfavored unions' First Amendment rights to freedom of speech and association and their Fourteenth Amendment rights to equal protection of the laws;

(b) Section 3 of the Act prohibits disfavored unions from collecting voluntary membership dues by means of employee-authorized payroll deductions, thereby impermissibly impairing disfavored unions' contractual rights in violation of Article I, Section 10 of the United States Constitution, and impermissibly imposing viewpoint-based restrictions on their collection of voluntary membership dues, in violation of their First Amendment rights to freedom of speech and of their Fourteenth Amendment rights to equal protection of the laws; and

(c) Section 4 of the Act subjects disfavored unions to immediate decertification—thereby impermissibly impairing the contractual rights of disfavored unions in violation of Article I, Section 10 of the United States

Constitution—if such a union fails to comply with any of the following

obligations: annually disclosing audited financial statements; annually

disclosing accountant-certified figures showing the number of bargaining

unit employees who are and are not dues-paying union members; and

undergoing an election to determine whether it can continue to serve in its

role as collective bargaining representative if its disclosures show that fewer

than 60% of the employees it represents are dues-paying members of the

union.

None of these provisions survives any level of constitutional scrutiny.  There is no

remotely sufficient governmental interest in compelling unions to convey the

state's preferred message, prohibiting disfavored unions from collecting voluntary

dues payments from their members via payroll deductions, or subjecting disfavored

unions to certification elections in the absence of any indication that they lack

majority support—much less is there any legitimate basis for singling out

disfavored unions for such adverse treatment.  Nor would the means that Governor

DeSantis and the Florida Legislature have chosen to further any putatively

legitimate and sufficient governmental interest bear an adequate connection to such

an interest under any level of constitutional scrutiny.

3.     SB 256 is an extension of Governor DeSantis's broader campaign

against public educators and public education itself, which the Plaintiffs have

vigorously and publicly opposed.  In advancing his anti-education campaign, Governor DeSantis has complained of the "excessive influence" of school unions—while expressing no such concerns for the influence of public unions he favors and who have politically supported him.  His campaign against public educators and public education has featured a battering range of legislative and executive actions including:  2023 House Bill 1, which authorizes universal taxpayer-funded private school vouchers; 2022 House Bill 7, branded by Governor DeSantis as the "Stop WOKE Act," which bans instruction concerning several vaguely described concepts relating to race; 2022 House Bill 1557, which banned instruction on sexual orientation and gender identity in kindergarten through third grade classes and enabled the Florida Board of Education's subsequent regulatory action extending that ban to fourth through twelfth grades; 2022 Senate Bill 7044 and the resulting Florida Board of Governors Regulation 10.003, which undermines academic freedom by curtailing tenure protections for faculty at state higher education institutions; and the Florida Department of Education's rejection of the College Board's Advanced Placement course in African-American studies.

4.     SB 256 opens a new front in this campaign.  SB 256 is a naked effort to curtail the constitutional rights of those public unions that have crossed Governor DeSantis.  Governor DeSantis has attacked education-employee unions in particular as "pernicious" and "partisan."  And in promoting SB 256, Governor

DeSantis made clear that the purpose of the ban on disfavored unions' collection of voluntary membership dues via employee-authorized payroll deductions was "to make sure the school unions are not getting any of that money."  He has also vowed to "fight against" and "rein in the school unions" by way of SB 256.  In stark contrast, the Governor has repeatedly praised public unions exempted from the Act and thanked them for their political support, saying he was "proud" and "honor[ed] to have the[ir] rare endorsement."  Governor DeSantis has offered no justification for "rein[ing] in the school unions" while leaving unions who are his political allies free from comparable restrictions, and none exists.  His opposition to the viewpoint advanced by his political opponents—including their full-throated support for public education—is the manifest purpose for his punitive, unconstitutional initiative.

5.      Plaintiffs bring this action pursuant to 42 U.S.C. §§ 1983 and 1988. Plaintiffs Alachua County Education Association ("ACEA"), United Faculty of Florida–University of Florida ("UFF–UF"), and United Faculty of Florida ("UFF") bring this action on their own behalf and on behalf of their members, who also are adversely affected by SB 256.  Plaintiff Florida Education Association ("FEA") brings this action on its own behalf as an organization whose right to free speech and association, as well as its financial well-being, and current contracts in which it is interested will be impaired and harmed by SB 256.  Plaintiffs seek declaratory

and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202, Fed. R. Civ. P. 57 and 65, and this Court's inherent equitable powers.  Plaintiffs also seek attorneys' fees pursuant to 42 U.S.C. § 1988(b).

## II.   JURISDICTION AND VENUE

6.      This Court has jurisdiction under 28 U.S.C. § 1331, which vests district courts with jurisdiction to decide federal questions, and under 28 U.S.C. § 1343(a)(3), which vests district courts with jurisdiction "[t]o redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States."

7.      Venue is proper in this court under 28 U.S.C. § 1391(b), as the Plaintiffs and Defendants all have their principal places of business in the Northern District of Florida.  Venue is proper in this division, as the Plaintiffs ACEA and UFF–UF have their principal places of business in Alachua County, Florida, and the harms from which they seek relief will occur in Alachua County.

## III.   PARTIES

8.      Plaintiff ACEA is an advocacy organization with more than 2,300 members employed by Alachua County Public Schools.  ACEA is a local affiliate of FEA and is affiliated at the national level with the National Education Association ("NEA") and the American Federation of Teachers ("AFT"), which

are non-profit advocacy organizations that collectively have nearly 5 million

members nationwide, the overwhelming majority of whom are educators and

education support professionals employed by public school districts and

institutions of higher education.  Pursuant to Florida's Public Employees Relations

Act ("PERA"), ACEA is certified by the Florida Public Employees Relations

Commission ("PERC") as the collective bargaining representative of Pre-K–12

educators and education support personnel employed by the Alachua County

Public Schools.  ACEA negotiates collective bargaining agreements ("CBAs")

with the School Board of Alachua County, represents Pre-K–12 educators and

education support personnel in grievance proceedings under those CBAs, and

engages in other advocacy in support of education employees, students, and public

education generally.

9.     The current CBA between ACEA and the Alachua County Public

Schools that applies to the school district's instructional staff, a copy of which is

attached to this Complaint as Exhibit B, and which was amended in May 2022, by

the Memorandum of Understanding attached to this Complaint as Exhibit C,

governs a wide array of matters relating to the terms and conditions of employment

of teachers employed by Alachua County Public Schools, including academic

freedom, progressive-discipline standards, grievance procedures, standards and

procedures for dismissal of teachers, and workplace safety, including

communicable disease/health screening tests.  The CBA also has a provision requiring the school district to deduct voluntary membership dues from the pay of union members who have authorized such deductions and to remit those dues payments to ACEA.

10.     ACEA has strongly opposed actions and initiatives by Governor DeSantis.  Notably, in the summer of 2020, ACEA protested Governor DeSantis's order resuming in-person instruction in the state's public schools, because the order did not follow mitigation measures developed by the Centers for Disease Control and Prevention.  In 2021, ACEA supported Superintendent Carlee Simon's district-wide mask mandate notwithstanding Governor DeSantis's executive order purporting to restrict school districts' abilities to implement such safety measures. And in the 2022 election for the District 2 seat on the Alachua County School Board, ACEA declined to endorse Mildred Russell, who was Governor DeSantis's hand-picked candidate:  in the previous year, Governor DeSantis had ousted the then-incumbent District 2 board member, Diyonne McGraw, and appointed Russell in her stead.  In the 2022 election, McGraw defeated Russell.

11.     Plaintiff UFF–UF is a non-profit advocacy organization with nearly 900 members employed as faculty by the University of Florida.  UFF–UF is a local chapter of UFF and is affiliated with FEA, NEA, and AFT.  UFF–UF sues on its own behalf and on behalf of its members.

12.     Plaintiff UFF is a statewide affiliate of FEA representing more than 25,000 faculty, graduate employees, and academic professionals at all twelve Florida public universities, sixteen state and community colleges, and four K-12 lab schools.  Pursuant to PERA, UFF is certified by PERC as the collective bargaining representative of faculty, graduate employees, and academic professionals employed by the University of Florida, in addition to other public employers in Florida.

13.     Alongside Plaintiff UFF-UF, UFF negotiates CBAs with the University of Florida, represents faculty members in grievance proceedings under those CBAs, and engages in other advocacy in support of higher education faculty and public education more generally.

14.     In the course of their advocacy for educators and public education, UFF–UF and UFF have strongly opposed actions and initiatives championed by Governor DeSantis, including executive and legislative actions to drastically weaken tenure protections and imperil academic freedom, as well as Governor DeSantis's efforts to restrict educators' ability to teach American history and current events comprehensively and honestly.

15.     The current CBA between UFF and the University of Florida Board of Trustees, a copy of which is attached to this Complaint as Exhibit D, governs a wide array of matters relating to University of Florida faculty members'

employment, including provisions relating to academic freedom, non-discrimination, workplace safety, faculty appointments, non-renewal of faculty contracts, performance evaluations, grievance procedures, and tenure.  The CBA also contains a provision requiring the University of Florida to deduct voluntary membership dues from the pay of union members who have authorized such deductions and to remit those dues payments to UFF.  As reflected in the UFF–UF membership form, a portion of the membership dues remitted by the University of Florida to UFF are subsequently remitted to Plaintiff FEA, and Plaintiff FEA is an intended third-party beneficiary of the CBA's payroll deduction provision.

16.     Plaintiff FEA is a non-profit advocacy organization with approximately 140,000 members statewide, the overwhelming majority of whom are educators and education-support professionals employed by public school districts and institutions of higher education throughout the State of Florida.  At the national level, FEA is affiliated with NEA and AFT.

17.     FEA advocates for the interests of its education-employee members, their students, and for public education generally before the Florida legislature, before state agencies, before federal and state courts, and in the public square. FEA's advocacy includes campaigns for public-education funding; instruction in K-12 schools and Florida's institutions of higher education that is the product of

educational, not ideological, judgments; the treatment of all students with equal dignity and respect; and school safety.

18.     FEA's exercise of its free speech rights—including its strong opposition to Governor DeSantis's campaign against public school educators and public education described in ¶ 3 above—has antagonized Governor DeSantis and his allies in the legislature.  Governor DeSantis has publicly lashed out at teachers' unions, describing them as "pernicious" and "partisan" organizations that spend "the public's time" politicking on their own behalf.  He made no such criticisms of the public-employee unions he favors, and which have endorsed him.  By way of example, Governor DeSantis touted an endorsement from the International Union of Police Associations in past election campaigns.

19.     FEA is affiliated with more than 150 local associations, the overwhelming majority of which are "employee organizations" under PERA.  FEA provides services to its members and also provides support and resources to its local affiliates' advocacy efforts, including local affiliates' advocacy pursuant to their roles as collective-bargaining representatives of public-education employees.

20.     FEA and its national and local affiliates operate under a system of unified membership, meaning that education employees who wish to become members of a local affiliate join all three levels of the association and authorize the

payment of dues to the local, state, and national affiliates for their membership in each and the representation and other benefits those memberships afford.

21.     Defendant Donald J. Rubottom serves as the chair and chief executive and administrative officer of PERC, which has the authority to implement and enforce the PERA provisions challenged in this action.  Chair Rubottom is sued in his official capacity.

22.     Defendant Jeff Aaron serves as a commissioner of PERC, which has the authority to implement and enforce the PERA provisions challenged in this action.  Commissioner Aaron is sued in his official capacity.

23.     Defendant Michael Sasso serves as a commissioner of PERC, which has the authority to implement and enforce the PERA provisions challenged in this action.  Commissioner Sasso is sued in his official capacity.

## IV.    FACTS

### A.    SB 256 Makes Drastic Changes to Florida's Collective-Bargaining System for Disfavored Unions

24.     In 1968, Florida voters approved an amendment to the Florida Constitution guaranteeing that "[t]he right of employees, by and through a labor organization, to bargain collectively shall not be denied or abridged," with the proviso that "[p]ublic employees shall not have the right to strike."  Fla. Const. art. I, § 6.  In 1974, the Florida legislature enacted PERA "to provide statutory implementation of s. 6, Art. I of the State Constitution" by "[g]ranting to public

13

employees the right of organization and representation." Fla. Stat. § 447.201

(2022). The legislation recognizes that collective bargaining "protect[s] the

public" and "promote[s] harmonious and cooperative relationships between

government and its employees." *Id.*

25.     PERA grants public employees the right to form, join, participate in,

and be represented by an employee organization of their own choosing, or to

refrain from doing so; recognizes public employee and employer rights; provides a

process by which a union chosen by a majority of the employees in an appropriate

bargaining unit can be certified by PERC as the representative of all the employees

in the unit for the purposes of collective bargaining; requires public employers and

public-employee unions to bargain collectively concerning the wages, hours, and

other terms and conditions of unit employees' employment; enumerates prohibited

unfair labor practices by public employee unions and employers; and requires

annual registration requirements to be filed with PERC by certified unions. *See*

*generally* Fla. Stat. §§ 447.301, 447.209, 447.305, 447.307, and 447.309 (2022).

26.     SB 256 has injected a novel form of discrimination into PERA by

amending the statute so as to discriminatorily apply onerous restrictions and rules

exclusively to public sector unions other than those representing bargaining units

with law enforcement officers, correctional officers, correctional probation

officers, or firefighters, as defined in Fla. Stat. §§ 943.10 and 633.102 (2022). The

Act thus creates a favored class of unions—those representing the specified law enforcement, corrections, and firefighter employees, which are exempt from the Act's amendments to PERA challenged here—and a disfavored class consisting of all other public employee unions, which are subject to three onerous restrictions and rules of relevance here.

    *(1)    SB 256 Prescribes a Government-Drafted Script that Disfavored Unions, and Only Disfavored Unions, Must Include in Their Membership Applications*

27.    Prior to the enactment of SB 256, unions in Florida could communicate with members and prospective members in their own voice using their own words.  PERA did not purport to regulate the communications between a public employee union and its members or prospective members but simply recognized public employees' "right to form, join, participate in," and "be represented by any" union "of their own choosing" or to refrain from doing so. Fla. Stat. § 447.301(1) and (2).  Section 1 of SB 256 amends these provisions regarding public employees' rights so as to burden disfavored unions' communications with prospective members by compelling those unions—and no others—to communicate two unjustifiable government-mandated messages.

28.    First, Section 1 requires that any public employee who "desires to be a member" of a disfavored union "must sign and date a membership authorization

form, as prescribed by [PERC]," that includes the following 91-word state-mandated message "in 14-point type":

> The State of Florida is a right-to-work state. Membership or non-membership in a labor union is not required as a condition of employment, and union membership and payment of union dues and assessments are voluntary. Each person has the right to join and pay dues to a labor union or to refrain from joining and paying dues to a labor union. No employee may be discriminated against in any manner for joining and financially supporting a labor union or for refusing to join or financially support a labor union.

This state-mandated message, which must be disseminated by the union, is unnecessary and inaccurate. It is unnecessary because there is no legitimate justification for its apparent assumption that public employees are not informed of their right not to join a union, let alone that the employees interested in joining a teachers' union or other disfavored union are less informed of that right than are those interested in joining a favored law enforcement, corrections, or fire employees' union. The message is misleading in that a public employee union, like any private association, may decline to extend to non-members certain benefits and rights, such as the right to vote for the officers of the exclusive representative and the right to participate in certain members-only programs sponsored by the union, such as group insurance benefits.

29.     Second, Section 1 of the Act also requires disfavored unions to include on the membership form "the name[s] and total amount of salary, allowances, and other direct or indirect disbursements, including reimbursements, paid to each of the [unions'] five highest compensated officers and employees."  There is no justification for requiring this information on membership applications, nor for requiring it to be provided by disfavored unions but not by unions favored by Governor DeSantis.

30.     Not only does Section 1 of the Act compel disfavored unions to communicate the above-described unjustifiable government-mandated messages to prospective members, it also requires that the entire form and content of disfavored unions' membership applications are to be prescribed by PERC.  There is no such requirement for unions favored by Governor DeSantis.

31.     Section 1 compels Governor DeSantis's disfavored unions to communicate and union members to acknowledge a message with which they may disagree.  But Section 1 of SB 256 expressly exempts favored unions—including those that have endorsed Governor DeSantis—from Section 1's compelled speech requirements.

*(2)    SB 256 Contains a Discriminatory Payroll Deduction Ban*

32.    Prior to the enactment of SB 256, PERA granted all certified bargaining representatives the right to collect voluntary membership dues and uniform assessments by means of public-employer-administered payroll deductions from the salaries of public employee members who provided revocable authorization for such deductions.  *See* Fla. Stat. § 447.303 (2022).  PERA further provided that "[r]easonable costs to the employer of" such deductions "shall be a proper subject of collective bargaining."  *Id.*

33.    Section 3 of SB 256 amends Fla. Stat. § 447.303 to prohibit disfavored unions from collecting such dues and assessments via payroll deduction while expressly continuing to grant favored unions the right to do so.  Section 3 thus discriminatorily restricts unions disfavored by the Governor based solely on their viewpoints.  Section 3 also independently violates the Contracts Clause by substantially impairing existing disfavored union contracts regarding payroll deduction.

*(3)    SB 256 Contains Discriminatory Disclosure and Decertification Rules*

34.    Prior to the enactment of SB 256, PERA provided that a certified bargaining representative continues in that role until and unless bargaining unit employees raise a question as to the representative's majority support and a majority of unit members then vote in a PERC-conducted election to decertify the

representative.  Fla. Stat. §§ 447.307, 447.308 (2022).  For unions representing K-12 teachers in public schools, a 2018 amendment to Chapter 1003 of the Education Code further required that the union include in its annual registration statement the number of employees in the unit and the number of those employees who are dues-paying members of the union; if a K-12 educator union's annual registration statement showed that less than 50% of unit employees were dues-paying members, that union was required to petition PERC for recertification as a bargaining agent.  Fla. Stat. § 1012.2315(4)(c) (2022).

35.    Section 4 of SB 256 amends PERA's provisions relating to public employee unions' obligations to file annual registration statements with PERC, Fla. Stat. § 447.305(2), to require every disfavored union, as of October 1, 2023, to provide, in its annual registration statements, audited financial statements as well as data, verified by an independent certified public accountant, showing the number of employees in the bargaining unit and the number of unit employees who are and are not paying dues.  Section 4 provides that if such a report shows that fewer than 60% of the unit employees are dues-paying members of the disfavored union, that union must petition PERC for recertification in order to continue in its role as collective bargaining representative.  A disfavored union's failure to comply with these provision subjects it to immediate decertification.  Section 4 expressly exempts Governor DeSantis's politically allied favored unions from

these onerous requirements and sanctions—including the 60% threshold—while imposing them on his political adversaries, the disfavored unions.

**B.     Effects of the Challenged Provisions of SB 256**

36.     Unless enjoined by this Court, the challenged provisions of the Act will have significant adverse effects on Plaintiffs as of the legislation's July 1 and October 1, 2023, effective dates and will cause them to suffer irreparable injuries, to wit:

37.     The inclusion of a state-mandated 91-word "right-to-work" message, as well as an accounting of all disbursements to the five most highly compensated union officers and employees on the disfavored unions' membership applications will burden the speech and association rights of the Plaintiffs and those who choose to become members of Plaintiffs.

38.     Plaintiffs, like other private associations, have the First Amendment right to recruit members using their own words and their own membership application forms.  And the Plaintiffs and their members have the right to refrain from endorsing an ideological slogan like the phrase "right-to-work" and the right not to communicate government-dictated inaccurate information in their private association membership forms, as communicating inaccurate information will force the Plaintiffs to engage in speech that attempts to dispel the inaccuracies.  In the face of those well-established rights, SB 256 will force the Plaintiffs to

20

communicate, and those choosing to become members to affirm, a government-prescribed form containing a prominent, inaccurate, government-drafted ideological statement with which the Plaintiffs do not agree.

39.     The Plaintiff unions, like other private associations, are free to extend only to members certain benefits including the right to vote and participate in union affairs, yet the government-mandated message that SB 256 requires disfavored unions to disseminate inaccurately informs prospective and new members that the Plaintiff unions in fact cannot discriminate "in any manner" against non-members.

40.     In addition, the government-mandated message compels the disfavored unions to disseminate the ideological statement that Florida is a "right-to-work" state to describe the state of the law in Florida.  The phrase "right-to-work" is not a statement of fact.  Rather, it is an ideological slogan of union opponents, which many who support unions find objectionable, as they understand the phrase to be a misleading euphemism that signals a desire to avoid paying one's fair share for the economic benefits produced by collective negotiation.  For the legislature to force the inclusion of the phrase onto a form designed to be endorsed only by those who, by definition, wish to become union members therefore goes well beyond the normal evils of compelled speech.  It adds an element of a government-sponsored taunt directed at those who hold views out of

21

favor with Governor DeSantis and his allies.  And it conditions a core exercise of the right to freedom of association—the right to join a voluntary advocacy organization—on the signing of an attestation that is offensive to the organization itself as well as many of its members.

41.    The requirement that disfavored unions—and only disfavored unions—must also include in their membership forms an accounting of all disbursements (including reimbursed business expenses) to the unions' five most highly compensated officers and employees further burdens disfavored unions' communications to prospective members with unnecessary and unjustifiable government-mandated speech that dilutes and distracts from the unions' own message.  Favored unions do not bear this burden.

42.    The discriminatory ban against disfavored unions' collection of voluntary membership dues by means of payroll deduction will cause the Plaintiffs to incur significant costs while diminishing their membership dues revenue.  For all the Plaintiffs, voluntary membership dues are the primary source of revenue on which the Plaintiffs support their operations.  Because of the transaction costs involved in the making and collecting of large numbers of small monthly dues payments, payroll deduction is the most effective and efficient method for public employees to pay, and for public employee unions to collect, membership dues—at a negligible cost to public employers, which, under pre-SB 256 PERA, any public

employer could recoup in bargaining.  Consequently, the ban against disfavored unions' collection of membership dues via employee-authorized payroll deductions will cause the Plaintiffs to incur significant, non-recoverable costs to implement and maintain alternative methods for collecting dues, such as by recurring electronic bank transfers, which require the payment of fees, and which are not comparable to payroll deduction in efficiency and effectiveness.  In addition, disfavored unions will lose dues revenue because many union members are unwilling to use bank-debit transactions to pay their dues owing to such concerns as the possibility of incurring charges for insufficient bank account funds, and sharing their private banking information, or because the members are unbanked and cannot pay automated dues absent payroll deduction.

43.    There is no adequate remedy at law for the impending loss of payroll deduction because the public employers with whom the Plaintiffs have contractual rights could raise SB 256's prohibition against payroll deduction for disfavored unions as a defense if the Plaintiffs brought damages claims for breach a contract.

44.    SB 256's classifications between disfavored unions and favored unions lack any rational, much less substantial, or compelling, connection to a legitimate state purpose; but they do precisely align with and advance the illegitimate purpose of punishing outspoken opponents of Governor DeSantis while rewarding the Governor's political allies.  While the Plaintiff public-

23

education-employee unions, who make up the lion's share of the disfavored class, have vigorously opposed major initiatives championed by Governor DeSantis, unions representing law enforcement, corrections, and firefighter employees in the favored union class endorsed his candidacy in the 2018 and 2022 gubernatorial elections.

45.     The significant harms that the challenged provisions selectively impose on disfavored unions are closely aligned with the illegitimate purpose of silencing opponents of Governor DeSantis.  In his first announcement of the forthcoming legislation in December of 2022, Governor DeSantis acknowledged that the point of the ban on payroll deduction of disfavored unions' membership dues was to reduce the revenue available for public education employee unions' advocacy.  Specifically, Governor DeSantis stated that the purpose of the ban was to prevent public education employees' union dues payments being "frittered away by interest groups who get involved in the school system."  Governor DeSantis also has complained that public education employees' voluntary union dues payments are used to assert "excessive influence," while lodging no such complaints about the use of dues revenue by his union supporters.

46.     The discriminatory requirement that disfavored unions must annually disclose audited financial statements and certified-accountant-verified data showing the percentage of bargaining unit members who are dues-paying union

members will cause disfavored unions to incur substantial administrative burdens and financial costs of compliance.  The further requirement that a disfavored union must undergo a decertification election if its annual registration statement shows that fewer than 60% of the unit employees are dues paying members will require disfavored unions to incur further costs to conduct election campaigns and to pay half of the costs of decertification elections.  The consequence of a union's failure to satisfy Section 4's new requirements is decertification of the union.  And decertification of the union means that the CBA itself becomes unenforceable before the expiration of its agreed-upon term, causing the union and the employee-beneficiaries of the contract to lose the benefit of their bargain.  Because Plaintiffs ACEA and UFF, in their capacities as certified bargaining agents for educators employed by Alachua Public Schools and the University of Florida, respectively, are parties to CBAs with those public employers that will be in force when Section 4's requirements take effect, those new requirements impose new and costly conditions precedent on ACEA's and UFF's ability to preserve their CBAs for their stated, agreed-upon duration.

47.     By adding new and costly conditions precedent to the enforceability of existing CBAs during their unexpired terms, Section 4's discriminatory disclosure and decertification rules substantially impair those CBAs, and that

impairment is not reasonable and necessary to serve any important, or even legitimate, public purpose.

48.     Section 4's onerous new requirement that disfavored unions undergo decertification elections if their annual registration statements show that fewer than 60% of their bargaining units' employees are dues-paying members is irrational. To begin with, Section 4 requires even a unit with a clear majority of actual dues-paying members to undergo a decertification election.  But the irrationality is deeper than that, for the fact is that the percentage of employees in a unit who are dues-paying union members is not a valid basis for judging the level of union support in a unit.  Indeed, the percentage of unit members who are union members, if anything, *undercounts* support for the union as a bargaining agent.  That is because employees in a represented unit who are not union members derive the same benefits from the union's collective bargaining and other advocacy as dues-paying members do.  This makes it easy for many employees to choose not to be members even though they wish to be represented by the union—*e.g.*, because they prefer not to pay union dues at all, because they have temporarily stopped paying dues to tend to an immediate financial emergency, or because they disagree with certain activities of the union but support its efforts to raise wages and benefits. Yet Section 4 irrationally requires disfavored unions to undergo decertification elections even in many instances where membership figures affirmatively suggest

26

increasing majority union support, as when membership has increased from 51% to 59%.  Meanwhile, unions allied with Governor DeSantis face no such super-majority requirement.

49.     Section 4's separate discriminatory requirement that disfavored unions must disclose audited financial statements in their annual registration statements, or else face the sanction of immediate decertification, likewise adds cumbersome and costly new conditions on the continuing enforceability of existing CBAs that are not reasonably related to any important or even legitimate government interest.  The administrative burdens and financial costs imposed by this new requirement will be particularly damaging to small local unions in rural areas that have limited revenues.

**COUNT ONE:**
**VIOLATION OF THE FIRST AMENDMENT**
**(SECTION 1 OF SB 256)**

50.     Plaintiffs incorporate all paragraphs above by reference as if fully set forth herein.

51.     Section 1 of SB 256, by compelling disfavored unions to convey a prominent, government-drafted, 91-word "right-to-work" affirmation in the membership authorization forms that they present to prospective members, and compelling those public employees who desire to become members of disfavored unions to sign that affirmation, violates the rights to freedom of speech and

freedom of association protected by the First Amendment of the United States Constitution, as incorporated by the Fourteenth Amendment to the U.S. Constitution.

52.     Section 1 of SB 256, by compelling disfavored unions to report the disbursements to the five highest-paid officers and employees of each union in the membership authorization forms that the unions present to prospective members, and compelling those public employees who desire to become members of disfavored unions to sign authorization forms that include such accounting, violates the rights to freedom of speech and freedom of association protected by the First Amendment of the United States Constitution, as incorporated by the Fourteenth Amendment to the U.S. Constitution.

53.     Section 1 of SB 256, by commandeering disfavored unions' membership applications with a mandate that PERC prescribe the entire form and content of those membership applications, violates the rights to freedom of speech and freedom of association protected by the First Amendment of the United States Constitution, as incorporated by the Fourteenth Amendment to the U.S. Constitution.

54.     These requirements fail to advance any substantial or compelling government interest, are not narrowly tailored, or reasonably related to any such interest, and substantially burden Plaintiffs' First Amendment rights.

55.     Plaintiffs will suffer certainly impending, continuing, irreparable harm as a result of this constitutional violation.

**COUNT TWO:**
**VIOLATION OF THE FOURTEENTH AMENDMENT**
**(SECTION 1 OF SB 256)**

56.     Plaintiffs incorporate all paragraphs above by reference as if fully set forth herein.

57.     Section 1 of SB 256, by compelling disfavored unions to convey a prominent, government-drafted, 91-word "right-to-work" affirmation in the membership authorization forms that they present to prospective members, and compelling those public employees who desire to become members of disfavored unions to sign that affirmation, while imposing no such requirements on favored unions and those public employees who wish to become members of them, violates the guarantee of equal protection of the laws provided by the Fourteenth Amendment of the United States Constitution.

58.     Section 1 of SB 256, by compelling disfavored unions to report the disbursements to the five highest-paid officers and employees of each union in the membership authorization forms that the unions present to prospective members, and compelling those public employees who desire to become members of disfavored unions to sign authorization forms that include such accounting, while imposing no such requirements on favored unions and those public employees who

wish to become members of them, violates the guarantee of equal protection of the laws provided by the Fourteenth Amendment of the United States Constitution.

59.     Section 1 of SB 256, by commandeering disfavored unions' membership applications with a mandate that PERC prescribe the entire form and content of those membership applications, while leaving favored unions free to use their own words in their membership applications, violates the guarantee of equal protection of the laws provided by the Fourteenth Amendment of the United States Constitution.

60.     These provisions infringe on disfavored unions' fundamental First Amendment rights to freedom of speech and freedom of association while imposing no comparable burden on favored unions.

61.     These provisions' differentiation between favored and disfavored unions does not advance any substantial or compelling government interest and is not narrowly tailored or reasonably related to any such interest.

62.     Plaintiffs will suffer certainly impending, continuing, irreparable harm as a result of this constitutional violation.

**COUNT THREE: VIOLATION OF ARTICLE I, SECTION 10 OF THE UNITED STATES CONSTITUTION (SECTION 3 OF SB 256)**

63.     Plaintiffs incorporate all paragraphs above by reference as if fully set forth herein.

64.     Plaintiffs UFF and ACEA have valid, binding, active contracts with the University of Florida and Alachua County Public Schools, respectively, under which Plaintiffs UFF and ACEA bargained for and secured the employers' agreement to collect voluntary membership dues via payroll deduction.

65.     By prohibiting disfavored unions from collecting voluntary membership dues via payroll deduction, Section 3 of SB 256 substantially impairs the contractual rights of Plaintiffs UFF and ACEA in violation of Article I, Section 10, Clause 1 of the United States Constitution.

66.     The imposed impairment is not reasonable and necessary to advancing an important public purpose.

67.     Plaintiffs will suffer certainly impending, continuing, irreparable harm as a result of this constitutional violation.

## COUNT FOUR:
## VIOLATION OF THE FIRST AMENDMENT
## (SECTION 3 OF SB 256)

68.     Plaintiffs incorporate all paragraphs above by reference as if fully set forth herein.

69.     By prohibiting disfavored unions from funding their advocacy by means of payroll deductions administered by public employers, while granting favored unions the right to fund their advocacy by means of such deductions, Section 3 of SB 256's payroll deduction ban distinguishes among different

speakers with different viewpoints, facilitating speech by some but not other speakers, as a means of curtailing, or diluting the relative reach of the advocacy of the viewpoints of the disfavored unions, and thereby violates the right to freedom of speech protected by the First Amendment of the United States Constitution, as incorporated by the Fourteenth Amendment to the U.S. Constitution.

70.     These requirements fail to advance any substantial or compelling government interest, are not narrowly tailored or reasonably related to any such interest, and substantially burden the Plaintiffs' First Amendment rights.

71.     Plaintiffs will suffer certainly impending, continuing, irreparable harm as a result of this constitutional violation.

## COUNT FIVE:
## VIOLATION OF THE FOURTEENTH AMENDMENT
### (SECTION 3 OF SB 256)

72.     Plaintiffs incorporate all paragraphs above by reference as if fully set forth herein.

73.     By prohibiting disfavored unions from collecting voluntary membership dues via payroll deduction, while allowing favored unions to continue collecting membership dues via payroll deduction, Section 3 of SB 256 violates the guarantee of equal protection of the laws provided by the Fourteenth Amendment of the United States Constitution.

74.     The provision infringes on disfavored unions' First Amendment and contractual rights while imposing no comparable burden on favored unions.

75.     The provision's differentiation between favored and disfavored unions does not advance any substantial or compelling government interest and is not narrowly tailored or reasonably related to any such interest.

76.     Plaintiffs will suffer certainly impending, continuing, irreparable harm as a result of this constitutional violation.

## COUNT SIX
## VIOLATION OF ARTICLE I, SECTION 10 OF THE UNITED STATES CONSTITUTION
## (SECTION 4 OF SB 256)

77.     Plaintiffs incorporate all paragraphs above by reference as if fully set forth herein.

78.     Plaintiffs UFF and ACEA have valid, binding, active contracts with the University of Florida and Alachua County Public Schools containing numerous provisions that establish the wages, benefits, and other valuable terms and conditions of employment for the employees represented by the respective unions. UFF's CBA runs through June 30, 2024, and ACEA's runs through July 31, 2024.

79.     Section 4 subjects disfavored unions, including UFF-UF and ACEA, to immediate decertification if they fail to comply with any of the following new obligations: annually disclosing audited financial statements; annually disclosing accountant-certified figures showing the number of bargaining unit employees who

are and are not dues-paying union members; and undergoing an election to determine whether the union can continue to serve in its role as collective bargaining representative if its disclosures show that fewer than 60% of the employees it represents are dues-paying members of the union.  Immediate decertification means that the CBAs setting out the rights of the bargaining unit employees become unenforceable.

80.     By conditioning the continuing enforceability of disfavored unions' CBAs on compliance with new and onerous conditions, Section 4 of SB 256 substantially impairs the contractual rights of Plaintiffs UFF and ACEA in violation of Article I, Section 10, Clause 1 of the United States Constitution.

81.     The imposed impairment is not reasonable and necessary to advancing an important public purpose.

82.     Plaintiffs will suffer certainly impending, continuing, irreparable harm as a result of this constitutional violation as Section 4's October 1, 2023, effective date approaches.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs pray for the following relief:

(a)     A declaratory judgment that:

     i.     Section 1 violates the Plaintiffs' rights to freedom of speech and association under the First Amendment and to equal

        protection of the laws under the Fourteenth Amendment of the United States Constitution;

ii.      Section 3 impairs the contractual rights of Plaintiffs UFF and ACEA in violation of Article I, Section 10, Clause 1 of the United States Constitution and also violate the Plaintiffs' rights to freedom of speech under the First Amendment and to equal protection of the laws under the Fourteenth Amendment of the United States Constitution; and

iii.     Section 4 impairs the contractual rights of the Plaintiffs UFF and ACEA in violation of Article I, Section 10, Clause 1 of the United States Constitution.

(b)     preliminary and permanent orders enjoining defendants, their successors, and all those acting in concert with them or at their direction from implementing or enforcing the provisions of SB 256 described in ¶¶ 28-35;

(c)     an award of attorneys' fees and costs to the Plaintiffs, pursuant to 42 U.S.C. § 1988(b);

(d)     such other and further relief as the court may find appropriate.

Respectfully submitted,

_____
MARTIN F. POWELL
On Behalf Of:

LEON O. DAYAN*
ldayan@bredhoff.com
ADAM BELLOTTI*
abellotti@bredhoff.com
KARA A. NASEEF*
knaseef@bredhoff.com
Bredhoff & Kaiser, P.L.L.C.
805 15th Street, N.W.
Suite 1000
Washington, D.C.  20005
(202) 842-2600

MARTIN F. POWELL
mpowell@meyerblohmlaw.com
Florida Bar No. 70317
Meyer, Blohm and Powell, P.A.
403 East Park Avenue
Post Office Box 1547 (32302)
Tallahassee, Florida 32301
(850) 878-5212

KIMBERLY C. MENCHION
kimberly.menchion@floridaea.org
Florida Bar No. 425613
Florida Education Association
213 South Adams Street
Tallahassee, Florida 32301
(850) 224-7818

* Admission *pro hac vice* forthcoming

ALICE M. O'BRIEN*
aobrien@nea.org
PHILIP A. HOSTAK*
phostak@nea.org
National Education Association
1201 16th Street N.W.
Washington, D.C. 20036
(202) 822-7035

MARK H. RICHARD*
mrichard@phillipsrichard.com
Florida Bar No. 305979
Phillips, Richard & Rind, P.A.
9360 S.W. 72nd Street, Suite 283
Miami, Florida 33173
(305) 412-8322

DANIEL J. MCNEIL*
dmcneil@aft.org
American Federation of Teachers
555 New Jersey Avenue, N.W.
Washington, D.C. 20001
(202) 879-4400

FAITH E. GAY*
fgay@selendygay.com
MAX SIEGEL*
msiegel@selendygay.com
Selendy Gay Elsberg PLLC
1290 Avenue of the Americas
New York, New York 10104
(212) 390-3000

*Counsel for Plaintiffs*