## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## GAINESVILLE DIVISION

| | |
|---|---|
| ALACHUA COUNTY EDUCA-<br>TION ASSOCIATION,<br>UNITED FACULTY OF FLOR-<br>IDA–UNIVERSITY OF FLORIDA,<br>UNITED FACULTY OF FLOR-<br>IDA, and<br>FLORIDA EDUCATION ASSOCI-<br>ATION,<br><br>     *Plaintiffs*,<br><br>     v.<br><br>DONALD J. RUBOTTOM, in his<br>official capacity as chair of the<br>Florida Public Employees Rela-<br>tions Commission,<br>JEFF AARON, in his official ca-<br>pacity as commissioner of the Flor-<br>ida Public Employees Relations<br>Commission, and<br>MICHAEL SASSO, in his official<br>capacity as commissioner of the<br>Florida Public Employees Rela-<br>tions Commission,<br><br>     *Defendants*. | Case 1:23-cv-00111-MW-HTC |

## DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................1

BACKGROUND ...................................................................................3

    A.  Florida's History of Regulating Public Employment and
        SB256 ........................................................................................3

    B.  The Unions' Lawsuit..................................................................9

ARGUMENT .......................................................................................10

I.  Defendants do not contest Plaintiffs' standing. ...............................10

II. Plaintiffs' challenge to Section 1 is unlikely to succeed. .................12

    A.  Section 1 does not violate the First Amendment because it
        involves only government speech.............................................12

    B.  Even if the form is not government speech, its language is
        reasonably related to the State's interest in promoting
        transparency. ...........................................................................20

III. Plaintiffs' challenges to Section 3 are unlikely to succeed. ............26

    A.  Section 3 does not violate the Contracts Clause......................26

        1. Plaintiffs have no cause of action under §1983....................26

        2. Section 3 does not substantially impair existing contract
           rights. ...................................................................................29

        3. Section 3 is justified by a significant and legitimate
           purpose.................................................................................39

    B. Section 3 does not violate the First Amendment......................42

        1. Section 3 regulates non-expressive conduct. ........................42

        2. Section 3 is at most a government subsidy that does not
           implicate the First Amendment.............................................43

        3. Section 3 easily passes rational-basis review. ......................48

IV. The equitable factors do not support preliminary relief. ...............50

    A.  Plaintiffs face no irreparable harm. ........................................50

    B.  The equities weigh against preliminary relief. ........................54

CONCLUSION....................................................................................54

# TABLE OF AUTHORITIES

**Cases**

*Abramson v. Gonzalez,*
  949 F.2d 1567 (11th Cir. 1992)........................................................17, 21

*Aitken v. Commc'ns Workers of Am.,*
  496 F. Supp. 2d 653 (E.D. Va. 2007) ....................................................22

*Alarm Detection Sys., Inc. v. Vill. of Schaumburg,*
  930 F.3d 812, (7th Cir. 2019)................................................................28

*Allied Structural Steel Co. v. Spannaus,*
  438 U.S. 234 (1978).........................................................29, 35, 38, 39

*Am. C.L. Union of Fla., Inc. v. Miami-Dade Cty. Sch. Bd.,*
  557 F.3d 1177 (11th Cir. 2009).............................................................50

*Anderson Fed'n of Teachers v. Rokita,* --- F. Supp. 3d ---,
  2023 WL 2712267 (S.D. Ind. 2023) ......................................................18

*Anderson Fed'n of Teachers v. Rokita,*
  546 F. Supp. 3d 733 (S.D. Ind. 2021) ...................................................33

*APT Tampa/Orlando, Inc. v. Orange Cty.,*
  1997 WL 33320573 (M.D. Fla. 1997) ...........................................26, 28

*B.W.C. v. Williams,*
  990 F.3d 614 (8th Cir. 2021).........................................................19, 20

*Bailey v. Callaghan,*
  715 F.3d 956 (6th Cir. 2013).........................................................passim

*Bd. of Trustees v. Fox,*
  492 U.S. 469 (1989)................................................................................22

*Broward Cty. Police Benevolent Ass'n, Inc. v. School Bd. of Broward
  Cty.,* 32 FPER ¶11, 2006 WL 6824956 (2006) ........................................9

*Buffalo Teachers Fed'n v. Tobe,*
  464 F.3d 362 (2d Cir. 2006) ..................................................................40

*Carter v. Greenhow,*
  114 U.S. 317 (1885)..........................................................26, 27, 28

*Cent. State Univ. v. Am. Ass'n of Univ. Professors,*
  526 U.S. 124 (1999)................................................................................49

*Centro Tepeyac v. Montgomery Cty.*,
  722 F.3d 184 (4th Cir. 2013)................................................................21

*Chrysler Corp. v. Kolosso Auto Sales, Inc.*,
  148 F.3d 892 (7th Cir. 1998)..............................................................37

*Citizens for Police Accountability Pol. Comm. v. Browning*,
  572 F.3d 1213 (11th Cir. 2009)..........................................................10

*Com. Union Assur. Co. v. Preston*,
  115 Tex. 351 (1926)............................................................................15

*Crosby v. City of Gastonia*,
  635 F.3d 634 (4th Cir. 2011)..............................................................28

*CTIA – The Wireless Ass'n v. City of Berkeley*,
  928 F.3d 832, 845 (9th 2019).............................................................25

*DeBartolo Corp. v. Florida Gulf Coast Bldg. & Const. Trades Council*,
  485 U.S. 568 (1988)............................................................................22

*Dennis Melancon, Inc. v. City of New Orleans*,
  703 F.3d 262 (5th Cir. 2012)..............................................................28

*Disc. Tobacco City & Lottery, Inc. v. United States*,
  674 F.3d 509 (6th Cir. 2012)..............................................................21

*Fac. Senate of Fla. Int'l Univ. v. Winn*,
  477 F. Supp. 2d 1198 (S.D. Fla. 2007) .........................................51, 52

*FCC v. Beach Commc'ns, Inc.*,
  508 U.S. 307 (1993).................................................................41, 49, 50

*Flanigan's Enterp. Inc. v. Fulton Cty.*,
  242 F.3d 976 (11th Cir. 2001)............................................................39

*Fraternal Ord. of Police v. D.C.*,
  45 F.4th 954 (D.C. Cir. 2022) ..............................................34, 35, 41

*Gill v. Whitford*,
  138 S. Ct. 1916 (2018)........................................................................12

*Gundy v. City of Jacksonville*,
  50 F. 4th 60 (11th Cir. 2022) ..................................................13, 14, 15

*Hand v. Scott*,
  888 F.3d 1206 (11th Cir. 2018)..........................................................54

*Home Bldg. & Loan Ass'n v. Blaisdell*,
   290 U.S. 398 (1934) ................................................................29

*Houlton Citizens' v. Town of Houlton*,
   175 F.3d 178 (1st Cir. 1999) ..................................................40

*In re Hubbard*,
   803 F.3d 1298 (11th Cir. 2015)..................................2, 43, 48

*Janus v. AFSCME*,
   138 S. Ct. 2448, (2018) ............................................................5

*Kaminski v. Coulter*,
   865 F.3d 339 (6th Cir. 2017)................................26, 28, 53

*KH Outdoor, LLC v. City of Trussville*,
   458 F.3d 1261 (11th Cir. 2006)........................................51, 53

*King v. Governor of N.J.*,
   767 F.3d 216 (3d Cir. 2014) ..................................................21

*Laborer's Int'l Union of N. Am., Loc. 860 v. Neff*,
   29 F.4th 325 (6th Cir. 2022) ..................................................26

*Leake v. Drinkard*,
   14 F.4th 1242 (11th Cir. 2021) ........................................13, 14

*Leathers v. Medlock*,
   499 U.S. 439 (1991)................................................................45

*Lifestar Ambulance Serv., Inc. v. United States*,
   365 F.3d 1293 (11th Cir. 2004)..............................................52

*Lovejoy Realty, LLC v. Clayton Cty.*,
   2009 WL 10699711 (N.D. Ga. 2009)......................................28

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992)................................................................11

*Maryland v. King*,
   567 U.S. 1301 (2012)..............................................................54

*Mech v. School Bd. of Palm Beach Cty.*,
   806 F.3d 1070 (11th Cir. 2015)........................................14, 15

*Metro. Life Ins. Co. v. Massachusetts*,
   471 U.S. 724 (1985)................................................................39

*Michigan State AFL-CIO v. Schuette,*
  847 F.3d 800 (6th Cir. 2017)..............................................................32, 34

*Milavetz, Gallop & Milavetz, P.A. v. United States,*
  559 U.S. 229 (2010).........................................................................20, 21

*Nat'l Head Start Ass'n v. Dep't of Health & Hum. Servs.,*
  297 F. Supp. 2d 242 (D.D.C. 2004).........................................................54

*NetChoice, LLC v. Att'y Gen., Fla.,*
  34 F.4th 1196 (11th Cir. 2022) ......................................................passim

*New Jersey Retail Merchants Ass'n v. Sidamon-Eristoff,*
  669 F.3d 374 (3d Cir. 2012) ...................................................................53

*NextEra Energy Cap. Holdings, Inc. v. Lake,*
  48 F.4th 306 (5th Cir. 2022) ............................................................34, 36

*NIFLA v. Becerra,*
  138 S. Ct. 2361 (2018).............................................................................25

*Northwest Florida Police Benevolent Ass'n v. City of Panama City,*
  2 FPER 8 (1976) ........................................................................................8

*Norwegian Cruise Line Holdings Ltd. v. State Surgeon Gen., Fla. Dep't
  of Health*, 50 F.4th 1126 (11th Cir. 2022)........................................42, 43

*Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n,*
  460 U.S. 37 (1983)...................................................................................44

*Pleasant Grove City v. Summum,*
  555 U.S. 460 (2009).........................................................................12, 13

*Poirier v. Hodges,*
  445 F. Supp. 838 (M.D. Fla. 1978) .........................................................26

*Recht v. Morrisey*, 32 F.4th 398 (4th Cir. 2022) .....................................25

*Regan v. Taxation With Representation of Washington,*
  461 U.S. 540 (1983)......................................................................44, 45, 47

*Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.,*
  487 U.S. 781 (1988).........................................................................17, 22

*Rumsfeld v. Forum for Academic and Institutional Rights, Inc.,*
  547 U.S. 47 (2006)...................................................................................12

*S. Cal. Gas Co. v. City of Santa Ana*,
   336 F.3d 885 (9th Cir. 2003) ................................................. 28

*S&M Brands, Inc. v. Georgia ex rel. Carr*,
   925 F.3d 1198 (11th Cir. 2019) ............................................ 35

*Safelite Group v. Jepsen*,
   764 F.3d 258 (2d Cir. 2014) ................................................. 21

*Sapuppo v. Allstate Floridian Ins. Co.*,
   739 F.3d 678 (11th Cir. 2014) ............................................. 17

*Siegel v. LePore*,
   234 F.3d 1163 (11th Cir. 2000) ........................................... 51

*South Carolina Educ. Ass'n v. Campbell*,
   883 F.2d 1251 (4th Cir. 1989) ............................................ 43

*Support Working Animals, Inc. v. DeSantis*,
   457 F. Supp. 3d 1193 (N.D. Fla. 2020) ................................. 34

*Sveen v. Melin*,
   138 S. Ct. 1815 (2018) ................................................. passim

*Swain v. Junior*,
   958 F.3d 1081 (11th Cir. 2020) ........................................... 54

*UAW-Lab. Emp. & Training Corp. v. Chao*,
   325 F.3d 360 (D.C. Cir. 2003) ............................................ 23

*United Auto., Aerospace, Agr. Implement Workers of Am. Int'l Union v. Fortuno*, 633 F.3d 37 (1st Cir. 2011) ................................... 39

*United States v. O'Brien*,
   391 U.S. 367 (1968) ........................................................ 48

*Walker v. Tex. Div., Sons of the Confederate Veterans, Inc.*,
   576 U.S. 200 (2015) ........................................................ 13

*Watters v. Bd. of Sch. Dirs. of City of Scranton*,
   975 F.3d 406 (3d Cir. 2020) ........................................ 28, 40

*Williamson v. Lee Optical*,
   348 U.S. 483 (1955) .................................................. 41, 50

*Wisconsin Educ. Ass'n Council v. Walker*,
   705 F.3d 640 (7th Cir. 2013) ......................................... passim

*Worley v. Roberts,*
  749 F. Supp. 2d 1321 (N.D. Fla. 2010)................................................51

*Ysursa v. Pocatello Educ. Ass'n,*
  555 U.S. 353 (2009)...........................................42, 43, 44, 48

*Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio,*
  471 U.S. 626 (1985)..................................................................23

**Statutes**

42 U.S.C. §1983 ...............................................................26, 28

Fl. Stat. §447.501 ................................................................11

Fl. Stat. §447.503 ................................................................11

Fla. Stat §447.201 .................................................................3

Fla. Stat. §§447.201-.609 .....................................................3

Fla. Stat. §110.227 ...............................................................8

Fla. Stat. §111.065 ...............................................................7

Fla. Stat. §112.044 ...............................................................7

Fla. Stat. §112.532 ...............................................................7

Fla. Stat. §112.82 .................................................................7

Fla. Stat. §121.0515 .............................................................8

Fla. Stat. §447.01 ...............................................................24

Fla. Stat. §447.17 ..........................................................23, 24

Fla. Stat. §447.207 ...............................................................3

Fla. Stat. §447.303 ................................................4, 31, 35, 46

Fla. Stat. §447.305 ...............................................................6

Fla. Stat. §447.3075 .............................................................8

Fla. Stat. §447.507 ..........................................................4, 35

**Other**

Floor Statement, Committee on Governmental Oversight and
  Accountability (March 7, 2023) ............................................9

Floor Statement, Constitutional Rights, House Rule of Law and Government Operations Committee (March 16, 2023) ..........................7

Floor Statement, House State Affairs Committee (April 11, 2023) .....6, 9

Notification of Employee Rights Under Federal Labor Laws, Executive Order 13496 (Jan. 30, 2009) ................................................22

Public Employees Relations Commission, PERC Forms .......................16

**Constitutional Provisions**

Fla. Const. Art. I, §6........................................................................3, 23, 24

## INTRODUCTION

There are roughly a million public employees in Florida. Like any good employer, Florida is obliged to care for its workforce, including its employees' health, safety, and financial well-being. In 2022, for example, Florida's legislature passed a budget that gave law enforcement officers a substantial pay raise. This year, the Legislature turned its attention to teachers and appropriated $1 billion to raise their salaries. That effort continued for almost all public-sector employees with Senate Bill 256, which became law on May 9, 2023. The law is the latest in Florida's long history of regulating the terms of public employment in the State.

SB256 makes modest changes to the code. Its purpose is to ensure that public employees are aware of their rights to join (or not join) their unions and their rights to pay (or not pay) dues to those unions. It also ensures that public employees have some understanding of how their unions use those dues. Public employees are often not aware of these issues. Indeed, because unions use the government's payroll to draw their dues automatically from public employees' paychecks, employees often are not even aware of how much they pay in dues every year. SB256 seeks to fix that problem too by removing the government's payroll apparatus from

the equation. Now, union members will pay their dues just as they pay for any other service or membership using one of the many payment options available for that purpose.

Plaintiffs want to recast the law as punishing "disfavored unions" and rewarding "favored unions" for political purposes. They rely on a subset of political donations by a subset of unions to make that case. But their own evidence belies that narrative. It shows that unions subject to this law made substantial donations to Republicans. Yet it would make no difference anyway if Plaintiffs' donation-based distinctions were accurate. SB256 is facially neutral. And the Eleventh Circuit has "held … many times" that "when a statute is facially constitutional, a plaintiff cannot bring a free-speech challenge claiming that the lawmakers who passed it acted with a constitutionally impermissible purpose." *In re Hubbard*, 803 F.3d 1298, 1313 (11th Cir. 2015). For this reason and those outlined below, the Court should deny Plaintiffs' motion for preliminary injunction.

# BACKGROUND

## A. Florida's History of Regulating Public Employment and SB256

Florida has long regulated the terms and conditions of union representation. Article 1, Section 6 of the Florida Constitution—first adopted in 1944—provides that "[t]he right of persons to work shall not be denied or abridged on account of membership or non-membership in any labor union or labor organization." *Id.* In 1974, the Legislature enacted chapter 447 to implement this constitutional provision for public employees. Public Employees Relations Act, 1974 Fla. Laws 134 (codified at Fla. Stat. §§447.201-.609). The purpose of that chapter is "to promote harmonious and cooperative relationships between government and its employees, both collectively and individually; and to protect the public by assuring, at all times, the orderly and uninterrupted operations and functions of government." Fla. Stat §447.201. The law also established the Public Employees Relations Commission (PERC), which is responsible for resolving disputes between public employees, public employers, and unions. Fla. Stat §§447.201(3),447.207.

Florida has allowed unions "to have [their] dues and uniform assessments deducted and collected by the employer from the salaries of

those employees who authorize the deduction." Fla. Stat. §447.303. But "such authorization[s]" were always "revocable at the employee's request upon 30 days' written notice to the employer and employee organization." Fla. Stat. §447.303. They were also revocable if PERC determined that the union engaged in an illegal strike. Fla. Stat. §447.507(6)(a)(3).

Despite these provisions, public employees are often in the dark about their rights, the nature of their relationship with the unions, and the unions' use of their dues. A recent survey of teachers, for example, found that most of them didn't know they could refuse to pay dues if they do not join the union. Ex. A, at 4. That study also found that 83% of teaches do not fully understand their rights with respect to union membership. *Id.* at 11; *see also* Calloway Decl. ¶¶5-6 ("It is very common for teachers not to know they have the right to refuse to join the union and the right to refuse to pay union dues."). This aligns with other reporting that shows many public employees do not know they have the right to refuse joining the union. *See, e.g.*, Exs. B, C.

Many of Florida's public employees also don't realize that they have authorized their unions to deduct dues from their paychecks. Calloway Decl. ¶8. And because the dues are automatically deducted, that leads to

many public employees being ignorant of the total amounts they pay the union. *Id.*

It is no surprise, then, that union members are also in the dark on how their unions use those dues. Another recent survey of public-school teachers revealed that 43% of union members had not even consulted their union contract in the previous year. *See* Ex. D, at 112. Half of the union members only "somewhat" understood the contracts' provisions. *Id.* at 114. And another 19% responded they understood the contracts' provisions "not very much" or "not at all." *Id.*; *see also Janus v. AFSCME*, 138 S. Ct. 2448, 2484 (2018) (explaining that it "would be a laborious and difficult task to check" the unions' disclosed expenditures); Calloway Decl. ¶9 ("In my experience, teachers often have little insight in how their unions spend their dues.").

SB256 was enacted on May 9, 2023, to fix these and other problems. Sections 1 and 3 of the law are at issue here. Section 1 requires public employees to sign a government-specified form if they join or continue to be a member of a union. *See* SB256 §1(b)(1). That form includes a 91-word statement that recounts the key provisions of the Florida Constitution and labor code:

> The State of Florida is a right-to-work state. Membership or
> non-membership in a labor union is not required as a condi-
> tion of employment, and union membership and payment of
> union dues and assessments are voluntary. Each person has
> the right to join and pay dues to a labor union or to refrain
> from joining and paying dues to a labor union. No employee
> may be discriminated against in any manner for joining and
> financially supporting a labor union or for refusing to join or
> financially support a labor union.

*Id.* §1(b)(3). This notice is intended to educate public employees of their

rights under Florida law. *See e.g.*, Floor Statement, House State Affairs

Committee 1:12:30 (April 11, 2023) ("Under this bill, we ensure that em-

ployees are made aware of their rights through the filling out of a form."),

https://tinyurl.com/3epszrf2.

The form also discloses the salary of the five highest-paid officers

or employees of the union. SB256 §1(b)(2). That is factual information

unions must already publicly report. *See* Fla. Stat. §447.305(2)(c). And

Section 3 prohibits unions from using the government's payroll appa-

ratus to collect employee dues directly from public employees' paychecks.

SB256 §3(1). These provisions will ensure that public employees are fully

aware of the dues amounts that they pay and provide some transparency

on how those dues are used. *See* Floor Statement, Constitutional Rights,

Rule of Law and Government Operations Committee 8:45 (March 16,

6

2023) (explaining that "this is a very simple, very basic reform. It's about transparency and it's about accountability"), https://tinyurl.com/3ab8rexe.

These provisions apply to virtually all unions in Florida, including unions representing teachers, nurses, other healthcare workers, and municipal workers. There is an exemption, however, for "law enforcement officers, correctional officers," "correctional probation officers," and "firefighters." SB256 §§1(6), 3(2)(a). This exemption accords with longstanding Florida policy that distinguishes between different types of public employees. For example, police, corrections officers, and firefighters have special rights during misconduct investigations. *See* Fla. Stat. §§112.532, .82. Police and fire departments are also exempt from certain age discrimination laws. Fla. Stat. §112.044(2)(a). And state agencies may pay attorney's fees only for law enforcement officers, correctional officers, or probation officers if they are sued for on-duty conduct. Fla. Stat. §111.065.

This differing treatment has occurred in areas normally subject to collective bargaining. In 2007, for example, Florida passed House Bill 73, which provided that "any state law enforcement agency that has 1,200 or

more officers shall be in a bargaining unit that is separate from officers in other state law enforcement agencies." *See* HB73, 2007 Leg., (Fla. 2007) (codified as Fla. Stat. §447.3075). And in 2001, Florida passed Senate Bill 446 to give police, corrections officers, and firefighters, different rights relating to layoff and disciplinary procedure. *See* SB446, 2001 Leg., (Fla. 2001) (codified at Fla. Stat. §110.227(2), (3), (6)(c), (7)).

Both PERC and the Florida Legislature have explained why the state's labor laws treat first responders differently. Since 1976, PERC has emphasized the need for "harmonious collective bargaining," *i.e.*, preventing labor strife, because of the nature of their jobs protecting the public, and the "special and peculiar dangers" that police face on the job as reasons for treating them differently. *Northwest Florida Police Benevolent Ass'n v. City of Panama City*, 2 FPER 8, 9 (1976). Florida's legislature, in amending the State's retirement system to award first responders more retirement credit per year, recognized the "peculiar and special" risk to the community when police, corrections officers, and firefighters suffer diminishing physical or mental ability. Fla. Stat. §121.0515(1). This "policy has stood inviolate for almost three decades whether the employer is a municipality, a county, a school board, or the state." *Broward*

*Cty. Police Benevolent Ass'n, Inc. v. School Bd. of Broward Cty.*, 32 FPER ¶11, 2006 WL 6824956 (2006).

SB256's exemption of these unions is a continuation of this longstanding policy. *See, e.g.*, Floor Statement, House State Affairs Committee 1:07:53 (April 11, 2023) ("Although many jobs are hazardous, those who are engaged in the work of public safety are fundamentally qualitatively and legally treated differently in all manner of laws in the state of Florida. And so they are under this Bill."). The exemption also recognizes that these employees typically work long shifts that keep them away from a "one centralized location" where, unlike other public employees, they could readily meet with union representatives to pay their dues. *See, e.g.*, Floor Statement, Committee on Governmental Oversight and Accountability 48:03 (March 7, 2023), https://tinyurl.com/yvy7e7u5.

**B. The Unions' Lawsuit**

Four teachers' unions—the Alachua County Education Association (ACEA), United Faculty of Florida (UFF) along with its University of Florida chapter (UFF-UF), and the Florida Education Association (FEA)—sued PERC officials to enjoin enforcement of SB256, claiming that it violates the First and Fourteenth Amendments and the Contracts

9

Clause of the United States Constitution. ECF 13 ("Am. Compl."). They moved for a preliminary injunction to block Sections 1 and 3 before they take effect. ECF 15-1 ("Mot.").

## ARGUMENT

A preliminary injunction is an "extraordinary and drastic remedy," particularly one aimed at Florida's duly enacted laws. *Citizens for Police Accountability Pol. Comm. v. Browning,* 572 F.3d 1213, 1217, 1221 (11th Cir. 2009). To obtain an injunction, Plaintiffs must prove "(1) a substantial likelihood of success on the merits; (2) irreparable injury absent an injunction; (3) the injury outweighs whatever damage an injunction may cause the opposing party; and (4) an injunction is not adverse to the public interest." *Id.* at 1217. Plaintiffs fail at each step.

## I. Defendants do not contest Plaintiffs' standing.

The Court ordered the parties to address whether there are any penalties for failing to comply with SB256 and the Plaintiffs' standing. ECF 21. There are, and Defendants do not contest Plaintiffs' standing to challenge the law. PERC has the authority to address and enjoin unfair labor practices. Florida law provides that "[a] public employee organization or anyone acting in its behalf … are prohibited from: Interfering

10

with, restraining, or coercing public employees in the exercise of any rights guaranteed them." Fl. Stat. §447.501(2)(a). A union that fails to comply with SB256 would be subject to a charge for unfair labor practice that PERC can enforce, for example, via a "cease and desist" order. *Id.* §447.503(6)(a).

PERC is also in the process of issuing regulations to implement and enforce Sections 1 and 3 of SB256. *See* Exs. E & F. For example, SB256 provides that "an employee organization that has less than 60 percent of the employees eligible for representation in the bargaining unit pay dues … must petition the commission … for recertification as the exclusive representative of all employees in the bargaining unit." SB256 §3(6). PERC has proposed regulations that would prohibit a union from counting a public employee toward that 60% threshold if (1) the employee has not signed the form required in Section 1 or (2) the union collects its dues from the employee in violation of Section 3. *See* Ex. F (60CC-6.104, 60CC-6.201).

For these reasons, Defendants do not contest Plaintiffs' standing to challenge Sections 1 and 3 on behalf of themselves. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). But "standing is not dispensed in

gross: A plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018) (cleaned up). As a result, Plaintiffs do not have standing to obtain an injunction against SB256 on behalf of any other union.

## II. Plaintiffs' challenge to Section 1 is unlikely to succeed.

Plaintiffs bring a First Amendment challenge to Section 1's requirement that public employees sign the PERC-designed and distributed form. *See* SB256 §1(b)(1). The claim is not likely to succeed because the form contains only government speech and, even if it did compel any speech, it is reasonably related to the State's interest in ensuring public employees are fully aware of their rights.

### A.   Section 1 does not violate the First Amendment because it involves only government speech.

The content of a state-issued form is quintessential government speech that does not implicate the First Amendment. The "freedom of speech prohibits the government from telling people what they must say." *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 61 (2006). The First Amendment thus "restricts government regulation of private speech; it does not regulate government speech." *Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009). "A government entity

12

has the right to 'speak for itself,'" "'say what it wishes,'" and "to select the views that it wants to express." *Id.* at 467-68 (citations omitted). So, when the "government speaks, it is not barred by the Free Speech Clause from determining the content of what it says." *Walker v. Tex. Div., Sons of the Confederate Veterans, Inc.*, 576 U.S. 200, 207 (2015).

Government speech comes in many forms. For instance, license plate designs are government speech when the State issues the plates and maintains direct control over the messages conveyed by reviewing and approving proposed designs. *Id.* at 210-13. And park monuments are government speech where the government selects the nature and locations of monuments placed in the park. *Summum*, 555 U.S. at 472-473. Ultimately, there are three "factors—history, endorsement, and control—that courts in this Circuit must weigh when determining whether speech constitutes government speech." *Gundy v. City of Jacksonville*, 50 F. 4th 60, 76 (11th Cir. 2022). "These factors are neither individually nor jointly necessary for speech to constitute government speech." *Leake v. Drinkard*, 14 F.4th 1242, 1248 (11th Cir. 2021). "But a finding that *all* evidence government speech will almost always result in a finding that

the speech is that of the government." *Id.* The form that Section 1 requires is government speech under these factors.

Start first with control. On this factor, courts must ask "whether the relevant government unit 'maintains direct control over the messages conveyed' through the speech in question.'" *Id.* Here, Florida "control[s] the design, typeface, [and] color" of the form. *Mech v. School Bd. of Palm Beach Cty.*, 806 F.3d 1070, 1078 (11th Cir. 2015); *see* SB256 §1(b)1 (charging PERC with prescribing the form). Florida "also dicate[s] the information that the [form] can contain," *Mech*, 806 F.3d at 1078, as the Legislature wrote the 91-word statement and PERC is responsible for drafting the form. Though "no case precedent says that government must control every word or aspect of speech in order for the control factor to lean toward government speech," *Gundy*, 50 F.4th at 76-77 (cleaned up), Florida controls every relevant word on the form here.

Next is endorsement. On this factor, "courts must ask 'whether the kind of speech at issue is often closely identified in the public mind with the government.'" *Id.* at 76. Here, the "'governmental nature' of the [form] is clear from [its] face[]." *Mech*, 806 F.3d at 1076. "Like the word 'TEXAS' on the specialty license plates in *Walker*," the form "bears" the

government's name as it is clearly identified as a "PERC FORM" at the top. *Id.*; *see* Ex. E, at 1. And Florida's name is directly above the challenged 91-word notice identifying it as the speaker: "The State of Florida wants you to know the following:" *Id.* at 2. These attributes show the government is speaking, not a private individual or organization.

Last is history. This inquiry asks "whether the type of speech under scrutiny has traditionally 'communicated messages' on behalf of the government." *Gundy*, 50 F.4th at 76. Governments drafting forms that private parties must use is nothing new. *See, e.g.*, *Com. Union Assur. Co. v. Preston*, 115 Tex. 351, 356 (1926) (noting that an insurance policy must be "the standard form prescribed by the state insurance commission"). Yet even if that weren't the case, "a long historical pedigree is not a *prerequisite* for government speech." *Mech*, 806 F.3d at 1076. The Supreme Court itself has found "government speech without conducting any historical inquiry or citing any historical evidence." *Id.*

The form is thus government speech under the three-factor analysis. Plaintiffs' contrary contention that the form is "compelled speech" largely misunderstands how the form will operate. Mot. 10-14, 18. Section 1 does not "force[] the plaintiff unions to disseminate [the 91-word]

script." *Id.* at 10. In addition to being available on the Florida Department of State's website as part of the Florida Administrative Code, the form will be posted on PERC's website (along with PERC's other forms) for public employees to download and fill out themselves. *See* Public Employees Relations Commission, PERC Forms, https://perma.cc/JG9K-NRA8. The salary information for the form is already "publicly available" for public employees to do so, as Plaintiffs' themselves acknowledge. *See* Mot. 15-16. Of course, Plaintiffs may choose to fill out portions of the form for the employees and provide it to them; and the proposed implementing regulations allow for that. *See* Ex. E, at 2; *see also* Ex. F. But Section 1 does not require that the union "act as couriers" of the form and deliver it to the public employee. *See* Mot. 11 n.3. And Plaintiffs themselves acknowledge that "[w]hen the government delivers its message directly without forcing private parties to act as couriers, the 'government speech' doctrine may immunize the governmental action from First Amendment scrutiny." *Id.* That is what will happen here.

Nor is there any requirement that the form be "interject[ed] … directly into their communications aimed at persuading prospective members to join." Mot. 12. Unions are free to persuade prospective members

16

using their own forms, materials, and speech. Ex. G, at 1 ("An organization is free to use the form as part of its membership application but is not required to do so."). All Section 1 requires is that, after an employee decides to join, he or she fill out and sign the form. SB256 §1(b)(1). The form is not "inextricably intertwined" with any of the union's purported protected speech. *Abramson v. Gonzalez*, 949 F.2d 1567, 1575 (11th Cir. 1992) (quoting *Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781, 796 (1988)). The Plaintiffs' reliance on *Riley* is therefore misplaced. *See* Mot. 11-13.[1]

Two recent cases confirm that forms like Florida's are government speech. In *Anderson Fed'n of Teachers v. Rokita*, the State of Indiana required a form almost exactly like the one here. --- F. Supp. 3d ---, 2023

---

[1] Plaintiffs add a single sentence referencing "the freedom of association." Mot. 13. Such a fleeting reference constitutes forfeiture of the argument at this stage. *See, e.g.*, *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014). In any event, had Plaintiffs pursued a freedom of association argument, the argument fails. Section 1 does not "regulate … private-organization *memberships*." Mot. 13. Plaintiffs are still free to impose whatever qualifications they wish for membership, including using their own enrollment criteria and forms as prerequisites to joining the union. *See* Ex. G, at 1 ("Completion and delivery of the PERC Form does not guarantee membership, the organization is free to establish its own membership requirements."). A person who fails to fill out the form is not, by operation of this law, somehow kicked out of the union.

WL 2712267 (S.D. Ind. 2023). To authorize dues deductions from public employees' paychecks, Indiana required the employees to sign a form that notified them of their right not to join the union: "The State of Indiana wishes to make you aware that you have a First Amendment right … to refrain from joining and paying dues to a union." *Id.* at *6. The court rejected the unions' argument that requiring the form was compelled speech; the form conveyed the government's speech. "Here, the dues de-duction authorization form is a state form, created by state officials. The challenged advisement language required by [the law] was drafted and adopted by the Indiana General Assembly and written from the state's perspective." *Id.* at *10. Based on "these factors," the court explained, "we have little trouble concluding that the advisement as currently crafted is government speech." *Id.* So too here.

Nor did the *Anderson* form require anyone "to speak the govern-ment's message that they do not desire to adopt." *Id.* at *10. The prefatory statement—that "the State of Indiana wishes to make you aware"—made "clear that what follows is a message directed *to* the teachers that is crafted and spoken *by* the government, not a statement voiced or en-dorsed by the signee of the authorization form." *Id.* Florida's form (as

18

currently proposed) contains the same type of prefatory statement. *See* Ex. E, at 2.

The Eighth Circuit reached the same conclusion in the same circumstances. *See B.W.C. v. Williams*, 990 F.3d 614 (8th Cir. 2021). Missouri has a form for those who claim religious exemptions from mandatory immunizations for public school students. *Id.* at 617-18. That "Form 11" had "two parts: first, [the agency's] message to parents about the exemption; second, a parent's election of religious exemption." *Id.* The agency's message in the first part was explicit advocacy. It stated, among other things, that "'[w]e strongly encourage you to immunize your child, but ultimately the decision is yours.'" *Id.* The Eighth Circuit held that the form "does not require the plaintiffs to *affiliate* with [the agency]'s immunization statement." *Id.* at 619. Instead, "it is the government's message *to* parents considering Form 11." *Id.* (emphasis added). There was "'little risk' recipients would believe that the parents were compelled to 'mouth support for views they find objectionable,' or 'pledge allegiance' to a state-sponsored message.'" *Id.* at 619-20 (citations omitted).

The "Plaintiffs' position that Form 11 compels them to state the government's position does not match the structure or wording of the

form." *Id.* at 620. For example, there was a "bold line separating the [agency] message" that made clear the signatories were not adopting it. *Id.* This was true even though there was no prefatory statement identifying the state as the speaker like the one in *Rokita*. Here, Florida's form has the *Rokita* prefatory statement *and B.W.C.*'s separation; the 91-word message in PERC's proposed form is on a *separate* page from the signature. *See* Ex. E, at 2. Florida's form is government speech.

**B.    Even if the form is not government speech, its language is reasonably related to the State's interest in promoting transparency.**

Even if Section 1 implicated the First Amendment, the law allows for the truthful disclosure of factual information. "Laws that compel commercial disclosures … trigger relatively permissive First Amendment scrutiny." *NetChoice, LLC v. Att'y Gen., Fla.*, 34 F.4th 1196, 1223 (11th Cir. 2022), *petition for writ of certiorari pending*. While "restrictions on nonmisleading commercial speech regarding lawful activity must withstand intermediate scrutiny," when "the challenged provisions impose a disclosure requirement rather than an affirmative limitation on speech … the less exacting scrutiny described in *Zauderer* governs." *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 249 (2010).

Namely, such a compelled disclosure must be only "reasonably related to the State's interest in preventing deception of consumers." *Id.* at 250. The test is akin to "rational basis" review.[2] And "[a]lthough this standard is typically applied in the context of advertising and to the government's interest in preventing consumer deception," the Eleventh Circuit has explained it is "broad enough to cover [other] disclosure requirements." *NetChoice*, 34 F.4th at 1227.

Here again, the Supreme Court's decision in *Riley* and its higher standard is inapplicable because the form is not "inextricably intertwined with otherwise fully protected non-commercial speech." *Abramson*, 949 F.2d at 1575 (cleaned up); *see* Mot. 12-13. "Nothing in the [law] prevents the speaker from conveying, or the audience from hearing, [any] noncommercial messages, and nothing in the nature of things requires them to be combined with commercial messages." *Bd. of Trustees v. Fox*, 492 U.S.

---

[2] *See, e.g., Safelite Group v. Jepsen*, 764 F.3d 258, 259 (2d Cir. 2014) (characterizing *Zauderer* as "rational basis review"); *King v. Governor of N.J.*, 767 F.3d 216, 236 (3d Cir. 2014) (similar); *Centro Tepeyac v. Montgomery Cty.*, 722 F.3d 184, 189 (4th Cir. 2013) (similar); *Disc. Tobacco City & Lottery, Inc. v. United States*, 674 F.3d 509, 559 n.8 (6th Cir. 2012) (similar*)*.

469, 474 (1989). That was not true in *Riley*, where the law required the disclosure "before an appeal for funds."487 U.S. at 795.[3]

With *Zauderer* supplying the applicable standard, Florida's "interest here is ensuring that" public employees "are fully informed about" their rights. *NetChoice*, 34 F.4th at 1230. At this preliminary stage, that "interest is likely legitimate" at the very least. *Id.* Florida is hardly unique on this point. President Obama, for example, issued an Executive Order that compelled disclosure of employee rights to federal contractors. It provided that "[t]he attainment of industrial peace is most easily achieved and workers' productivity is enhanced when workers are well informed of their rights under Federal labor laws." Notification of Employee Rights Under Federal Labor Laws, Executive Order 13496 §1, (Jan. 30, 2009), https://tinyurl.com/3uvu39e3. President Bush issued a similar Executive Order, and it explained that "[w]hen workers are better

---

[3] Plaintiffs do not argue that the form is categorically non-commercial speech simply because unions are involved. Nor could they. *See De-Bartolo Corp. v. Florida Gulf Coast Bldg. & Const. Trades Council*, 485 U.S. 568, 576 (1988) (rejecting that proposition); *Aitken v. Commc'ns Workers of Am.*, 496 F. Supp. 2d 653, 664-65 (E.D. Va. 2007) (rejecting the argument "that union organization efforts are *per se* non-commercial speech."). They argue instead that the form is not viable commercial speech because it does not contain "purely factual and uncontroversial information." Mot. 13-14.

informed of their rights, including their rights under the Federal labor laws, their productivity is enhanced." *UAW-Lab. Emp. & Training Corp. v. Chao*, 325 F.3d 360, 366 (D.C. Cir. 2003). SB256 serves similarly legitimate goals.

The form's disclosures are also not "unduly burdensome." *NetChoice*, 34 F.4th at 1230. PERC has already drafted the form and the 91-word notice, and the salary information to be entered is already "publicly available." Mot. 15-16. There is nothing about the form that is "intrinsically burdensome." *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 653 n.15 (1985). Section 1's disclosures thus easily satisfy *Zauderer*'s standard.

Plaintiffs counter that the 91-word notice is "factually misleading" and thus not subject to the permissive *Zauderer* standard. *See* Mot. 14 (cleaned up). But the notice accurately explains Florida law: that public employees cannot be discriminated against because of their union membership (or lack thereof). That law is enshrined in Florida's Constitution, Fla. Const. Art. I, §6. And it is also enshrined in statute. *See* Fla. Stat. §447.17(1). Plaintiffs try to introduce ambiguity by claiming the notice "indicates that unions cannot discriminate in any respect against non-

members." Mot. 14. Yet that is exactly what the law says. It includes "labor union[s]" and "labor organization[s]" as entities that cannot "discriminate" against employees "on account of membership or non-membership in any labor union." *See* Fla. Stat. §447.17(1). The union pointing to its ability, for example, to "exclude them from … officer and committee elections" is a red herring. Mot. 14. A union's internal governance decisions are not the form of "discrimination" the law prohibits; it prohibits discrimination in "employment." Fla. Stat. §447.17(1).

Nor does Section 1 require "controversial" speech. On this point, Plaintiffs complain that the notice uses the phrase "Right to Work." *See* Mot. 14 & n.5. But that is not "an ideological slogan." Mot. 14, 29. It is the *title* of the relevant provision of Florida's Constitution—first enacted in 1944—that the 91-word notice explains. *See* Fla. Const. Art. I, §6 (titled "Right to work"). And the notice tracks the text of that constitutional provision. *See id.* ("The right of persons to work …."). The "right to work" is also a phrase that is used in the very first section of Florida's public-sector labor laws. *See* Fla. Stat. §447.01(1). A boilerplate statement repeating the law's very language is not "controversial." Were it otherwise, virtually every disclosure about what a law requires could be

attacked as "controversial" and therefore subject to heightened scrutiny. *Cf. CTIA–The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 845 (9th 2019) ("We do not read the Court as saying broadly that any purely factual statement that can be tied in some way to a controversial issue is, for that reason alone, controversial.").

Finally, Plaintiffs briefly argue that *Zauderer* requires Florida to "prove[]" that the disclosures will "remedy a harm that is … not purely hypothetical." Mot. 13 n.4. A defendant needs to show only that the harm is "*potentially real* not purely hypothetical." *NIFLA v. Becerra*, 138 S. Ct. 2361, 2377 (2018) (emphasis added). That standard is low, as it is "in keeping with the 'minimal' interest that [speakers] have in refraining from 'providing any particular factual information." *Recht v. Morrisey*, 32 F.4th 398, 418 (4th Cir. 2022). Far from being a "potentially real not purely hypothetical" problem, there is ample evidence that public employees are often in the dark on their right to join or not to join a union. *See supra* 4-5. They are also often in the dark about how the union spends their dues. *Id*. For these reasons, Section 1 passes the *Zauderer* standard's "relatively permissive First Amendment scrutiny." *NetChoice*, 34 F.4th at 1223.

## III. Plaintiffs' challenges to Section 3 are unlikely to succeed.

Section 3 no longer grants access to the government's payroll apparatus for covered unions to collect their dues. *See* SB256 §3. Plaintiffs challenge this provision under the Contracts Clause and First Amendment. Neither claim is likely to succeed.

### A.  Section 3 does not violate the Contracts Clause.

#### 1. Plaintiffs have no cause of action under §1983.

Under binding Supreme Court precedent, "an alleged Contracts Clause violation cannot give rise to a cause of action under § 1983.'" *Laborer's Int'l Union of N. Am., Loc. 860 v. Neff*, 29 F.4th 325, 334 (6th Cir. 2022); *see Carter v. Greenhow*, 114 U.S. 317, 322 (1885). Section 1983 provides a cause of action for violations of the Constitution's individual "rights, privileges, or immunities." 42 U.S.C. §1983. But the Contracts Clause "does *not* protect an individual constitutional right"; it imposes a "structural limitation" on the States. *Kaminski v. Coulter,* 865 F.3d 339, 346 (6th Cir. 2017) (discussing *Carter*). That structural limitation "is not a right redressable under [section] 1983." *APT Tampa/Orlando, Inc. v. Orange Cty.*, 1997 WL 33320573, at *8 (M.D. Fla. 1997) (citing *Carter*); *Poirier v. Hodges*, 445 F. Supp. 838, 842 (M.D. Fla. 1978) (same). Here, Plaintiffs brought their Contracts Clause claim under section 1983. Am.

Compl ¶5. Because that provision does not give them a cause of action, their claim is unlikely to succeed.

*Carter* is squarely on point. Virginia passed a law forbidding citizens from using interest coupons from state-issued bonds to pay their taxes. *Carter*, 114 U.S. at 318-19. Bonds are contracts with bondholders, and when the state issued them, Virginia law expressly permitted bondholders to pay their taxes in coupons. *Id.* When a bondholder sued the local tax collector for refusing to accept the coupons, the Court held he had no cause of action. The bondholder's complaint alleged a violation of a "right secured to him by the constitution," *id.* at 320, but the Court explained that the Contracts Clause does not itself secure an individual constitutional right. It instead protects "rights of contract"—and even then, only "indirectly and incidentally"—by limiting the States' legislative power to impair existing contract rights. *Id.* at 322. Thus, the rights at stake in *Carter*—"the right to pay taxes in coupons instead of money," and "immunity from further proceeding"—were *contract* rights, not constitutional rights. *Id.* Because those rights "derive[] from the contract with the state," the bondholder had no cause of action under a provision that protects rights "secured by the constitution." *Id.* at 321-22.

*Carter* is still good law and is dispositive here. *See, e.g.*, *APT Tampa/Orlando*, 1997 WL 33320573, at *8 (citing *Carter* and dismissing "with prejudice" a Contracts Clause claim brought under section 1983); *Lovejoy Realty, LLC v. Clayton Cty.*, 2009 WL 10699711, at *4 (N.D. Ga. 2009) ("*Carter* has not been explicitly overruled"). Just as in *Carter*, the rights at issue here are "rights of contract," but section 1983 only protects rights "secured by the constitution." *See* 114 U.S. at 317, 321; 42 U.S.C. §1983. Since the rights Plaintiffs claim Section 3 violates "derive from [a] contract with the state," and not the Constitution or federal law, Plaintiffs have no cause of action under section 1983. *Carter*, 114 U.S. at 322. Several circuits have either held that *Carter* forecloses section 1983 claims for alleged Contracts Clause violations,[4] or have assumed a cause of action only to deny the claim on the merits,[5] *but see S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 887 (9th Cir. 2003). The Court should follow their lead.

---

[4] *See Crosby v. City of Gastonia*, 635 F.3d 634, 640-41 (4th Cir. 2011); *Kaminski,* 865 F.3d at 346.

[5] *See, e.g., Watters v. Bd. of Sch. Dirs. of City of Scranton*, 975 F.3d 406, 413 (3d Cir. 2020); *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 280 n.14 (5th Cir. 2012); *Alarm Detection Sys., Inc. v. Vill. of Schaumburg*, 930 F.3d 812, 825 n.2 (7th Cir. 2019).

## 2. Section 3 does not substantially impair existing contract rights.

Even if Plaintiffs had a cause of action, Section 3 does not substantially impair existing contract rights. *Sveen v. Melin*, 138 S. Ct. 1815, 1822 (2018). The Contracts Clause "is not an absolute [prohibition]" on laws effecting contract rights. *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 428 (1934). A state law must cause a "*substantial* impairment of a contractual relationship." *Sveen*, 138 S. Ct. at 1821-22 (emphasis added). Whether any impairment is "substantial" turns on the extent to which the law (1) "undermines the contractual bargain," (2) "interferes with a party's reasonable expectations," and (3) "prevents the party from safeguarding or reinstating his rights." *Id.* at 1822. If the contract is not substantially impaired, the inquiry ends. *Id.*; *see also Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 245 (1978). All three considerations cut decisively against Plaintiffs.

### i. Section 3 does not undermine the bargain of the University of Florida's and the Alachua County School Board's collective bargaining agreements.

As an initial matter, Plaintiffs UFF-UF and FEA have not included any contract to which they are a party; so there is no impairment as to them that could support this claim. Section 3 also does not "undermine[]

the contractual bargain" of the University of Florida's and Alachua County School Board's collective bargaining agreements. *Sveen*, 138 S. Ct. at 1822. The core of any collective bargaining agreement is the terms between the employees and their employer. The agreements here cover a broad range of subjects of critical importance to teachers, including how they are paid and evaluated, their health insurance benefits, class size, and the schools' reduction-in-force policy. *See* Ward Decl., Ex. 2 at 80-86 ("Alachua CBA"); Gothard Decl., Ex. 1 at 2 ("UFF CBA").

Section 3 touches none of those subjects. It affects only an ancillary provision in each agreement that describes how the employees' *bargaining representatives*—Plaintiffs here—receive membership dues. *See* Calloway Decl. ¶7 ("In my career, I have never heard a teacher express interest in whether a collective bargaining agreement allows the union to collect dues from paychecks."). Interference with such "minor contractual provision[s] is not a substantial impairment under the Contracts Clause." *Heights Apartments*, 30 F.4th at 728. Those provisions do not guarantee Plaintiffs any revenue. *See* Alachua CBA 5-6; UFF CBA 10-11; *contra Sveen*, 138 S. Ct. at 1822. They merely obligate employers to collect payroll deductions from employees who opt-in and pass along the proceeds.

30

Section 3 operates no differently than if employees withdrew consent for automatic deductions, which teachers have the right to do under their agreements (and state law). *See* Alachua CBA 5-6; UFF CBA 10-11; Fla. Stat. §447.303.

Plaintiffs have other means of receiving membership dues. Their preferred method is through a union-specific, automated collections platform called "eDues." *See* Mot. 30. As FEA *itself* acknowledges, "eDues is easy." *See* Ex. H, at 2. "Most members complete the switch to eDues in about 5 minutes by using their online banking credentials or their account number and bank routing number." *Id.* FEA also believes eDues is superior to payroll deduction. "eDues protects your privacy. Paying union dues via payroll deduction allows school districts and school board members to view employees' membership status, opening educators to targeting and retaliation. *Id.* at 11. Not so with eDues. "Paying union dues via bank transfer allows members to keep their union membership private from administrators." *Id.*

But there is no requirement that Plaintiffs collect their dues through just one platform. Other Florida labor organizations use Unionly, which is another payment platform designed for unions to collect

dues via credit card. *See* Ex. I; *see also* Unionly, Online Dues Payment Platform ("The Online Dues Payment Platform Built for Organized Labor."), https://perma.cc/S7Z4-8F8H. They are also free to collect dues just as any other service provider collects payments, whether it be by ACH withdrawal, credit card, PayPal, Venmo, check, or cash, as other Florida labor organizations do. *See, e.g.*, Ex. J (accepting PayPal and credit cards). Plaintiffs had no reasonable expectation to continue receiving state-run payroll deductions forever. *Infra* 34-39. But even if they did, Section 3's modest change to the collective bargaining agreements does not undermine the core of those deals. *See Sveen*, 138 S. Ct. at 1824.

Plaintiffs point to a Sixth Circuit ruling that Michigan's law forbidding public employers from making automatic payroll contributions to the workers' preferred political action committee. *See Michigan State AFL-CIO v. Schuette*, 847 F.3d 800, 801 (6th Cir. 2017). But *Schuette* is not the lifeline Plaintiffs hope for. Unlike here, the plaintiffs in that case included "union members." *Id.* at 803. And *Schuette* held that a state law can impair a collective bargaining agreement if it frustrates the "*workers'* contractual expectation that the state would allow them to use this highly effective method of political fundraising for the agreed upon term." *Id.* at

804 (cleaned up and emphasis added). Workers' rights are central to collective bargaining, and it is common for workers to agree to make collective donations. Indeed, University of Florida employees bargained for the same right to donate in their agreement. *See* UFF CBA 10. But Section 3 does not affect any *workers'* rights guaranteed by collective bargaining agreements—including the University of Florida's teachers' donations. It only affects the Plaintiffs' (*unions'*) right to require state employers to administer their dues payments. By modifying that ancillary provision, Section 3 does not undermine the bargain that the University of Florida and the Alachua County School Board struck with their employees.[6]

Every contract is also different, and whether a bargain has been undermined depends on the nature of the contract. In *Schuette*, however, there was very little in the record about the contract at issue; the parties

---

[6] In passing, Plaintiffs cite another payroll deduction case, *Anderson Fed'n of Teachers v. Rokita*, 546 F. Supp. 3d 733, 744 (S.D. Ind. 2021), but that ruling likewise offers no support. The contracts at issue there were "dues authorization agreements," not collective bargaining agreements. *See id.* at 738-39. The court found the Contracts Clause claim likely to succeed because the state law "alter[ed] the 'central undertaking'" of those agreements by "terminat[ing] the contractual relationships altogether." *Id.* at 744. Here, by contrast, Section 3 does not touch the key terms of the University of Florida or Alachua County School Board's collective bargaining agreements, let alone "terminate" their contractual relationship with Plaintiffs.

focused only on the affected provisions. 847 F.3d at 804. (noting that the unions placed "short excerpts from only two contracts in the record"). Not so here. And of course, the impairment analysis turns on other factors such as whether the contract contemplates regulatory changes, the relevant state laws, and the parties' conduct. *See infra* 34-39. Those all differ from case to case.

### ii. Section 3 does not frustrate the parties' reasonable expectations.

Section 3 also does not frustrate any reasonable expectations. *Sveen*, 138 S. Ct. at 1822. "Only Plaintiffs' *reasonable* expectations and reliance can undergird a claim for unconstitutional contract interference." *Support Working Animals, Inc. v. DeSantis*, 457 F. Supp. 3d 1193, 1223 (N.D. Fla. 2020). Nowadays, "parties contract with an expectation of possible regulation," *NextEra Energy Cap. Holdings, Inc. v. Lake*, 48 F.4th 306, 328 (5th Cir. 2022), especially on highly regulated subjects like collective bargaining, *see, e.g., Fraternal Ord. of Police v. D.C.*, 45 F.4th 954, 961 (D.C. Cir. 2022). Plaintiffs cannot make a showing that their expectations were reasonable for three reasons.

***First,*** Florida has "heavily regulated collective bargaining for decades," and Plaintiffs were "on notice that future statutory changes were

likely." *Fraternal Ord. of Police*, 45 F.4th at 961. In these circumstances, contract rights "carry with [them] the infirmity of the subject matter." *Spannaus*, 438 U.S. at 242. That history is enough to put a reasonable union in Plaintiffs' shoes "on notice" that Florida may pass new regulations effecting payroll deductions in the public sector. *Fraternal Ord. of Police*, 45 F.4th at 961.

The case for substantial impairment is "even weaker" where, as here, "the subject matter of the contract itself is already subject to state regulation" *S&M Brands, Inc. v. Georgia ex rel. Carr*, 925 F.3d 1198, 1203 (11th Cir. 2019). Before SB256, Florida law permitted public-sector employees' "bargaining agent" to receive dues through automatic payroll deductions, revocable if the employees or their agent strike improperly. *See* Fla. Stat. §§447.303, 447.507(6)(a)(3). Plaintiffs were aware of the regulatory landscape when negotiating their collective bargaining agreements. And the Contracts Clause does not "ossify" yesterday's regulations. *S&M Brands*, 925 F.3d at 1203. Florida has every right to "exercise the police power to supersede old regulations" without constitutional infirmity. *Id.*

**Second,** both collective bargaining agreements anticipate changes in state law and defer to those changes. The Alachua County School Board's agreement includes a duty to renegotiate whenever a provision "ha[s] become invalid during the life of this contract through legislative action." Alachua CBA 1. The University of Florida's agreement states that any provision "shall be invalid and have no force or effect" if it is "rendered invalid by reason of any subsequently enacted legislation," in which case the parties shall "immediately enter into negotiations for the purpose of arriving at a mutually satisfactory replacement for such provision." UFF CBA 136. Plaintiffs thus entered these agreements with the "expectation of possible regulation," and they included renegotiation clauses to protect themselves. *NextEra Energy*, 48 F.4th at 328. The parties expected their agreements to *adapt* to new state laws, not preempt them.

**Third,** Plaintiffs' own conduct shows they did not expect automatic payroll contributions to continue much longer. Here again, Plaintiffs use "eDues," which allows for "payment of your union dues through direct bank draft transfer that you can set up on the same schedule as your current regular deductions from your paycheck." Ex. K, at 1-2. eDues was

active as early as April 2019 for the National Education Association, *see* Ex. L, which is Plaintiffs' affiliate organization, *see* Am. Compl. ¶¶9, 11-12, 16. That was well before the collective bargaining agreements at issue here were executed, although Plaintiffs did not start offering eDues to their members until earlier this year. *See* Gothard Decl. ¶19; Roeder Decl. ¶¶15-16. It is hard to see why Plaintiffs would take on administering such a dues-collection platform if they believed they had a "solid right" in their agreements to have state employers continue doing it for free. *Chrysler Corp. v. Kolosso Auto Sales, Inc.*, 148 F.3d 892, 897 (7th Cir. 1998).

### iii.   Section 3 allows Plaintiffs other ways to safeguard their asserted rights.

Finally, Section 3 does not substantially impair the collective bargaining agreements because it allows other ways for Plaintiffs to safeguard their interests. *Sveen*, 138 S. Ct. at 1822. Plaintiffs can collect their dues in any other manner they see fit. In fact, they can—and do—receive member payments through their eDues system, rather than by state-run payroll deductions. *See* Roeder Decl. ¶¶4-16. eDues appears every bit as convenient as the bill-pay platforms that countless consumers use every day for all manner of payments. *See supra* 31-32.

37

For these reasons, Plaintiffs can avoid Section 3's impact simply by asking their members who currently use payroll deductions to enroll in eDues and pay their dues just as they would pay, for example, a utility bill or credit card bill. A state law does not substantially impair contracts when the parties can avoid its impact by taking simple steps, especially where the parties have "several months to do so" before the law takes effect. *Sveen*, 138 S. Ct. at 1824; *see also Spannaus*, 438 U.S. at 249 & n.23. Plaintiffs' members are already required to submit written consent to have dues deducted from their paychecks. *See* Alachua CBA 5-6; UFF CBA 10. Asking their members to sign up for eDues is a similarly small burden.

Plaintiffs acknowledge they are in the process of moving their members to eDues, but they claim it is too costly to finish the transition before Section 3 takes effect on July 1, 2023. *See* Mot. 30. According to their declarations, UFF and ACEA began enrolling their members in eDues in March and April of 2023, respectively. Roeder Decl. ¶¶15, 16. That means Plaintiffs will have had between two and three months to contact their members and ask them to change their payment method before the law takes effect. Florida has not substantially impaired the University of

Florida and Alachua County School Board's collective bargaining agreements if Plaintiffs can avoid its effects by accomplishing that modest task.

### 3. Section 3 is justified by a significant and legitimate purpose.

Even if Section 3 substantially impairs the CBAs in the record, the impairment is justified by a significant and legitimate public purpose. *See Sveen*, 138 S. Ct. at 1822. The Contracts Clause "does not operate to obliterate the police power of the States." *Spannaus*, 438 U.S. at 244. Under the police power, Florida has "great latitude" to pass laws aimed at promoting the "lives, limbs, health, comfort, and quiet of all persons." *Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 756 (1985). A law that falls within the state's police power does not violate the Contracts Clause, even if it substantially impairs a contract. *See, e.g., Flanigan's Enterp. Inc. v. Fulton Cty.*, 242 F.3d 976, 989 (11th Cir. 2001). Courts owe "meaningful deference" to the state's judgment when it passes laws that alter public contracts. *United Auto., Aerospace, Agr. Implement Workers of Am. Int'l Union v. Fortuno*, 633 F.3d 37, 44 (1st Cir. 2011). Plaintiffs bear the burden to show Section 3 lacks a legitimate purpose. *Id.* at 44-45 & n.11. They have not carried that burden.

Florida had a significant and legitimate public purpose in passing Section 3: to increase transparency by ensuring public employees are fully informed about the dues they are paying their unions. *See supra* 4-7. Courts have readily concluded that similar public purposes justify state laws that substantially impair public contracts. *See Watters*, 975 F.3d at 413 (school district's economic hardship justified state law suspending teachers without pay despite tenure contract); *Buffalo Teachers Fed'n v. Tobe*, 464 F.3d 362, 371 (2d Cir. 2006) (same for teacher wage freezes). If states can pass laws suspending teachers or reducing their pay to alleviate the *government*'s financial difficulty without running afoul of the Contracts Clause, then surely Florida can pass a law seeking to bring some transparency to its *public employees'* financials without constitutional infirmity. *See Houlton Citizens' v. Town of Houlton*, 175 F.3d 178, 191 (1st Cir. 1999) (greater deference owed when state does not seek to "serve its own pecuniary interests"). There is also a need for this sort of transparency as public employees often are not aware of the dues they are paying via payroll deductions. *See supra* 4-7.

Plaintiffs briefly argue that Section 3's purpose is not legitimate because it does not apply to public employers who employ first

responders. Mot. 17, 23. They invite the Court to speculate that Florida's aim in making their exception is to favor unions who support the Governor. The Court should reject that invitation. For one thing, Plaintiffs' own data contradicts their "favored union/disfavored union" theory. *See* Phipps Decl. ¶8 & Appendix A (noting that Plaintiffs' own evidence shows covered unions made substantial donations to Republicans). The reason for the exception is that Florida has long treated its first responders differently in employment regulation because of the nature of their jobs in protecting the public and the wish to avoid labor strife. *See supra* 7-9. And these groups are often not in "one centralized location" to meet with union representatives. *Id.*; *see Williamson v. Lee Optical*, 348 U.S. 483, 489 (1955) ("Evils in the same field may be of different dimensions and proportions, requiring different remedies."). And when exercising the police power, "the legislature must be allowed leeway to approach a perceived problem incrementally." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 316 (1993); *see Fraternal Ord. of Police*, 45 F.4th at 961 (law abrogating rights to bargained-for disciplinary procedure for police only did not violate the Contracts Clause).

## B. Section 3 does not violate the First Amendment.

"This case [also] presents the question whether the [First Amendment] *compels*" Florida's public employers "to collect membership dues for unions that represent public[] employees." *Bailey v. Callaghan*, 715 F.3d 956, 957 (6th Cir. 2013) (emphasis added). "The problem with this theory is that the Supreme Court has already rejected it." *Id.* at 958. "[T]hat the state gave one category of public employees the benefit of payroll dues deduction does not run afoul of the First Amendment." *Wisconsin Educ. Ass'n Council v. Walker*, 705 F.3d 640, 647 (7th Cir. 2013) (citing *Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 355 (2009)).

### 1. Section 3 regulates non-expressive conduct.

At the outset, Section 3 does "not implicate the First Amendment at all" because it regulates "non-expressive" conduct. *Norwegian Cruise Line Holdings Ltd. v. State Surgeon Gen., Fla. Dep't of Health*, 50 F.4th 1126, 1135 (11th Cir. 2022). "Restrictions on protected expression are distinct from restrictions on economic activity or, more generally, on nonexpressive conduct." *Id.* There is no First Amendment right "to use government payroll mechanisms for the purpose of obtaining funds for expression." *Ysursa*, 555 U.S. at 355. "[P]ayroll deductions are not speech"; they are a "ministerial act," so Florida may regulate that conduct without

First Amendment scrutiny. *Bailey*, 715 F.3d at 959. That is true "even if [Section 3] incidentally burden[s] speech." *Norwegian Cruise Line*, 50 F.4th at 1135. Florida's choice to authorize payroll deductions for certain unions but not others "does not deny [covered union] members the right to associate, to speak, to publish, to recruit members, or to otherwise express and disseminate their views." *South Carolina Educ. Ass'n v. Campbell*, 883 F.2d 1251, 1257 (4th Cir. 1989). Plaintiffs' First Amendment claim fails for that reason alone.

### 2. Payroll deduction is at most a government subsidy that does not implicate the First Amendment.

Even if Section 3 does implicate speech, it still is constitutional. Plaintiffs concede much of the ground on this point. They admit this case is about speech subsidies rather and speech restrictions. Mot. 24-28. They agree that "speech-subsidy laws are judged by different criteria from speech-restrictive laws." Mot. 26. And they "recognize that making payroll deduction available to unions is a form of 'subsidy' of expressive activities that can be withdrawn across the board without facing heightened scrutiny." Mot. 24-25 (citing *Ysursa*, 555 U.S. at 359; *In re Hubbard*, 803 F.3d at 1313).

There is good reason for treating subsidies differently. "The First Amendment … protects the right to be free from government abridgement of speech." *Ysursa*, 555 U.S. at 358. That means "[w]hile in some contexts the government must accommodate expression, it is not required to assist others in funding the expression of particular ideas, including political ones." *Id.* "A legislature's decision not to subsidize the exercise of a fundamental right," then, "does not infringe on that right, and thus is not subject to strict scrutiny." *Id.* (quoting *Regan v. Taxation With Representation of Washington*, 461 U.S. 540, 549 (1983)). Applied in this context, "the State's decision not to [allow payroll deductions] is not an abridgment of the unions' speech; they are free to engage in such speech as they see fit." *Id.* at 359.

Plaintiffs also recognize that "when the government subsidizes speech without restricting it, it can permissibly discriminate between classes of speakers who have different statuses relevant to the need for the subsidy." Mot. 25 (citing *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 48 (1983); *Walker*, 705 F.3d at 648). That rule, too, is with good reason. A legislature's "selection of particular entities or persons for entitlement" of a subsidy "is obviously a matter of policy and

discretion and not [ordinarily] open to judicial review." *Regan*, 461 U.S. at 549. A government subsidy "that discriminates among speakers does not implicate the First Amendment." *Leathers v. Medlock*, 499 U.S. 439, 450 (1991) (citing *Regan*, 461 U.S. 540).

These rules doom Plaintiffs' First Amendment challenge. Payroll deductions are (at most) a subsidy; the First Amendment allows governments to take away subsidies; and the First Amendment also allows governments to choose which speakers receives a subsidy. When a "state g[ives] one category of public employees the benefit of payroll dues deduction," that "does not run afoul of the First Amendment." *Walker*, 705 F.3d at 647. That should be the end of the matter.

But the problem with Section 3, according to Plaintiffs, is not that it subsidizes certain *classes* of speakers and not others; it is that it subsidizes certain *ideas* and not others. Mot. 25-28. That claim fails for several reasons. Most immediately, Section 3 is viewpoint neutral on its face. "[I]t does not tie public employees' use of the payroll system to speech on any particular viewpoint." *Walker*, 705 F.3d at 648. "It does not, for example, grant certain unions access to the payroll-deduction process, and deny access to others, based upon whether a union supports or opposes a

particular policy position." *Bailey*, 715 F.3d at 959. It instead ties the use of the payroll system based on employee classes: all public sector employees are barred from paying their dues via a payroll deduction except "law enforcement officers," "correctional officers," "correctional probation officers," and "firefighters." Fla. Stat. §§447.303(1)-(2)(a). "The Act is therefore facially neutral as to viewpoint, which goes a long way toward defeating the plaintiffs' facial challenge." *Bailey*, 715 F.3d at 959.

Plaintiffs suggest that the statute facially discriminates based on viewpoint because it distinguishes between types of unions. The "design and structure" of the statute, they argue, "make clear that SB 256 is precisely the type of *speaker*-discriminatory law that must be subjected to heightened scrutiny." Mot. 27 (emphasis added). But, again, governments can discriminate based on classes of speakers. Plaintiffs' argument runs directly contrary to their recognition that "when the government subsidizes speech without restricting it, it can permissibly discriminate between classes of speakers." Mot. 25.

What Plaintiffs appear to be arguing—indeed, it is a theme of their brief—is that unions covered by Section 3 supported Democrats and the exempted unions supported Republicans. *See also Walker*, 705 F.3d at

648 ("[T]he Unions argue that Act 10 facially discriminates on the basis of viewpoint because general employee unions and public safety unions will necessarily espouse different viewpoints."). So treating them differently is viewpoint discrimination. But this theory fails on Plaintiffs' own terms. Plaintiffs point to the political donations from a subset of teachers' unions for support. *See* Mot. 8-9 (citing McCulloch Decl. ¶¶5-8). Yet Plaintiffs' own exhibits show that the teachers unions made substantial donations to Republicans. *See* Phipps Decl. ¶8 & Appendix A; *Walker*, 705 F.3d at 651 (noting that, "as a factual matter, the public safety category includes several unions that did not endorse Governor Walker.").

It makes no difference anyway because this theory merely "recycles" the "assertion that speaker-based discrimination in the subsidy context requires heightened scrutiny. It does not." *Walker*, 705 F.3d at 648 (citing *Regan*, 461 U.S. at 549-50). This view also "proves too much: if different speakers necessarily espouse different viewpoints, then any selective legislative funding decision would violate the First Amendment as viewpoint discriminatory." *Id.* at 649. That "interpretation of the First Amendment would leave legislatures with the unpalatable choice of funding all expressive activity or none at all." *Id.*

Binding precedent also forecloses this path. The Supreme Court has emphasized that "[i]t is a familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive." *United States v. O'Brien*, 391 U.S. 367, 383 (1968). And the Eleventh Circuit has "held … many times" that "when a statute is facially constitutional, a plaintiff cannot bring a free-speech challenge claiming that the lawmakers who passed it acted with a constitutionally impermissible purpose." *In re Hubbard*, 803 F.3d at 1312-13 (collecting cases). So too here. And other "virtually identical cases[s]" have reached the same conclusion in this very context. *Bailey*, 715 F.3d at 960 ("[W]e will not peer past the text of Public Act 53 to infer some invidious legislative intention." (cleaned up)); *Walker*, 705 F.3d at 649-50 (similar).

### 3. Section 3 easily passes rational-basis review.

Because Section 3 is not viewpoint discriminatory, it does not implicate the First Amendment and requires only rational basis review. *Ysursa*, 555 U.S. at 359; *see also Walker*, 705 F.3d at 653; *Bailey*, 715 F.3d at 960. Under that review, legislation carries "a strong presumption of constitutionality," *Cent. State Univ. v. Am. Ass'n of Univ. Professors*, 526

U.S. 124, 126 (1999), and "those attacking the rationality of the legislative classification have the burden 'to negate every conceivable basis which might support it,'" *Beach Commc'ns*, 508 U.S. at 315.

Plaintiffs cannot carry their heavy burden to negate "every conceivable basis" for Section 3's legislative classifications. *Beach Commc'ns*, 508 U.S. at 315. They hardly even try, offering only a single sentence on the topic. *See* Mot. 28. That is because there are ample reasons why Florida's legislature may have written Section 3 to exempt unions that represent law enforcement and firefighters.

Here again, Florida has long recognized that first responders face different job demands than other public-sector workers—their job is dangerous and they protect the public—and it has treated them differently because of those demands. *See supra* 7-9. The differential treatment here is consistent with that history. The "differential treatment of general and public safety unions is [also] supported by [Florida's] concern for labor peace among public safety employees." *Walker*, 705 F.3d at 657; *see supra* 7-9. Another justification is that exempted employees typically work long shifts away from "one centralized location" where they could readily meet with union representatives to pay their dues. *Id*. There are other viable

justifications as well. For example, Florida "could have concluded that it is more important for the public schools [and other public employers] to conserve their limited resources for their core mission than it is for [exempt] state and local employers." *Bailey*, 715 F.3d at 960.

Any of these rationales is enough to satisfy, on their own, the deferential rational basis test because it is well established that legislatures may choose to regulate different occupations differently. *See, e.g., Lee Optical, Inc.*, 348 U.S. at 489 (optometrists versus opticians). And even these exempted workers face the same concerns that Section 3 is designed to address, a state legislature "must be allowed leeway to approach a perceived problem incrementally." *Beach Commc'ns*, 508 U.S. at 316.

## IV. The equitable factors do not support preliminary relief.

A preliminary injunction is "not to be granted unless the movant clearly establishes the burden of persuasion as to the four requisites." *Am. C.L. Union of Fla., Inc. v. Miami-Dade Cty. Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009). "Failure to show any of the four factors is fatal." *Id.* The equitable factors independently weigh against preliminary relief.

### A.    Plaintiffs face no irreparable harm.

*Section 1.* Plaintiffs first argue they will suffer *per se* irreparable harm if Sections 1 is enforced. *See* Mot. 28-29. But "a violation of the First

Amendment 'does not automatically require a finding of irreparable injury.'" *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006). Rather, a First Amendment violation causes *per se* irreparable harm only if the injury is "direct penalization," and not merely "incidental inhibition," of First Amendment rights. *Id.*

Section 1 does not directly "penalize" Plaintiffs' First Amendment rights. Here, "Florida law does not prohibit a plaintiff from speaking. Each plaintiff is free to speak as much as the plaintiff chooses." *Worley v. Roberts*, 749 F. Supp. 2d 1321, 1325 (N.D. Fla. 2010). In these circumstances, there is no "direct" penalty on the Plaintiffs' speech. *Id.* at 1326. The compelled speech, in other words, is "an incidental inhibition that does not prevent the expressive activity." *Fac. Senate of Fla. Int'l Univ. v. Winn*, 477 F. Supp. 2d 1198, 1209 (S.D. Fla. 2007). This is not a case where there is "an imminent likelihood that pure speech will be chilled or prevented altogether" supporting the presumption of "irreparable injury." *Siegel v. LePore*, 234 F.3d 1163, 1178 (11th Cir. 2000) (en banc).

**Section 3.** As for Section 3, Plaintiffs claim that losing payroll deductions would constitute "per se irreparable injury" because of the purported First Amendment violation. *See* Mot. 31. For the same reasons as

Section 1, Section 3 causes no more than "an incidental inhibition that does not prevent the expressive activity." *Winn*, 477 F. Supp. 2d at 1209. Section 3 also takes away only a subsidy for speech; and taking away subsidies do not burden speech in the same ways as outright restrictions. *See supra* 43-45. The minor harms caused by "the denial of state funding" to *subsidize* speech is an additional reason the burden here is "incidental." *Winn*, 477 F. Supp. 2d at 1209.

Plaintiffs' primary argument for Section 3, however, is that the loss of monthly dues and operating revenue will cause it irreparable harm. Mot. 30-31. But that contention rests on a false premise. Section 3 does not bar the Plaintiffs from receiving dues; it bars them only from receiving dues via government-administered paychecks. Plaintiffs are still owed the dues. Members can pay those dues just like they pay countless other bills every day. And if members miss any payments, Plaintiffs are still entitled to recover them from their members. They have a breach-of-contract remedy, for example. Nothing in Section 3 prohibits them from pursuing that remedy. And "recoverable monetary loss does not constitute irreparable injury." *Lifestar Ambulance Serv., Inc. v. United States*, 365 F.3d 1293, 1296 n.5 (11th Cir. 2004). In any event, the Plaintiffs' own

declarations make clear they have plenty of runway to get the rest of their members signed up for eDues or alternative forms of payment. *See* Gothard Decl. ¶22 (union has "one year" of reserves); Ward Decl. ¶21 (union has "six months" reserves).

Finally, Plaintiffs separately argue they will suffer *per se* irreparable harm if Section 3 is enforced based on the view that it violates the Contracts Clause. *See* Mot. 31-32. But Contracts Clause violations do not constitute irreparable harm *per se*; they require a further showing of injury. *See, e.g., New Jersey Retail Merchants Ass'n v. Sidamon-Eristoff*, 669 F.3d 374, 388-89 (3d Cir. 2012) (evaluating the specific way in which the purported violation caused irreparable harm). That rule aligns with binding precedent. The "*only*" constitutional violations that the Eleventh Circuit has said constitute *per se* irreparable injury are of "the first amendment" and the "right of privacy." *KH Outdoor*, 458 F.3d at 1272 (emphasis added). But unlike those constitutional provisions, the Contract Clause provides no "individual constitutional right" to burden. *See Kaminski,* 865 F.3d at 346.

**B.     The equities weigh against preliminary relief.**

"Finally, where the government is the party opposing the prelimi-

nary injunction, its interest and harm merge with the public interest."

*Swain v. Junior*, 958 F.3d 1081, 1091 (11th Cir. 2020). The state would

be harmed by an injunction because "any time a State is enjoined by a

court from effectuating statutes enacted by representatives of its people,

it suffers a form of irreparable injury." *Hand v. Scott*, 888 F.3d 1206, 1214

(11th Cir. 2018) (quoting *Maryland v. King*, 567 U.S. 1301, 1301 (2012)

(Roberts, C.J., in chambers)). SB256 is also meant to bring transparency

to public workers who are often in the dark as to their constitutional and

statutory rights. *Cf. Nat'l Head Start Ass'n v. Dep't of Health & Hum.*

*Servs.*, 297 F. Supp. 2d 242, 251 (D.D.C. 2004) (noting "that the public's

interest in transparency is predominant"). These equities thus way

against an injunction.

## CONCLUSION

This Court should deny Plaintiffs' motion for preliminary injunc-

tion.

Dated: June 9, 2023

Amber S. Nunnally
Florida Bar No. 109281
amber@lawsonhuckgonzalez.com
Jason Brent Gonzalez
Florida Bar No. 146854
jason@lawsonhuckgonzalez.com
LAWSON HUCK GONZALEZ PLLC
215 S Monroe St., Ste. 320
Tallahassee, FL 32301
(850) 241-1717

Respectfully submitted,

_/s/ Bryan Weir_____
Jeffrey M. Harris*
Bryan Weir*
Matt Pociask*
David Rosenthal*
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
jeff@consovoymccarthy.com
bryan@consovoymccarthy.com
matt@consovoymccarthy.com
david@consovoymccarthy.com

*Admitted *pro hac vice*

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(F), undersigned counsel for the Defend-ants certifies that the foregoing Defendants' Memorandum in Opposition to Plaintiffs' Motion for Preliminary Injunction, excluding those portions excluded by Local Rule 7.1(F), consists of 11,151 words.

 */s/ Bryan Weir* 
Bryan Weir

## CERTIFICATE OF SERVICE

I hereby certify that on June 9, 2023, I electronically filed the foregoing via CM/ECF, which automatically serves all counsel of record for the parties who have appeared.

<u>/s/ Bryan Weir</u><br>
Bryan Weir