## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## GAINESVILLE DIVISION

ALACHUA COUNTY EDUCATION
  ASSOCIATION,

UNITED FACULTY OF FLORIDA–
  UNIVERSITY OF FLORIDA,

UNITED FACULTY OF FLORIDA,

LAFAYETTE EDUCATION
  ASSOCIATION,

PINELLAS CLASSROOM TEACHERS
  ASSOCIATION,

HERNANDO UNITED SCHOOL
  WORKERS,

    and

FLORIDA EDUCATION
  ASSOCIATION,

MALINI SCHUELLER,

      *Plaintiffs*,

v.

DONALD J. RUBOTTOM, in his official
  capacity as chair of the Florida Public
  Employees Relations Commission,

JEFF AARON, in his official capacity as
  commissioner of the Florida Public
  Employees Relations Commission,

MICHAEL SASSO, in his official
  capacity as commissioner of the Florida

Civil Action No.

1:23-cv-00111-MW-HTC

Public Employees Relations
Commission,

MORTEZA HOSSEINI, DAVID
    BRANDON, RICHARD COLE,
    CHRISTOPHER CORR, OLIVIA
    GREEN, JAMES HEAVENER,
    DANIEL O'KEEFE, RAHUL PATEL,
    MARSHA POWERS, FRED RIDLEY,
    DANAYA WRIGHT, PATRICK
    ZALUPSKI, and ANITA ZUCKER, in
    their official capacities as Chair and
    Members of the Board of Trustees of
    the University of Florida,

THE SCHOOL BOARD OF ALACHUA
    COUNTY,

THE SCHOOL BOARD OF PINELLAS
    COUNTY,

and

THE SCHOOL BOARD OF
    HERNANDO COUNTY,

                    *Defendants*.

## SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### I.    NATURE OF THE ACTION

1.      In this action, the Plaintiffs challenge provisions of Florida Senate Bill

256 ("SB 256" or "the Act") under the First Amendment, the Fourteenth

Amendment, and Article I, Section 10 ("the Contracts Clause") of the United

States Constitution.  The Act, a copy of which is attached to this Complaint as

Exhibit A, makes numerous changes to Florida's public-sector collective

bargaining law, but it does not do so in the way one would expect if it were a

legitimate effort to effectuate labor law reform. Instead, SB 256 leaves prior

Florida law intact as to the unions representing the tens of thousands of law-

enforcement, fire, and corrections employees in Florida (the "favored unions")

while imposing draconian new restrictions on unions representing teachers,

education support professionals, and all other public-sector employees (the

"disfavored unions").

2.      There is no policy logic to the Act's pervasive distinction between

favored and disfavored unions. The rationale offered by the defenders of SB 256 to

justify SB 256's punitive new requirements on disfavored unions are equally as

persuasive—or, rather, unpersuasive—as applied to the favored unions. But there

is an unmistakable political logic. The unions left unharmed by SB 256

overwhelmingly favored the Florida Governor's re-election bid and the unions

harmed by SB 256 did not.

3.      Plaintiffs challenge the following restrictions that the Act imposes

solely on disfavored unions and their members and prospective members:

(a) Section 1 of the Act requires of public employees—as a condition of

membership in a covered union—that they sign a government-drafted

membership authorization form containing a 91-word "right-to-work"

3

affirmation in 14-point type, along with a misleading description of public employees' rights in Florida and an accounting of the compensation of the union's five highest-paid officers and employees. This requirement violates the First Amendment freedom of association rights of the disfavored unions and the employees who wish to join those unions, and it also violates their Fourteenth Amendment right to equal protection of the laws. Furthermore, and especially when read in conjunction with regulatory guidance published by the Florida Public Employees Relations Commission ("PERC") shortly after SB 256's enactment, Section 1 violates the disfavored unions' First Amendment rights against compelled speech, because it compels them to disseminate the government's misleading and ideological message if they wish to exist or grow as a voluntary advocacy association;

(b) Section 3 of the Act prohibits disfavored unions from collecting voluntary membership dues by means of employee-authorized payroll deductions, thereby impermissibly impairing disfavored unions' contractual rights in violation of the Contracts Clause of the United States Constitution, and impermissibly imposing viewpoint-based restrictions on their collection of voluntary membership dues, in violation of their First Amendment rights to freedom of speech and of their Fourteenth Amendment rights to equal protection of the laws; and

(c) Section 4 of the Act subjects disfavored unions to immediate decertification—thereby impermissibly impairing the contractual rights of disfavored unions in violation of the Contracts Clause of the United States Constitution—if such a union fails to comply with any of the following obligations: annually disclosing audited financial statements; annually disclosing accountant-certified figures showing the number of bargaining unit employees who are and are not dues-paying union members; and undergoing an election to determine whether it can continue to serve in its role as collective bargaining representative if its disclosures show that fewer than 60% of the employees it represents pay dues to the union.

4.    None of these provisions survives any level of constitutional scrutiny. There is no remotely sufficient governmental interest in compelling employees to sign, or in compelling unions to disseminate, a misleading and ideological government-drafted form, let alone in singling out disfavored groups of employees and unions for such adverse treatment. Nor is there any sufficient governmental interest in prohibiting disfavored unions from collecting voluntary dues payments from their members via payroll deductions, or in subjecting disfavored unions to decertification elections in the absence of any indication that they lack majority support.  Nor do the means employed by SB 256 bear an adequate connection to

any putatively substantial or legitimate governmental purpose under any level of constitutional scrutiny.

5.      Plaintiffs bring this action under 42 U.S.C. §§ 1983 and 1988, as well as directly under the First Amendment, Fourteenth Amendment, and Contracts Clause of the United States Constitution, pursuant to the inherent power of federal courts to enjoin actions taken by government officials in violation of the United States Constitution. Plaintiffs Alachua County Education Association ("ACEA"), United Faculty of Florida–University of Florida ("UFF–UF"), United Faculty of Florida ("UFF"), Lafayette Education Association ("LEA"), Pinellas Classroom Teachers Association ("PCTA"), and Hernando United School Workers ("HUSW") bring this action on their own behalf and on behalf of their members, who also are adversely affected by SB 256.  Plaintiff Florida Education Association ("FEA") brings this action on its own behalf as an organization whose right to free speech and association, as well as its financial well-being, and current contracts in which it is interested will be impaired and harmed by SB 256. Plaintiffs seek declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202, Fed. R. Civ. P. 57 and 65, and this Court's inherent equitable powers. Plaintiffs also seek attorneys' fees pursuant to 42 U.S.C. § 1988(b).

## II.    JURISDICTION AND VENUE

6.    This Court has jurisdiction under 28 U.S.C. § 1331, which vests district courts with jurisdiction to decide federal questions, and under 28 U.S.C. § 1343(a)(3), which vests district courts with jurisdiction "[t]o redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States."

7.    Venue is proper in this court under 28 U.S.C. § 1391(b) because, *inter alia*, all Defendants reside in Florida and at least one Defendant resides in the Northern District of Florida. Venue is proper in this division, as Plaintiffs ACEA and UFF–UF have their principal places of business in Alachua County, Florida, and the harms from which they seek relief will occur in Alachua County.

## III.   PARTIES

8.    Plaintiff ACEA is a voluntary private membership association and a non-profit advocacy organization with more than 2,300 members employed by Alachua County Public Schools.  ACEA is a local affiliate of FEA and is affiliated at the national level with the National Education Association ("NEA") and the American Federation of Teachers ("AFT"), which are non-profit advocacy organizations that collectively have nearly 5 million members nationwide, the overwhelming majority of whom are educators and education support professionals

employed by public school districts and institutions of higher education.  Pursuant

to Florida's Public Employees Relations Act ("PERA"), ACEA is certified by the

Florida Public Employees Relations Commission ("PERC") as the collective

bargaining representative of Pre-K–12 educators and education support

professionals employed by the Alachua County Public Schools ("ACPS").  ACEA

negotiates collective bargaining agreements ("CBAs") with the School Board of

Alachua County, represents Pre-K–12 educators and education support

professionals in grievance proceedings under those CBAs, and engages in other

advocacy in support of education employees, students, and public education

generally.

       9.     The current CBA between ACEA and ACPS that applies to the school

district's instructional staff, a copy of which is attached to this Complaint as

Exhibit B, and which was amended in May 2022, by the Memorandum of

Understanding attached to this Complaint as Exhibit C, governs a wide array of

matters relating to the terms and conditions of employment of teachers employed

by ACPS, including academic freedom, progressive-discipline standards, grievance

procedures, standards and procedures for dismissal of teachers, and workplace

safety, including communicable disease/health screening tests.  The CBA also has

a provision requiring the school district to deduct voluntary membership dues from

the pay of union members who have authorized such deductions and to remit those

dues payments to ACEA. This payroll deduction provision places an important obligation on ACPS and confers a corresponding important contract right in favor of ACEA.

10.    ACEA regularly exercises its First Amendment speech rights, including by speaking out on public issues and by endorsing and opposing candidates for political office.

11.    Plaintiff UFF–UF is a voluntary private membership association and a non-profit advocacy organization with nearly 900 members employed as faculty by the University of Florida ("UF").  UFF–UF is a local chapter of UFF and is affiliated with FEA, NEA, and AFT.  UFF–UF sues on its own behalf and on behalf of its members.

12.    Plaintiff UFF is a statewide affiliate of FEA representing more than 25,000 faculty, graduate employees, and academic professionals at all twelve Florida public universities, sixteen state and community colleges, and four K–12 lab schools.  Pursuant to PERA, UFF is certified by PERC as the collective bargaining representative of faculty, graduate employees, and academic professionals employed by UF, in addition to other public employers in Florida.

13.    Alongside Plaintiff UFF-UF, UFF negotiates CBAs with UF, represents faculty members in grievance proceedings under those CBAs, and

engages in other advocacy in support of higher education faculty and public

education more generally.

14.     In the course of their advocacy for educators and public education on

issues of public concern, UFF–UF and UFF have regularly exercised their First

Amendment speech rights.

15.     The current CBA between UFF and the University of Florida Board of

Trustees, a copy of which is attached to this Complaint as Exhibit D, governs a

wide array of matters relating to UF faculty members' employment, including

provisions relating to academic freedom, non-discrimination, workplace safety,

faculty appointments, non-renewal of faculty contracts, performance evaluations,

grievance procedures, and tenure.  The CBA also contains a provision requiring

UF to deduct voluntary membership dues from the pay of union members who

have authorized such deductions and to remit those dues payments to UFF. This

payroll deduction provision places an important obligation on UF and confers a

corresponding important contract right in favor of UFF.  As reflected in the UFF–

UF membership form, a portion of the membership dues remitted by the University

of Florida to UFF are subsequently remitted to Plaintiff FEA, and Plaintiff FEA is

an intended third-party beneficiary of the CBA's payroll deduction provision.

16.     Plaintiff LEA is a voluntary private membership association and a

non-profit advocacy organization with approximately 70 members employed by

the School Board of Lafayette County as instructional personnel and education support professionals. LEA is a local affiliate of FEA and is affiliated at the national level with NEA and AFT. PERC has certified LEA as the representative of a bargaining-unit of approximately 140 instructional personnel and education support professionals employed by the School Board of Lafayette County.

17.     LEA is party to two CBAs with the School Board of Lafayette County, which are attached to this Complaint as Exhibits E (instructional personnel) and F (education support professionals). LEA's CBAs govern an array of terms of employment for represented instructional personnel and education support professionals. The CBAs also contain provisions requiring the School Board of Lafayette County to deduct voluntary membership dues from the pay of union members who have authorized such deductions and to remit those dues payments to LEA. These payroll deduction provisions place important obligations on the School Board of Lafayette County and confer a corresponding important contract right in favor of LEA.

18.     Plaintiff PCTA is a voluntary private membership association and a non-profit advocacy organization with approximately 3,848 members employed by the School Board of Pinellas County as instructional personnel. PCTA is a local affiliate of FEA and is affiliated at the national level with NEA and AFT. PERC

11

has certified PCTA as the representative of a bargaining-unit of instructional

personnel employed by the School Board of Pinellas County.

19.     PCTA is party to a CBA with the School Board of Pinellas County,

which is attached to this Complaint as Exhibit G. PCTA's CBA governs an array

of terms of employment for represented instructional personnel. The CBA also

contains a provision requiring the School Board of Pinellas County to deduct

voluntary membership dues from the pay of union members who have authorized

such deductions and to remit those dues payments to PCTA. This payroll deduction

provision places an important obligation on the School Board of Pinellas County

and confers a corresponding important contract right in favor of PCTA.

20.     Plaintiff HUSW is a voluntary private membership association and a

non-profit advocacy organization with approximately 175 members employed by

the School Board of Hernando County as educational support professionals.

HUSW is a local affiliate of FEA and is affiliated at the national level with NEA

and AFT. PERC has certified HUSW as the representative of a bargaining-unit of

education support professionals employed by the School Board of Hernando

County.

21.     HUSW is party to a CBA with the School Board of Hernando County,

which is attached to this Complaint as Exhibit H. HUSW's CBA governs an array

of terms of employment for represented education support professionals. The CBA

also contains a provision requiring the School Board of Hernando County to deduct voluntary membership dues from the pay of union members who have authorized such deductions and to remit those dues payments to HUSW. This payroll deduction provision places an important obligation on the School Board of Hernando County and confers a corresponding important contract right in favor of HUSW.

22.     Plaintiff FEA is a non-profit advocacy organization with approximately 140,000 members statewide, the overwhelming majority of whom are educators and education support professionals employed by public school districts and institutions of higher education throughout the State of Florida.  At the national level, FEA is affiliated with NEA and AFT.

23.     FEA advocates for the interests of its education-employee members, their students, and for public education generally before the Florida legislature, before state agencies, before federal and state courts, and in the public square. FEA's advocacy includes campaigns for public-education funding; instruction in K–12 schools and Florida's institutions of higher education that is the product of educational, not ideological, judgments; the treatment of all students with equal dignity and respect; and school safety.

24.     FEA's exercise of its free speech rights—including its strong opposition to Governor DeSantis's campaign against public school educators and

public education—has antagonized Governor DeSantis and his allies in the legislature.  Governor DeSantis has publicly lashed out at teachers' unions, describing them as "pernicious" and "partisan" organizations that spend "the public's time" politicking on their own behalf.  He has made no criticisms of the public-employee unions that have endorsed him.  By way of example, Governor DeSantis touted an endorsement from the International Union of Police Associations in past election campaigns.

25.    FEA is affiliated with more than 150 local associations, the overwhelming majority of which are "employee organizations" under PERA.  FEA provides services to its members and also provides support and resources to its local affiliates' advocacy efforts, including local affiliates' advocacy pursuant to their roles as collective-bargaining representatives of public-education employees.

26.    FEA and its national and local affiliates operate under a system of unified membership, meaning that education employees who wish to become members of a local affiliate join all three levels of the association and authorize the payment of dues to the local, state, and national affiliates for their membership in each and the representation and other benefits those memberships afford. Under this system of unified membership, when the local union directly collects membership dues and pursuant to the affiliation agreements between FEA and its affiliated local unions, FEA is entitled to a portion of the collected dues. Because

of its entitlement to a portion of such membership union dues, FEA is interested in and is intended to benefit from CBAs providing for payroll deduction of membership dues.

27.     ACEA, UFF, UFF-UF, LEA, PCTA, HUSW, and FEA are referred to herein as "the Plaintiff Unions."

28.     Malini Schueller is a tenured professor at the University of Florida and a voluntary member of Plaintiffs UFF and UFF-UF. Professor Schueller has been a member of UFF and UFF-UF for approximately 32 years.  Professor Schueller intends to continue to be a member of UFF and UFF-UF, but she has not signed and does not intend to sign PERC Form 2023-1.101.

29.     Professor Schueller is referred to herein as "the Individual Plaintiff."

30.     Defendant Donald J. Rubottom serves as the chair and chief executive and administrative officer of PERC, which has the authority to implement and enforce the PERA provisions challenged in this action.  Chair Rubottom is sued in his official capacity.

31.     Defendant Jeff Aaron serves as a commissioner of PERC, which has the authority to implement and enforce the PERA provisions challenged in this action.  Commissioner Aaron is sued in his official capacity.

32.     Defendant Michael Sasso serves as a commissioner of PERC, which has the authority to implement and enforce the PERA provisions challenged in this

action.  Commissioner Sasso is sued in his official capacity. Collectively with Chair Rubottom and Commissioner Aaron, Commissioner Sasso is referred to herein as "PERC."

33.     Defendants Morteza Hosseini, David Brandon, Richard Cole, Christopher Corr, Olivia Green, James Heavener, Daniel O'Keefe, Rahul Patel, Marsha Powers, Fred Ridley, Danaya Wright, Patrick Zalupski, and Anita Zucker serve as members of the Board of Trustees of the University of Florida, which is party to the CBA with UFF and has the authority to require the University of Florida to comply with the provisions of that CBA. The members of the Board of Trustees of the University of Florida are sued in their official capacities and are sued for the purpose of ensuring that Plaintiffs will be provided with complete relief. The members of the Board of Trustees of the University of the Florida are referred to herein as "the UF Trustees."

34.     Defendant School Board of Alachua County has legal authority over operation of the public schools in Alachua County, and is party to the CBAs with Plaintiff ACEA. The School Board of Alachua County has authority to comply with the provisions of its CBAs with Plaintiff ACEA. The School Board of Alachua County is sued for the purpose of ensuring that Plaintiffs will be provided with complete relief.

16

35.     Defendant School Board of Hernando County has legal authority over operation of the public schools in Hernando County, and is party to the CBAs with Plaintiff HUSW. The School Board of Hernando County has authority to comply with the provisions of its CBAs with Plaintiff HUSW. The School Board of Hernando County is sued for the purpose of ensuring that Plaintiffs will be provided with complete relief.

36.     Defendant School Board of Pinellas County has legal authority over operation of the public schools in Pinellas County and is party to the CBA with Plaintiff PCTA. The School Board of Pinellas County has authority to comply with the provisions of its CBA with Plaintiff PCTA. The School Board of Pinellas County is sued for the purpose of ensuring that Plaintiffs will be provided with complete relief.

37.     The UF Trustees, the School Board of Alachua County, the School Board of Pinellas County, and the School Board of Hernando County are referred to herein as "the Defendant Public Employers."

## IV.   FACTS

### A.     SB 256 Makes Drastic Changes to Florida's Collective-Bargaining System, But Only for Disfavored Unions

38.     In 1968, Florida voters approved an amendment to the Florida Constitution guaranteeing that "[t]he right of employees, by and through a labor organization, to bargain collectively shall not be denied or abridged," with the

proviso that "[p]ublic employees shall not have the right to strike."  Fla. Const. art. I, § 6.  In 1974, the Florida legislature enacted PERA "to provide statutory implementation of s. 6, Art. I of the State Constitution" by "[g]ranting to public employees the right of organization and representation."  Fla. Stat. § 447.201 (2022).  The legislation recognizes that collective bargaining "protect[s] the public" and "promote[s] harmonious and cooperative relationships between government and its employees." *Id.*

39.     PERA grants public employees the right to form, join, participate in, and be represented by an employee organization of their own choosing, or to refrain from doing so; recognizes public employee and employer rights; provides a process by which a union chosen by a majority of the employees in an appropriate bargaining unit can be certified by PERC as the representative of all the employees in the unit for the purposes of collective bargaining; requires public employers and public-employee unions to bargain collectively concerning the wages, hours, and other terms and conditions of unit employees' employment; enumerates prohibited unfair labor practices by public employee unions and employers; and requires annual registration requirements to be filed with PERC by certified unions. *See generally* Fla. Stat. §§ 447.301, 447.209, 447.305, 447.307, and 447.309 (2022).

40.     SB 256 has injected a novel form of discrimination into PERA by amending the statute so as to discriminatorily apply onerous restrictions and rules

exclusively to public sector unions other than those representing bargaining units with law enforcement officers, correctional officers, correctional probation officers, or firefighters, as defined in Fla. Stat. §§ 943.10 and 633.102 (2022).  The Act thus creates a favored class of unions—those representing the specified law enforcement, corrections, and firefighter employees, which are exempt from the Act's amendments to PERA challenged here—and a disfavored class consisting of all other public employee unions, which are subject to three onerous restrictions and rules of relevance here.

> (1)   *SB 256 Prescribes a Government-Drafted Membership Authorization Form that Prospective Members of Disfavored Unions, and Only Disfavored Unions, Must Sign in Order to Become Statutorily Recognized Union Members.*

41.    Prior to the enactment of SB 256, unions in Florida could communicate with members and prospective members in their own voice using their own words.  PERA did not purport to regulate or prescribe the communications between a public employee union and its members or prospective members but simply recognized public employees' "right to form, join, participate in," and "be represented by any" union "of their own choosing" or to refrain from doing so.  Fla. Stat. § 447.301(1) and (2).  Section 1 of SB 256 amends these provisions regarding public employees' rights so as to burden the First Amendment rights of prospective members of disfavored unions by requiring them to sign a new government-drafted membership authorization form as a condition of union

membership when would-be members of other associations are not required to sign a government prescribed form.  Section 1 also burdens disfavored unions' membership sign-up processes and communications by compelling disfavored unions—and no others—to disseminate and collect forms communicating two unjustifiable government-mandated messages.

42.    First, Section 1 requires that any public employee who "desires to be a member" of a disfavored union "must sign and date a membership authorization form, as prescribed by [PERC] with the bargaining agent," that includes the following 91-word state-mandated message "in 14-point type":

> The State of Florida is a right-to-work state.  Membership or non-membership in a labor union is not required as a condition of employment, and union membership and payment of union dues and assessments are voluntary.  Each person has the right to join and pay dues to a labor union or to refrain from joining and paying dues to a labor union. No employee may be discriminated against in any manner for joining and financially supporting a labor union or for refusing to join or financially support a labor union.

Under the "preliminary text" of a regulation that PERC has published (*see* ¶¶ 51, 52, 56 *infra*), disfavored unions would be compelled to disseminate this message on pain of risking the loss of their certified status. The message is unnecessary and inaccurate.  It is unnecessary because there is no legitimate justification for its apparent assumption that public employees are not informed of their right not to join a union, let alone that the employees

interested in joining a teachers' union or other disfavored union are less informed of that right than are those interested in joining a favored law enforcement, corrections, or fire employees' union.  The message is inaccurate because it asserts that "[n]o employee may be discriminated against in any manner for … refusing to join or financially support a labor union," and yet PERA clearly provides that  "certified employee organizations shall not be required to process grievances for employees who are not members of the organization." Fla. Stat. § 447.401. Such organizations may also decline to extend to non-members certain rights and benefits, including the right to vote in union elections and eligibility to participate in certain members-only programs sponsored by the union, such as group insurance benefits.

43.    Second, Section 1 of the Act, as it would be enforced by PERC under the "preliminary text" of a proposed regulation (*see infra*), also compels disfavored unions, on pain of risking the loss of their certified status, to include on the membership form "the name[s] and total amount of salary, allowances, and other direct or indirect disbursements, including reimbursements, paid to each of the [unions'] five highest compensated officers and employees."  There is no justification for requiring this

information on membership applications, nor for requiring it to be provided

by disfavored unions but not by unions favored by Governor DeSantis.

44.    Section 1 thus conditions the right of a public employee to join

a disfavored union on the employee's willingness to sign a government-

drafted form carrying an ideological and misleading message with which

they may disagree, and it effectively compels disfavored unions to

disseminate that message.  But Section 1 of SB 256 expressly exempts

favored unions and their members and prospective from its requirements.

   *(2)    SB 256 Contains a Discriminatory Payroll Deduction Ban*

45.    Prior to the enactment of SB 256, PERA granted all certified

bargaining representatives the right to collect voluntary membership dues and

uniform assessments by means of public-employer-administered payroll

deductions from the salaries of public employee members who provided voluntary

and revocable authorization for such deductions.  *See* Fla. Stat. § 447.303 (2022).

PERA further provided that "[r]easonable costs to the employer of" such

deductions "shall be a proper subject of collective bargaining."  *Id.*

46.    Section 3 of SB 256 amends Fla. Stat. § 447.303 to prohibit

disfavored unions from collecting such dues and assessments via payroll deduction

while expressly continuing to grant favored unions the right to do so.  Section 3

thus discriminatorily restricts unions disfavored by the Governor based solely on

their viewpoints.  Section 3 also independently violates the Contracts Clause by substantially impairing existing disfavored union contracts regarding payroll deduction.

47.    When read in conjunction with PERA § 447.501(2)(b), Section 3 not only bars disfavored unions from having payroll-deduction provisions in their CBAs, it exposes such unions to the risk of unfair labor practice charges for even requesting such provisions in their CBAs or from seeking to enforce such provisions.

*(3)    SB 256 Contains Discriminatory Disclosure and Decertification Rules*

48.    Prior to the enactment of SB 256, PERA provided that a certified bargaining representative continues in that role until and unless bargaining unit employees raise a question as to the representative's majority support and a majority of unit members then vote in a PERC-conducted election to decertify the representative.  Fla. Stat. §§ 447.307, 447.308 (2022).  For unions representing K–12 teachers in public schools, a 2018 amendment to Chapter 1003 of the Education Code further required that the union include in its annual registration statement the number of employees in the unit and the number of those employees who pay dues to the union; if a K-12 educator union's annual registration statement showed that less than 50% of unit employees pay dues, that union was required to petition

PERC for recertification as a bargaining agent.  Fla. Stat. § 1012.2315(4)(c)

(2022).

49.     Section 4 of SB 256 amends PERA's provisions relating to public

employee unions' obligations to file annual registration statements with PERC,

Fla. Stat. § 447.305(2) and to require every disfavored union, as of October 1,

2023, to provide, in its annual registration statements, audited financial statements

as well as data, verified by an independent certified public accountant, showing the

number of employees in the bargaining unit and the number of unit employees who

are and are not paying dues.  Section 4 provides that if such a report shows that

fewer than 60% of the unit employees pay dues to the disfavored union, that union

must petition PERC for recertification in order to continue in its role as collective

bargaining representative.  A disfavored union's failure to comply with these

provisions subjects it to immediate decertification.  Section 4 expressly exempts

favored unions from these onerous requirements and sanctions—including the 60%

threshold—while imposing them on the disfavored unions.

**B.      PERC'S Implementation Plan for SB 256**

50.     Since SB 256 passed the legislature and was signed into law by the

Governor, PERC has initiated rulemaking proceedings to implement the changes

SB 256 makes to PERA. On or about May 30, 2023, PERC issued Notices of

Development of Rulemaking for rules to implement Section 1, Section 3, and Section 4 of SB 256. Those rulemaking proceedings are ongoing.

51.     On or about June 5 and 8, 2023, PERC issued proposed regulations implementing SB 256 and/or drafts of the "Preliminary Text" of proposals for implementing SB 256. In proceedings before this Court, PERC has referred to both the proposed regulations and the draft "Preliminary Text" as "proposed regulations," and they are all collectively referred to as such herein. Under the proposed regulations, rules implementing Section 1 will be codified at 60CC-1.102 – 60CC-1.104; rules implementing Section 3 will be codified at 60CC-5.101; and rules implementing Section 4 will be codified at 60CC-6.101 – 60CC-6.401.

52.     PERC's proposed regulations implementing Section 1 require that a membership form conforming to Section 1's requirements be submitted by all members of disfavored unions, regardless of whether that member became a voluntary member of a disfavored union before Section 1's July 1, 2023 implementation date, or even before SB 256's passage. Specifically, proposed regulation 60CC-1.103(2) states as follows: "By the first renewal of registration occurring on or after October 1, 2023, each employee organization must have received and must retain a PERC Form 2023-1.101 for each eligible member of a bargaining unit who is a current member of the employee organization or is seeking membership therein."

53.     PERC's proposed regulations implementing Section 1 also evidence

PERC's intention to find it to be an unfair labor practice if a disfavored union fails

to collect and maintain a membership form conforming to Section 1's requirements

for each member of that union. Specifically, proposed regulation 60CC-1.103(7)

grants to PERC the authority to seek an injunction against a union not in

compliance with the proposed regulation by issuing "an order to show cause why

the Commission should not petition the circuit court for enforcement of this rule."

54.     PERC's proposed regulations implementing Section 1 also

promulgate PERC Form 2023-1.101, the only membership form PERC will accept

to satisfy the requirements of Section 1. A true and correct copy of proposed PERC

Form 2023-1.101 is attached to this Complaint as Exhibit I.

55.     PERC's proposed regulations implementing Section 3 evidence

PERC's intention to find it to be an unfair labor practice for a public employer to

collect or remit dues via payroll deduction to a disfavored union. Specifically,

proposed regulation 60CC-5.101(3) grants to PERC the authority to seek an

injunction "pending the final adjudication by the Commission" against a public

employer that "collect[s] employee organization dues by payroll deduction" in

violation of Section 3.

56.     PERC's proposed regulations implementing Section 4 link Section 4

to Section 1 by providing that an employee who has paid dues to a union and met

the union's criteria for membership will not be counted for the purpose of meeting Section 4's 60% requirement unless the employee has provided the union with a signed and unrevoked PERC Form 2023-1.101. Specifically, proposed regulation 60CC-6.101( ) provides that the number of retained Form 2023-1.101s must equal or exceed the reported number of employees who pay dues to the union. In addition, proposed regulation 60CC-6.104( ) states that "[i]f a public employee has not delivered a signed and dated PERC Form 2023-1.101 to the employee organization as required by [Section 1], and Rule 60CC-1.101, the employee may not be counted as an employee in the bargaining unit who paid dues to the employee organization under [Section 3]."

57.     PERC's proposed regulations implementing Section 4 also provide that an employee who pays dues to a union and has satisfied the union's criteria for membership will not be counted for the purpose of meeting Section 4's 60% requirement unless the employee has paid membership dues through some mechanism other than payroll deduction. Specifically, proposed regulation 60CC-6.201( ) states that "[i]f an employee organization receives dues or uniform assessments deducted from an employee's salary in violation of [Section 3], such employee may not be counted as a dues-paying employee for purposes of registration renewals."

**C.     The Injuries Caused by the Challenged Provisions of SB 256 and How They Are Redressable Through the Remedies Sought in this Lawsuit**

58.     The challenged provisions of the Act, as PERC has stated it intends to implement and enforce them, are causing Plaintiffs immediate and irreparable injuries that will continue absent injunctive and declaratory relief from this Court, to wit:

59.     As to Section 1, its requirement that disfavored unions collect PERC Form 2023-1.101s is injuring Plaintiffs and will continue to injure them by burdening the speech and association rights of the Plaintiff Unions, their members (including the Individual Plaintiff), and those who desire to be members of Plaintiff Unions. As alleged above, PERA will subject noncompliant unions and putative union members to sanctions, enforceable by PERC, if they violate Section 1 and the proposed regulations to implement it.

60.     Section 1 will also burden the First Amendment associational rights of Plaintiff Unions and their members and prospective members by interposing the government as a membership gatekeeper between disfavored unions and their prospective members. Unlike any other private association, individuals will be prevented from joining the disfavored unions unless the employee signs the PERC Form 2023-1.101. Plaintiff Unions, like other private associations, have the First Amendment right to recruit members using their own words and their own

28

membership application forms and their would-be members have the right to associate with the Plaintiff Unions without signing a government prescribed form.

61.    Section 1, as PERC intends to enforce it, will violate the First Amendment speech rights of disfavored unions by effectively compelling them to disseminate the ideological "right-to-work" slogan and the government-drafted message in the PERC Form 2023-1.101.

62.    The phrase "right-to-work" is not a statement of fact.  Rather, it is a controversial ideological slogan of union opponents, which many who support unions find objectionable, as they understand the phrase to be a misleading euphemism that signals a desire to avoid paying one's fair share for the economic benefits produced by collective negotiation.  For the legislature to force the inclusion of the phrase onto a form designed to be used only by those who, by definition, wish to become union members therefore goes well beyond the normal evils of compelled speech.  It adds an element of a government-sponsored taunt directed at those who disagree with the government's official ideology.  And it conditions a core exercise of the right to freedom of association—the right to join a voluntary advocacy organization—on the signing of a form containing an attestation that is offensive to the organization itself as well as many of its members and prospective members.

63.     Compounding the injury to Plaintiffs is that a significant item of information that Section 1 requires to be included in the form is inaccurate. Under PERA, the Plaintiff Unions are entitled to withhold grievance processing and arbitration services to non-members. Yet Section 1's mandated message falsely asserts that "[n]o employee may be discriminated against in any manner for … refusing to join or financially support a labor union." As a direct result of Section 1, disfavored unions will be compelled to engage in speech that attempts to dispel that falsehood.

64.     Thus, Section 1 and the proposed implementing regulations will compel the Plaintiff Unions to disseminate, and those desiring to be or remain members of Plaintiff Unions to sign, a government-prescribed form containing a prominent, inaccurate, government-drafted ideological statement with which the Plaintiffs do not agree.

65.     Compulsion for First Amendment purposes exists not only when the government directly forces a person to utter certain words or refrain from doing so. Where government action, combined with "practical realities," pressures private parties to abandon their First Amendment liberties, the government action is subject to First Amendment scrutiny. *Healy v. James,* 408 U.S. 169, 183 (1972) (collecting cases). The practical realities that work in combination with SB 256's

regulation of disfavored unions establish that Section 1 plainly compels the disfavored unions to disseminate a message with which they disagree.

66. Those practical realities include the following:

67. Section 1 states that an employee cannot be a union member unless and until the employee signs the required form. The proposed implementing regulation that links Section 1 to Section 4 referenced above provides that a union that fails to collect signed PERC forms 2023-1.101 from 60% of the employees it represents is required to undergo a decertification election. These requirements, read together, mean that an otherwise successful union solicitation of a prospective member will be unsuccessful unless the union secures a signed PERC Form 2023-1.101 from the prospective member. And for this purpose, PERC's proposed regulations treat even a pre- July 1, 2023 union member as merely a prospective member who must re-join the union by signing the Form 2023-1.101.

68. Furthermore, both pre-July 1 members and future prospective members are, absent the aid of a union representative, unlikely to know of the existence of Form 2023-1.101 or how to access the form. And they are even more unlikely to know what to write down in the "Employee Organization Information" section of the Form where it asks for the union's "PERC registration number," the "date of last order granting registration," and the "salaries, allowances, and other

31

direct and indirect disbursements" paid to the union's five most highly compensated individuals.

69.     When the "practical realities" set out in the two preceding paragraphs are taken into account, Section 1 and the proposed implementing regulations will compel unions themselves to disseminate the form and present it to both their pre-July 1 members and their future prospective members as part of their solicitation process in order to ensure that they do not face a decertification election or other adverse consequences. Any union that refrained from disseminating the form as part of its solicitation process would find itself unable to grow, or even exist for long, as a union. And, because the ideological statement, the misleading information, and the officer salary information contain content that the Plaintiff Unions would not otherwise choose to communicate as part of their member solicitation process, Section 1, if implemented in accordance with PERC's proposed regulations, will burden the speech of the disfavored unions—including the Plaintiff Unions—and dilute the force of the unions' preferred message aimed at persuading prospective members to join the union.

70.     Section 1 also burdens the speech of the Individual Plaintiff. Specifically, by conditioning the Individual Plaintiff's ability to join or financially support a voluntary membership association on her signature to a government-drafted form containing factually inaccurate information and controversial political

slogans with which she strenuously disagrees, Section 1 conditions the Individual Plaintiff's right to join a union on her being forced to read and acknowledge the government's 91-word political slogan. Members and prospective members of favored unions do not bear this burden.

71.    Because it abridges the Plaintiff Unions' and the Individual Plaintiff's speech and association in violation of the U.S. Constitution, there is no adequate remedy at law for the deprivations caused to Plaintiffs by Section 1, and they will be irreparably harmed if enforcement of Section 1 is not enjoined.

72.    An injunction prohibiting PERC from enforcing Section 1 would redress Plaintiffs Unions' injuries because it would enable Plaintiff Unions to engage in the speech in which they would otherwise engage—solicitation of current and prospective members without distributing or collecting PERC Form 2023-1.101—without fear of PERC-imposed penalty or sanction.

73.    An injunction prohibiting PERC from enforcing Section 1 would redress the Individual Plaintiff's injuries because it would enable the individual plaintiff to engage in the speech and association in which she otherwise would engage—joining and financially supporting the disfavored union of her choice without having to first read and acknowledge the government's controversial and inaccurate speech—without fear of PERC-imposed penalty or sanction.

74.     As to Section 3 of SB 256, the discriminatory ban against disfavored unions' collection of voluntary membership dues by means of payroll deduction will injure the Plaintiff Unions by causing them to incur significant costs while diminishing their membership dues revenue. It will further expose the Plaintiff Unions to penalties imposed by PERC in unfair-labor-practice proceedings for taking actions to enforce their CBAs and otherwise secure the benefits of payroll deduction that they would take in the absence of Section 3 and any implementing regulations. Finally, it will harm the Individual Plaintiff, who will be prevented from financially supporting the union of her choice through her chosen method.

75.     For all of the Plaintiff Unions, voluntary membership dues are the primary source of revenue on which the Plaintiff Unions support their operations. Because of the transaction costs involved in the making and collecting of large numbers of small monthly dues payments, payroll deduction is the most effective and efficient method for public employees to pay, and for public employee unions to collect, membership dues—at a negligible cost to public employers, which, under pre-SB 256 PERA, any public employer could recoup in bargaining. Consequently, the ban against disfavored unions' collection of membership dues via employee-authorized payroll deductions will cause the Plaintiff Unions to incur significant, non-recoverable costs to implement and maintain alternative methods for collecting dues, such as by recurring electronic bank transfers, which require

the payment of fees, and which are not comparable to payroll deduction in efficiency and effectiveness.  In addition, disfavored unions will lose dues revenue because many union members are unwilling to use bank-debit transactions to pay their dues owing to such concerns as the possibility of incurring charges for insufficient bank account funds, and sharing their private banking information, or because the members are unbanked and cannot pay automated dues absent payroll deduction.

76.     Because of SB 256 and PERC's implementing regulations, numerous public employers with which UFF has a CBA containing a payroll deduction requirement have contacted UFF and/or its chapters to inform it that the employer would be stopping the payroll deduction of membership dues, effective July 1, 2023. But for Section 3 and the threat of enforcement by PERC, those public employers would have continued to comply with their contractual obligation to deduct and remit membership dues to the Plaintiff Unions, as they did up until July 1, 2023. Enjoining PERC from enforcing Section 3 will cause those public employers to resume dues deductions, especially in combination with an injunction directed to the Defendant Public Employers barring them from invoking Section 3 in any forum as a basis for refusing to honor the dues-deduction provisions in their CBAs.

77.     Notwithstanding Section 3, non-Defendant Lafayette County School Board, which is party to CBAs with Plaintiff Lafayette Education Association, will comply with the payroll-deduction provisions of those CBAs if PERC is enjoined from enforcing Section 3. Notwithstanding Section 4, Lafayette County School Board will also continue to comply with its CBAs if PERC is enjoined from enforcing Section 4.

78.     After the July 1 effective date of Section 3, Plaintiffs ACEA, UFF, PCTA, and HUSW have ceased receiving dues via payroll deduction, and they do not expect the Defendant Public Employers to resume dues remittances absent action from this Court enjoining enforcement of Section 3 and/or declaring Section 3 unconstitutional either on its face or as applied to existing contracts with dues-deduction provisions.

79.     The Individual Plaintiff will also be harmed by PERC's planned enforcement of Section 3. Prior to July 1, 2023, Professor Schueller had paid her membership dues to UFF and UFF-UF via payroll deduction, her preferred method of dues payment. She is not currently enrolled in eDues, and has not agreed to any other means of payment for her membership dues. Professor Schueller would begin paying her membership dues via payroll deduction if Defendants were enjoined from enforcing and/or relying on Section 3.

80.     There is no adequate remedy at law for the harm the Plaintiff Unions will suffer from the loss of payroll deduction. Plaintiff Unions cannot seek damages from the State of Florida because Florida would raise Eleventh Amendment immunity as a defense. Similarly, those Public Employer Defendants who are not arms of the State of Florida would be acting pursuant to a policy mandated by the State of Florida, not their own policy, and so would likely have a defense to a damages action sought against them as municipalities.

81.     Because of the severe reduction in income Plaintiff Unions are likely to incur as a direct result of the end of payroll deduction, their viability as ongoing enterprises will be threatened during the pendency of this litigation. Finally, it would be impracticable for the Plaintiff Unions to prosecute thousands of small claims against their own members to recover small sums of unpaid dues that were not deducted and remitted because of the implementation of Section 3.

82.     An injunction prohibiting enforcement of Section 3 by PERC and prohibiting the Public Employers from invoking Section 3 in any forum as a basis for refusing to honor the dues-deduction provisions in their CBAs would redress the Plaintiffs' injuries because it would restore the Plaintiff Unions' access to payroll deduction and/or would enable the Plaintiff Unions to avail themselves of their normal remedies if, contrary to experience and expectations, the Public Employers do not comply with their contractual obligations.

83.     SB 256's classifications between disfavored unions and favored unions lack any rational, much less substantial or compelling, connection to a legitimate state purpose; but they do closely align with and advance the illegitimate purpose of rewarding the Governor's political allies while punishing those who have opposed or declined to support him. Unions representing law enforcement, corrections, and firefighter employees in the favored union class endorsed the Governor's candidacy in the 2018 and 2022 gubernatorial elections, while unions in the disfavored class did not.

84.     In his first announcement of the forthcoming legislation in December of 2022, Governor DeSantis acknowledged that the point of the ban on payroll deduction of disfavored unions' membership dues was to reduce the revenue available for public education employee unions' advocacy.  Specifically, Governor DeSantis stated that the purpose of the ban was to prevent public education employees' union dues payments being "frittered away by interest groups who get involved in the school system."  Governor DeSantis also has complained that public education employees' voluntary union dues payments are used to assert "excessive influence," while lodging no such complaints about the use of dues revenue by his union supporters. In his public remarks at the SB 256 signing ceremony, the Governor invoked as a justification for the statute his disagreement with the policies of the "school unions" on matters ranging from "parents' rights"

to "standards" to "Covid." On the last topic, the Governor faulted the teachers' unions for getting districts to adopt masking policies and for being "instrumental in getting [school districts] to fight the state when we said [they] couldn't [enforce mask mandates]."

85.    As to Section 4, the discriminatory requirement that disfavored unions must annually disclose audited financial statements and certified-accountant-verified data showing the percentage of bargaining unit members who are dues-paying union members will injure the disfavored unions by causing them to incur substantial administrative burdens and financial costs of compliance.  The further requirement that a disfavored union must undergo a decertification election if its annual registration statement shows that fewer than 60% of the unit employees pay dues to the union will require disfavored unions to incur further costs to conduct election campaigns and to pay half of the costs of decertification elections.

86.    The consequence of a union's failure to satisfy Section 4's new requirements is decertification of the union.  And decertification of the union means that the CBA itself becomes unenforceable as a contract before the expiration of its agreed-upon term, causing the union and the employee-beneficiaries of the contract to lose the benefit of their bargain.  Because the Plaintiff Unions, in their capacities as certified bargaining agents for educators employed by the Defendant Public Employers, are parties to CBAs with those

public employers that will be in force when Section 4's requirements take effect, those new requirements impose new and costly conditions precedent on the Plaintiff Unions' ability to preserve their CBAs for their stated, agreed-upon duration.

87.    By adding new and costly conditions precedent to the enforceability of existing CBAs during their unexpired terms, Section 4's discriminatory disclosure and decertification rules substantially impair those CBAs. That impairment is not reasonable and necessary to serve any important, or even legitimate, public purpose.

88.    Section 4's onerous new requirement that disfavored unions undergo decertification elections if their annual registration statements show that fewer than 60% of their bargaining units' employees pay dues to the union is irrational.  To begin with, Section 4 requires even a unit with a clear majority of actual dues-paying members to undergo a decertification election.  But the irrationality is deeper than that, for the fact is that the percentage of employees in a unit who pay dues to the union is not a valid basis for judging the level of union support in a unit.  Indeed, the percentage of unit members who pay dues to the union, if anything, *undercounts* support for the union as a bargaining agent.  That is because employees in a represented unit who are not union members and who do not pay dues to the union derive the same benefits from the union's collective bargaining

and other advocacy on behalf of the bargaining unit as dues-paying members do.
This makes it easy for many employees to choose not to be members or pay dues
even though they wish to be represented by the union—*e.g.*, because they prefer
not to pay union dues at all, because they have temporarily stopped paying dues to
tend to an immediate financial emergency, or because they disagree with certain
activities of the union but support its efforts to raise wages and benefits.  Yet
Section 4 irrationally requires disfavored unions to undergo decertification
elections even in many instances where membership figures affirmatively suggest
increasing majority union support, as when membership has increased from 51% to
59%.  Meanwhile, unions allied with Governor DeSantis face no such super-
majority requirement.

89.    Section 4's separate discriminatory requirement that disfavored
unions must disclose audited financial statements and audited membership figures
in their annual registration statements, or else face the sanction of immediate
decertification, likewise adds cumbersome and costly new conditions on the
continuing enforceability of existing CBAs that are not reasonably related to any
important or even legitimate government interest.

90.    The administrative burdens and financial costs imposed by this new
requirement will impose a nearly insurmountable hurdle to continued certification
for certain small and poorly resourced unions. Plaintiff LEA, for example, has a

41

budget for total annual expenditures, net of per capita dues paid to FEA, of

approximately $10,000 per year. It does not currently retain an accountant to

maintain its books, and it does not produce formal financial statements. The cost of

retaining a certified public accountant to create audited financial statements and to

certify its eligible employee and membership numbers, as required by Section 4, is

prohibitive for an organization of its size and resources.

91.     In addition, although it has, through its agents, contacted certified

public accountants in and around Lafayette County to inquire as to their rates and

availability to perform those functions required by Section 4, LEA has, so far,

failed to identify a certified public accountant willing to even quote it a cost for

such a project.

92.     The combination of the unavailability of certified public accountants

and the prohibitive cost of retaining a certified accountant to perform the tasks

required by Section 4 makes it highly unlikely that LEA will be able to comply

with Section 4's new reporting requirements when it is required to complete its

annual re-registration on or after October 1, 2023. As a result, LEA is highly likely

to be decertified as the certified representative of the Lafayette County

instructional personnel and education support professionals it currently represents.

Therefore, as a direct consequence of Section 4's new registration requirements,

and specifically its requirements that financial statements and membership figures

be certified by a public accountant, it is likely that LEA's two CBAs with the School Board of Lafayette County will be completely impaired by Section 4.

93.     The complete impairment of LEA and similar unions' CBAs is not reasonable and necessary to serve a legitimate public purpose.

94.     Because the total impairment of the Plaintiff Unions' CBAs upon decertification by PERC would eliminate the Plaintiff Unions' ability to hold the Public Employers to their obligations under those CBAs, there is no adequate remedy at law for the injuries caused by Section 4.

95.     An injunction prohibiting PERC from enforcing Section 4 would redress the Plaintiffs' injuries because, absent PERC's failure and refusal to register Plaintiff Unions unless they have complied with Section 4's requirements, the Plaintiff Unions would not be decertified and their CBAs would not be invalidated.

**COUNT ONE:**
**VIOLATION OF THE FIRST AMENDMENT:  FREE SPEECH**
**(SECTION 1 OF SB 256)**

96.     Plaintiffs incorporate paragraphs 1-8, 10-14, 16, 18, 20, 22-27, 29-44, 50-73 above by reference as if fully set forth herein.

97.     The First Amendment to the United States Constitution provides that the government "shall make no law… abridging the freedom of speech." U.S.

Const. amend. I. The First Amendment is made applicable to the State of Florida

by the Due Process Clause of the Fourteenth Amendment.

98.    Section 1, particularly as PERC intends to implement it, will compel

unions to engage in speech that they would otherwise prefer not to engage in. As

explained in more detail above, Section 1 will compel unions to disseminate a

government-drafted form communicating an ideological message and other

information, including misleading information, to both their pre-July 1 members

and to their future prospective members as part and parcel of their solicitation

process. Section 1 will therefore burden the speech of the disfavored unions—

including the Plaintiff Unions—by altering the content of the unions' speech and

diluting the force of the unions' preferred message aimed at persuading prospective

members to join the union.

99.    Section 1 also burdens the speech of the Individual Plaintiff.

Specifically, by conditioning the Individual Plaintiff's ability to join or financially

support a voluntary membership association on her signature to a government-

drafted form containing factually inaccurate information and controversial political

slogans with which she strenuously disagrees, Section 1 conditions the Individual

Plaintiff's speech on her being forced to read and acknowledge the government's

91-word political slogan.

100.   These requirements fail to advance any substantial or compelling government interest, are not narrowly tailored, or reasonably related to any such interest, and substantially burden Plaintiffs' First Amendment rights.

101.   Plaintiffs are suffering and will suffer certainly impending, continuing, irreparable harm as a result of this constitutional violation.

## COUNT TWO:
## VIOLATION OF THE FIRST AMENDMENT: FREEDOM OF ASSOCIATION
## (SECTION 1 OF SB 256)

102.   Plaintiffs incorporate paragraphs 1-8, 10-14, 16, 18, 20, 22-27, 29-44, 50-73 above by reference as if fully set forth herein.

103.   The First Amendment to the United States Constitution provides that the government "shall make no law… abridging the freedom of speech … or the right of the people peaceably to assemble." U.S. Const. amend. I. The First Amendment is made applicable to the State of Florida by the Due Process Clause of the Fourteenth Amendment.

104.   Encompassed within the freedoms of speech and assembly is the right of individuals to form and join private expressive associations and the right of such associations to autonomy over their internal affairs, including, of particular importance, autonomy over membership admissions.

105.   Section 1 of SB 256 infringes the freedom of association rights of the Individual Plaintiffs and of the Plaintiff Unions and their members and prospective members.

106.   Section 1 infringes the freedom of association rights of the Individual Plaintiff by conditioning their right to be a member of the union of their choice on their execution of a government-drafted membership authorization form. Conditioning an individual's right to membership in a private association on the execution of a government-drafted form in the manner required by Section 1 is not a reasonable, let alone a narrowly tailored, means of advancing a compelling, substantial, or even legitimate, governmental interest. It therefore cannot pass any level of First Amendment scrutiny.

107.   Section 1 infringes the freedom of association rights of the Plaintiff Unions by depriving them of a core aspect of their institutional autonomy, namely, their autonomy over their membership admissions process. Depriving voluntary private associations, such as the Plaintiff Unions, of their First Amendment right to self-determination over their membership admissions process in the manner required by Section 1 is not a reasonable, let alone a narrowly tailored, means of advancing a compelling, substantial, or even legitimate, governmental interest. It therefore cannot pass any level of First Amendment scrutiny.

108.   Plaintiffs are suffering and will suffer certainly impending,

continuing, irreparable harm as a result of this constitutional violation.

## COUNT THREE:
## VIOLATION OF THE FOURTEENTH AMENDMENT
## (SECTION 1 OF SB 256)

109.   Plaintiffs incorporate paragraphs 1-8, 10-14, 16, 18, 20, 22-27, 29-44,

50-73 by reference as if fully set forth herein.

110.   The Fourteenth Amendment to the United States Constitution

provides that "[n]o State shall … deny to any person within its jurisdiction the

equal protection of the laws." U.S. Const. amend. XIV.

111.   The freedoms of speech and association are fundamental rights.

Section 1 of SB 256 impinges on the speech and associational rights of Plaintiffs in

the manner specified in the preceding two causes of action. To the extent that a

state legislature, consistent with the Fourteenth Amendment, may pass a uniform,

evenhanded law regulating speech and association in the manner in which

Section 1 would do so if it covered the favored unions as well as the disfavored

unions, a state legislature nevertheless may not pass a law that discriminates

against classes of individuals or associations in the course of restricting their

speech and associational rights unless the discrimination passes heightened

scrutiny.

112.   The discriminatory classification in SB 256 between the favored and disfavored unions is not a reasonable, let alone a narrowly tailored, means of advancing a compelling, substantial, or even legitimate, governmental interest. It therefore cannot pass any level of Fourteenth Amendment equal protection scrutiny.

113.   Plaintiffs are suffering and will suffer certainly impending, continuing, irreparable harm as a result of this constitutional violation.

**COUNT FOUR: VIOLATION OF ARTICLE I, SECTION 10 OF THE UNITED STATES CONSTITUTION (SECTION 3 OF SB 256)**

114.   Plaintiffs incorporate paragraphs 1-9, 11-13, 15-27, 29-40, 45-47, 50-57, 74-84 above by reference as if fully set forth herein.

115.   Article I, Section 10 of the United States Constitution provides that "[n]o State shall … pass any … Law impairing the Obligation of Contracts."

116.   Plaintiff Unions have valid, binding, active contracts with the Defendant Public Employers, under which Plaintiff Unions bargained for and secured the employers' agreement to collect voluntary membership dues via payroll deduction.

117.   By prohibiting disfavored unions from collecting voluntary membership dues via payroll deduction, Section 3 of SB 256 substantially impairs the contractual rights of Plaintiff Unions in violation of Article I, Section 10,

Clause 1 of the United States Constitution. The provision changes permissions of and obligations toward disfavored unions and their members on which those unions and members have relied.

118.    The imposed impairment is not reasonable and necessary to advancing an important public purpose.

119.    Plaintiffs are suffering and will suffer certainly impending, continuing, irreparable harm as a result of this constitutional violation.

## COUNT FIVE:
## VIOLATION OF THE FIRST AMENDMENT
### (SECTION 3 OF SB 256)

120.    Plaintiffs incorporate paragraphs 1-9, 11-13, 15-27, 29-40, 45-47, 50-57, 74-84 above by reference as if fully set forth herein.

121.    By prohibiting disfavored unions from funding their advocacy by means of payroll deductions administered by public employers, while granting favored unions the right to fund their advocacy by means of such deductions, Section 3 of SB 256's payroll deduction ban distinguishes among different speakers with different viewpoints, facilitating speech by some but not other speakers, as a means of curtailing, or diluting the relative reach of the advocacy of the viewpoints of the disfavored unions, and thereby violates the right to freedom of speech protected by the First Amendment of the United States Constitution, as incorporated by the Fourteenth Amendment to the U.S. Constitution.

49

122.   These requirements fail to advance any substantial or compelling government interest, are not narrowly tailored or reasonably related to any such interest, and substantially burden the Plaintiffs' First Amendment rights.

123.   Plaintiffs are suffering and will suffer certainly impending, continuing, irreparable harm as a result of this constitutional violation.

**COUNT SIX:**
**VIOLATION OF THE FOURTEENTH AMENDMENT**
**(SECTION 3 OF SB 256)**

124.   Plaintiffs incorporate paragraphs 1-9, 11-13, 15-27, 29-40, 45-47, 50-57, 74-84 above by reference as if fully set forth herein.

125.   By prohibiting disfavored unions from collecting voluntary membership dues via payroll deduction, while allowing favored unions to continue collecting membership dues via payroll deduction, Section 3 of SB 256 violates the guarantee of equal protection of the laws provided by the Fourteenth Amendment of the United States Constitution.

126.   The provision infringes on disfavored unions' First Amendment and contractual rights while imposing no comparable burden on favored unions.

127.   The provision's differentiation between favored and disfavored unions does not advance any compelling, substantial, or even legitimate government interest and is not narrowly tailored or rationally related to advancing any such

interest. It therefore fails any level equal protection scrutiny that may be applicable.

128.   Plaintiffs are suffering and will suffer certainly impending, continuing, irreparable harm as a result of this constitutional violation.

**COUNT SEVEN**
**VIOLATION OF ARTICLE I, SECTION 10 OF THE UNITED STATES**
**CONSTITUTION**
**(SECTION 4 OF SB 256)**

129.   Plaintiffs incorporate paragraphs 1-9, 11-13, 15-27, 29-40, 48-57, 85-95 above by reference as if fully set forth herein.

130.   Plaintiff Unions have valid, binding, active contracts with the Defendant Public Employers containing numerous provisions that establish the wages, benefits, and other valuable terms and conditions of employment for the employees represented by the respective unions. The Plaintiff Unions' CBAs run into at least 2024.

131.   Section 4 subjects disfavored unions, including Plaintiff Unions, to immediate decertification if they fail to comply with any of the following new obligations: annually disclosing audited financial statements; annually disclosing accountant-certified figures showing the number of bargaining unit employees who are and are not dues-paying union members; and undergoing an election to determine whether the union can continue to serve in its role as collective bargaining representative if its disclosures show that fewer than 60% of the

employees it represents pay dues to the union. Immediate decertification means that the CBAs setting out the rights of the bargaining unit employees become unenforceable.

132. By conditioning the continuing enforceability of disfavored unions' CBAs on compliance with new and onerous conditions, Section 4 of SB 256 substantially impairs the contractual rights of Plaintiff Unions in violation of Article I, Section 10, Clause 1 of the United States Constitution. The provision changes permissions of and obligations toward disfavored unions and their members on which those unions and individuals have relied.

133. The imposed impairment is not reasonable and necessary to advancing an important public purpose.

134. Plaintiffs will suffer certainly impending, continuing, irreparable harm as a result of this constitutional violation as Section 4's October 1, 2023, effective date approaches. Indeed, because the PERC proposed regulations link Section 4 to Section 1, Plaintiffs are currently injured by Section 4 when read together with the proposed regulations.

**PRAYER FOR RELIEF**

Wherefore, Plaintiffs pray for the following relief:

(a)    A declaratory judgment that:

i.  Section 1 violates the Plaintiffs' rights to freedom of speech and association under the First Amendment and to equal protection of the laws under the Fourteenth Amendment of the United States Constitution;

ii.  Section 3 impairs the contractual rights of Plaintiff Unions in violation of Article I, Section 10, Clause 1 of the United States Constitution and also violates the Plaintiffs' rights to freedom of speech under the First Amendment and to equal protection of the laws under the Fourteenth Amendment of the United States Constitution; and

iii.  Section 4 impairs the contractual rights of the Plaintiff Unions in violation of Article I, Section 10, Clause 1 of the United States Constitution.

(b)  preliminary and permanent orders enjoining the PERC defendants, their successors, and all those acting in concert with them or at their direction from implementing or enforcing the provisions of SB 256 described in ¶¶ 41-49, or from enforcing PERA § 447.501(2)(b) where the action attempted by the employee organization, representative, agent or member of the employee organization is an attempt to request, persuade, or induce a public employer to provide

payroll deduction of dues in favor of the employee organization under

circumstances where a favored employee organization would be

permitted to make such an attempt;

(c)     preliminary and permanent orders barring Defendant Public

Employers, their successors, and all those acting in concert with them

or at their direction, from invoking Section 3 as a defense in any

forum, including without limitation in any grievance meeting or

arbitration, as a basis for refusing to honor the dues-deduction

provisions in their CBAs.

(d)     An award of attorneys' fees and costs to the Plaintiffs, pursuant to

42 U.S.C. § 1988(b); and

(e)     such other and further relief as the court may find appropriate.


Respectfully submitted,

/s/ Leon Dayan
LEON DAYAN

On behalf of:

LEON DAYAN*
(DC Bar ID 444144)
ldayan@bredhoff.com
ADAM BELLOTTI*
(DC Bar ID 1020169)
abellotti@bredhoff.com
KARA A. NASEEF*
(DC Bar ID 1671394)
knaseef@bredhoff.com
Bredhoff & Kaiser, P.L.L.C.
805 15th Street, N.W.
Suite 1000
Washington, D.C.  20005
(202) 842-2600

MARTIN F. POWELL
mpowell@meyerblohmlaw.com
Florida Bar No. 70317
Meyer, Blohm and Powell, P.A.
403 East Park Avenue
Post Office Box 1547 (32302)
Tallahassee, Florida 32301
(850) 878-5212

KIMBERLY C. MENCHION
kimberly.menchion@floridaea.org
Florida Bar No. 425613
Florida Education Association
213 South Adams Street
Tallahassee, Florida 32301
(850) 224-7818

ALICE M. O'BRIEN**
aobrien@nea.org
PHILIP A. HOSTAK*
phostak@nea.org
National Education Association
1201 16th Street N.W.
Washington, D.C. 20036
(202) 822-7035

MARK H. RICHARD
mrichard@phillipsrichard.com
Florida Bar No. 305979
Phillips, Richard & Rind, P.A.
9360 S.W. 72nd Street, Suite 283
Miami, Florida 33173
(305) 412-8322

* Admitted *pro hac vice*
** Admission *pro hac vice forthcoming*

*Counsel for Plaintiffs*