## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## GAINESVILLE DIVISION

**ALACHUA COUNTY EDUCATION
ASSOCIATION, et al.,**

    *Plaintiffs*,

v.                           **Case No.: 1:23cv111-MW/HTC**

**DONALD J. RUBOTTOM, et al.,**

    *Defendants*.

_____/

## ORDER DENYING SECOND MOTION
## FOR PRELIMINARY INJUNCTION

Pending before this Court is Plaintiffs' second motion for preliminary injunction, ECF No. 63. Plaintiffs previously challenged two new provisions of Florida law affecting most public-sector unions that went into effect July 1, 2023; namely, a "payroll deduction ban" and a "membership form requirement." After this Court denied their first motion for preliminary injunction for failure to demonstrate standing for purposes of a preliminary injunction, *see Alachua Cnty. Educ. Ass'n v. Rubottom*, Case No. 1:23cv111-MW/HTC, 2023 WL 4188197, *1 (N.D. Fla. Jun. 26, 2023), Plaintiffs filed a second amended complaint, adding several new Plaintiffs

(including an individual and three unions[1]), and Defendants (including the members of the University of Florida Board of Trustees, and the School Boards for Alachua, Pinellas, and Hernando Counties). ECF No. 48. Plaintiffs also filed a second motion for preliminary injunction that is now limited to challenging only the payroll deduction ban. This Court has considered, without hearing, the second motion for preliminary injunction, ECF No. 63, Defendants' response in opposition and supplementary authority, ECF Nos. 80 and 83, Plaintiffs' reply, ECF No. 84, and all attachments. For the reasons set out below, the second[2] motion for preliminary injunction, ECF No. 63, is **DENIED.**

---

[1] Namely, Plaintiffs now also include (1) Malini Schueller, an individual who is a tenured professor at the University of Florida and a voluntary member of Plaintiffs United Faculty of Florida ("UFF") and United Faculty of Florida-UF ("UFF-UF"), (2) Lafayette Education Association ("LEA"), (3) Pinellas Classroom Teachers Association ("PCTA"), and (4) Hernando United School Workers ("HUSW"). Neither Ms. Schueller nor LEA join in the second motion for preliminary injunction.

[2] Defendants have raised no procedural issues or objections to Plaintiffs' motion even though Plaintiffs have now moved for preliminary injunctive relief for a second time. Accordingly, although this Court has an independent obligation to investigate Plaintiffs' standing at each stage in this case, this Court is not required to make procedural arguments on behalf of the Defendants. In the absence of any procedural objection or argument that the motion should be construed as something other than a motion for preliminary injunction that is properly before this Court—such as a motion for reconsideration—this Court will consider Plaintiffs' second motion for preliminary injunction as if it is procedurally proper. *Cf., e.g., Oviedo Med. Center, LLC v. Adventis Health Sys./Sunbelt, Inc.*, 2020 WL 4218276, *1 n. 2(M.D. Fla. Apr. 28, 2020) (construing renewed motion for preliminary injunction as a motion for reconsideration because "prior motion was not denied without prejudice, and there has not been a significant change in the requested relief. Rather, Plaintiff has come forward with new evidence in an attempt to alter [the] Court's prior determination on the merits of its motion seeking identical relief.").

I

Before addressing the merits of Plaintiffs' motion, this Court must again determine whether Plaintiffs have standing for purposes of a preliminary injunction and whether they may pursue their Contracts Clause[3] claim under section 1983. As an initial matter, only Plaintiffs ACEA, FEA, UFF, UFF-UF, PCTA, and HUSW seek preliminary injunctive relief with respect to the payroll deduction ban. ECF No. 63 at 1. Here, Defendants assert that ACEA, UFF-UF, PCTA, and HUSW "have fixed the standing defect" this Court identified in its Order denying the original motion for preliminary injunction. ECF No. 80 at 13. But Defendants assert Plaintiffs UFF and FEA "are not parties to any of the four [collective bargaining agreements] that Plaintiffs proffer so they do not have standing to challenge Section 3's effect on those CBAs." *Id*. Plaintiffs do not respond to Defendants' arguments with respect to Plaintiffs UFF and FEA's standing for a preliminary injunction.[4] This Court construes Plaintiffs' silence as a concession that only those Plaintiffs who have

_____

[3] As noted by *LL Liquor, Inc. v. Montana*, 912 F.3d 533, 537 n.2 (9th Cir. 2018), federal courts—including the United States Supreme Court—have "bounced between using the plural 'Contracts' and the singular 'Contract' when referring to this Clause." The Ninth Circuit concluded the plural form was appropriate because article 10, section 1 of the Constitution says "Obligation of *Contracts*." (emphasis added). Letters (and words) matter, especially in the Constitution. *See M'Culloch v. Maryland*, 17 U.S. 316, 407 (1819) ("[W]e must never forget that it is a *constitution* we are expounding."). This Court will likewise use the plural form.

[4] However, as noted in their motion and evidence submitted in support thereof, Plaintiff UFF is, in fact, a party to the collective bargaining agreement with the University of Florida. *See* ECF No. 15-2; ECF No. 63-1 at 11.

proffered collective bargaining agreements that have allegedly been impaired by the payroll deduction ban have standing to seek a preliminary injunction based on the asserted Contracts Clause violation. *See Bricklayers Union Local 21 v. Edgar*, 922 F. Supp. 100, 105 (N.D. Ill. 1996) ("[I]f there is no contract or the impairment is not substantial, the inquiry ends and there is no Contract Clause violation . . . . The Contract Clause is only implicated when an existing contract is substantially impaired." (citing *United States Trust Co. of New York v. New Jersey*, 431 U.S. 1, 17 (1977)). Accordingly, this Court limits its standing analysis to only those Plaintiffs who have proffered existing collective bargaining agreements subject to the challenged provision and to which they are parties.

As this Court noted in its prior Order, the Supreme Court has developed a three-part test for determining when standing exists. Under that test, a plaintiff must show (1) that they have suffered an injury-in-fact that is (2) traceable to the defendant and that (3) can likely be redressed by a favorable ruling. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). And "where a plaintiff moves for a preliminary injunction, the district court . . . should normally evaluate standing 'under the heightened standard for evaluating a motion for summary judgment.' " *Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 900 F.3d 250, 255 (6th Cir. 2018) (quoting *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 912 (D.C. Cir. 2015)). Thus, "a plaintiff cannot 'rest on such mere allegations, [as would be appropriate at

the pleading stage,] but must set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true.' " *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011) (some alteration in original) (quoting *Lujan*, 504 U.S. at 561). This Court addresses standing for the moving Plaintiffs with existing collective bargaining agreements below.

### A

Plaintiffs' second motion for preliminary injunction challenges only section 3 of SB 256, which amends section 447.303, Florida Statutes. This provision prohibits the use of payroll deductions for payment of certain public employee union dues. For purposes of their motion, Plaintiffs assert this provision violates the Contracts Clause, article I, section 10 of the United States Constitution because it substantially impairs their existing collective bargaining agreements. Specifically, section 3 of SB 256 nullified payroll deduction terms in their current agreements as soon as the law took effect.

With respect to this claim, Plaintiffs ACEA, HUSW, UFF, and PTCA have demonstrated an injury-in-fact. The challenged provision nullifies an express term of their existing collective bargaining agreements and eliminates the primary mode by which these Plaintiffs collect union dues. For example, Plaintiff HUSW has introduced evidence demonstrating that its primary source of revenue is from voluntary membership dues and that, before this year, substantially all of HUSW's

175 dues-paying members paid their dues through payroll deductions. ECF No. 63-2 ¶¶ 11–12. Defendant School Board of Hernando County, with whom HUSW has entered into a collective bargaining agreement that included payroll deduction for dues and is effective now through June 30, 2026, terminated payroll deductions on July 1, 2023. *Id*. ¶¶ 4, 14. HUSW is currently working on implementing an alternative method for payment of voluntary dues; however, this alternative payment system "will not be available to its members until September 2023 at the earliest." *Id*. ¶ 15.

Similarly, Plaintiff PCTA has introduced evidence that its collective bargaining agreement with Defendant School Board of Pinellas County, effective now through June 30, 2025, provides for payroll deductions to collect voluntary membership dues. ECF No. 63-3 ¶¶ 4–5. According to PCTA, substantially all of their 3,848 dues-paying members paid their dues via payroll deductions prior to the introduction of eDues in April 2023 and before the challenged provision went into effect. *Id*. ¶ 10. As of July 7, 2023, 43% of PCTA's dues-paying members had switched to paying dues through an alternative method called eDues. *Id*. ¶ 13. In addition, according to PCTA, Defendant School Board of Pinellas County announced that it would stop deducting membership dues in the pay period beginning August 5, 2023, thus terminating a majority of PCTA's revenue stream at the start of the new school year. *Id*. ¶ 15.

Plaintiffs also point to the collective bargaining agreement between UFF and the University of Florida, whose members of the Board of Trustees are now Defendants in this action. *See* ECF No. 15-2; ECF No. 63-1 at 11 (citing First Gothard Declaration and collective bargaining agreement). This agreement is effective now through June 30, 2024, and provides for payroll deductions of voluntary membership dues by the University of Florida. ECF No. 15-2 ¶¶ 7, 9. The University of Florida ceased deducting membership dues from payroll effective July 1, 2023, and, as of July 14, 2023, only about half of dues-paying members have transitioned to paying dues via another method. *See* ECF No. 63-4 ¶ 9.

Lastly, with respect to Plaintiff ACEA, Plaintiffs point to the collective bargaining agreement they submitted in support of their first motion for preliminary injunction. ECF No. 63-1 at 11–12. Like the other union Plaintiffs discussed above, Plaintiff ACEA has entered into collective bargaining agreements—one for teachers and one for education support professionals—that include payroll deduction provisions for collection of membership dues. ECF No. 15-6 ¶¶ 7–8. The teacher's collective bargaining agreement with Defendant Alachua County School Board is in the record and in effect now through July 31, 2024. *See id*. ¶ 7. The primary source of ACEA's operating revenue is voluntary membership dues, and over 99% of the union's members paid these dues via payroll deductions before the challenged provision went into effect. *Id*. ¶ 18. ACEA introduced an alternative payment

method in April, *id.* ¶ 19, but as of July 14, 2023, only 60% of members have signed up to pay dues through this alternative payment method.

Defendants do not contest that the statutory elimination of payroll deductions for payment of voluntary membership dues is an imminent, concrete, and particularized injury. Nor do the original Defendants argue that such an injury is not traceable to their enforcement authority. And now that Plaintiffs have amended their complaint to include the employers who are also parties to the collective bargaining agreements at issue, it appears Plaintiffs' injuries—the elimination of an express term of their collectively bargaining agreements that directly impacts their primary mode of dues collection—would likely be redressed by an injunction against both the original, PERC Defendants and the public-employer Defendants. As this Court noted in its order denying the original motion for preliminary injunction, absent an injunction, the public employers who are parties to Plaintiffs' collective bargaining agreements are prohibited by law from deducting membership dues from their employees' salaries. Now that Plaintiffs have also sued these public employers, Plaintiffs have "fixed" the redressability problem this Court identified earlier.

In short, this Court is satisfied that Plaintiffs ACEA, UFF, HUSW, and PCTA have demonstrated standing for purposes of their second motion for preliminary injunction. Next, this Court turns to the second preliminary issue before reaching the

merits of Plaintiffs' Contracts Clause claim; namely, whether Plaintiffs may pursue this claim under section 1983.

B

Plaintiffs bring their Contracts Clause claim under both 42 U.S.C. § 1983, "as well as directly under the . . . Contracts Clause of the United States Constitution, pursuant to the inherent power of federal courts to enjoin actions taken by government officials in violation of the United States Constitution." ECF No. 48 ¶ 5. Defendants assert Plaintiffs' motion must be denied because alleged Contracts Clause violations do not fall within the scope of cognizable claims under section 1983, nor do Plaintiffs have a cause of action directly under the Constitution. ECF No. 80 at 14. For the reasons set out below, this Court concludes that Plaintiffs' Contracts Clause claim falls within the scope of section 1983 and this Court need not consider whether they may pursue the claim directly under the Constitution.

To start, Defendants assert "binding Supreme Court precedent" holds that "an alleged Contracts Clause violation cannot give rise to a cause of action under § 1983." *Id*. (quoting *Laborers' Int'l Union of N. Am., Local 860 v. Neff*, 29 F.4th 325, 334 (6thCir. 2022)). Of course, Defendants' quotation omits critical language from *Neff*, in which the Sixth Circuit notes that the *Sixth Circuit* has held this, not the Supreme Court. *Id*. ("*We have held*, however, than an 'alleged Contracts Clause violation cannot give rise to a cause of action under § 1983.' " (quoting *Kaminski v.*

9

*Coulter*, 865 F. 3d 339, 347 (6th Cir. 2017)). In addition, Defendants' argument focuses almost entirely on language from cases that fall on only one side of a circuit split regarding whether alleged Contracts Clause violations fall within the scope of section 1983 claims. The circuit split is the result of differing interpretations that federal appeals courts have assigned to the Supreme Court's decision in *Carter v. Greenhow*, 114 U.S. 317 (1885). *See Heights Apts., LLC v. Walz*, 30 F.4th 720, 727–28 (8th Cir. 2022) (discussing circuit split). The Eleventh Circuit has not yet weighed in on this split, thus this Court turns to *Carter* and the federal circuit courts that have interpreted its holding to determine whether Plaintiffs' claim is within section 1983's broad scope.

*Carter* involved a Virginia property owner, Samuel Carter, who attempted to pay his real estate taxes with coupons. The tax collector, Samuel Greenhow, refused to accept payment via coupon and proceeded to levy the owner's property to collect his tax debts. Mr. Carter sued under the statutory predecessor to section 1983 to vindicate his alleged "right to pay taxes in coupons instead of in money, and, after a tender of coupons, the immunity from further proceeding to collect such taxes as though they were delinquent." 114 U.S. at 322. In rejecting Mr. Carter's claim, the Supreme Court noted that the facts alleged failed to "constitute a cause of action within the terms of" section 1983's predecessor statute, because Mr. Carter failed to show he had been deprived "of a right, privilege, or immunity secured by the

constitution." *Id*. at 321. Instead, the Court held that "[t]he right to pay his taxes in coupons, and the immunity from further proceedin[g]s, in a case of a rejected tender, are not rights directly secured to him by the constitution, and only so indirectly as they happen in this case to be the rights of contract which he holds under the laws of Virginia." *Id*. at 322. Rather than pursue "a judicial determination declaring the nullity of [an] attempt to impair [a contractual] obligation"—a right secured by the Contracts Clause of the Constitution—Mr. Carter sought to vindicate his contractual right to pay taxes with coupons. In short, the facts alleged fell outside the scope of the statute he sued under.

At the very least, this Court gleans from its own review of *Carter* that the Supreme Court in the 1880s understood that the Constitution grants Congress the power to pass legislation to remedy alleged violations of the Contracts Clause and that individuals have the right to seek relief in federal court to declare a state law null in the event it unconstitutionally impairs a contract. *See also Civil Rights Cases*, 109 U.S. 3, 12 (1883) (noting that the Constitution gave Congress "the power to provide remedies by which the impairment of contracts by State legislation might be counteracted and corrected"). Mr. Carter's claim failed in his case, according to the Supreme Court, because he premised his claim under section 1983's predecessor as a violation of the contractual right to pay taxes with coupons, rather than a violation

11

of the constitutional prohibition on the passage of state laws that impair contractual obligations.

In more recent years, the Supreme Court has expressly read *Carter* to have reached a holding that is much narrower than Defendants suggest. For example, in *Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 613 n.29 (1979), the majority described the Supreme Court's earlier rejection of Mr. Carter's claim under section 1983's predecessor statute as based on a pleading deficiency, noting the Court "held as a matter of pleading that the particular cause of action set up in the plaintiff's pleading was in contract and was not to redress [a] deprivation of the 'right secured to him by that clause of the Constitution' [the contract clause], to which he had 'chosen not to resort.' " *Id*. (alterations in original) (quoting *Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 527 (1939) (opinion of Stone, J.)). In his concurrence, Justice White likewise described *Carter* as "holding that an action for damages against a state tax collector did not state a cause of action under [section 1983's predecessor] because the right to pay taxes in coupons arose under state, rather than federal, law." *Id*. at 658 n.27 (White, J., concurring). In other words, rather than grounding his federal claim in allegations of a violation of the Contracts Clause, Mr. Carter alleged a violation of a state-law contractual right to pay his taxes with coupons—an insufficient basis upon which to seek a federal remedy under section 1983's predecessor.

Similarly, in *Dennis v. Higgins*, 498 U.S. 439 (1991), the Supreme Court echoed the *Chapman* Court's reading of *Carter*. In response to Justice Kennedy's dissent, which read *Carter* to broadly hold that a "violation of the Contracts Clause does not give rise to a § 1983 cause of action," *id*. at 457 (Kennedy, J., dissenting), the majority again reiterated that *Carter* "held as a matter of pleading that the particular cause of action set up in the plaintiff's pleading was in contract and was not to redress [a] deprivation of . . . [the contract clause], to which he had 'chosen not to resort.'" *Id*. at 451 n.9 (quoting *Chapman*, 441 U.S. at 613 n.29).

The Ninth Circuit relied upon the Supreme Court's limitation of *Carter* to hold that a deprivation of the "right of a party not to have a State, or a political subdivision thereof, impair its obligations of contract," gives rise to a claim under section 1983. *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 887 (9th Cir. 2003). Because the Supreme Court has instructed that "[t]he rights guaranteed by section 1983 are 'liberally and beneficently construed,'" *id*. (quoting *Dennis*, 498 U.S. at 443), and because the right not to have the state impair contractual obligations is "a right secured by the first article of the United States Constitution," the Ninth Circuit concluded that alleged Contracts Clause violations necessarily fall within the scope of section 1983, which "provides for liability against any person acting under color of law who deprives another 'of any rights, privileges, or immunities secured by the

Constitution and laws' of the United States." *Santa Ana*, 336 F.3d at 887 (quoting 42 U.S.C. § 1983).

The Fourth Circuit reached a different conclusion in 2011 in *Crosby v. City of Gastonia*, 635 F.3d 634 (4th Cir. 2011); namely, "that *Carter* stands even today for the proposition that an attempted § 1983 action alleging state impairment of a private contract will not lie." *Id*. at 641. The Fourth Circuit was unpersuaded by the Ninth Circuit's "short opinion" in *Santa Ana* and its differing view of the majority's footnote in *Dennis*. *Id*. at 640. Specifically, the Fourth Circuit viewed "Justice White's reference to the 'narrow reading' accorded *Carter* [as] intended to address the usefulness of that case in providing a framework for the analysis of § 1983 claims invoking parts of the Constitution other than the Contracts Clause, or alleging the deprivation of rights secured by other federal laws." *Id*. at 640–41. However, the Fourth Circuit offered no explanation for why the Ninth Circuit's view of the majority's footnote in *Dennis* is wrong. Nor is it obvious to this Court that the Ninth Circuit's interpretation is incorrect. Indeed, the Eighth Circuit appears to share the Ninth Circuit's view *Dennis*'s limitation of *Carter*. *See Walz*, 30 F.4th at 727 (citing *Dennis* and noting that "the Court has since clarified that *Carter* was a question about pleading and not about whether the plaintiff could bring a claim under the Contract Clause").

14

In 2017, the Sixth Circuit joined the Fourth Circuit in holding that a Contracts Clause violation cannot give rise to a claim under section 1983. *Kaminski v. Coulter*, 865 F.3d 339, 346–47 (6th Cir. 2017). The Sixth Circuit noted that although the Supreme Court "has never definitively held that an alleged Contracts Clause violation is cognizable as a § 1983 claim . . . the only on-point Supreme Court decision[, *Carter*,] suggests that the Contracts Clause does not protect an individual constitutional right enforceable under § 1983, but is rather a structural limitation placed upon the power of the States."[5] *Id*. at 346. And while noting that "[i]t is unclear . . . if *Carter* retains much precedential force" following *Dennis*, the Sixth Circuit concluded that the Fourth Circuit's view "better reconcile[s] the Supreme Court's holdings in *Carter* and *Dennis* with the text and history of § 1983, [and] it also better comports with the time-honored principle that 'it is [the Supreme Court's] prerogative alone to overrule one of its precedents.' " *Id*. at 347 (quoting *State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997)).

---

[5] Some courts have also adopted the argument that Contracts Clause claims are improper under section 1983 because the "bar against states[] enacting laws that impair contractual obligations . . . has never been incorporated into the sphere of Fourteenth Amendment protection." *APT Tampa/Orlando, Inc. v. Orange Cnty.*, 1997 WL 33320573, at *8 (M.D. Fla. Dec. 10, 1997) (quoting *Poirier v. Hodges*, 445 F. Supp. 838, 842 (M.D. Fla. 1978)). But *Dennis* directly undermines this conclusion. Specifically, *Dennis* noted that "the Court has never restricted [section 1983's] scope to [ensure a right of action only to enforce the protections of the Fourteenth Amendment and the federal laws enacted pursuant thereto]." 498 U.S. at 444–45. Indeed, the Supreme Court previously "rejected attempts to limit the types of constitutional rights that are encompassed within the phrase 'rights, privileges or immunities,' [under section 1983]." *Id*. at 445. Accordingly, the Court held that suits for violations of the Commerce Clause may be brought under section 1983, notwithstanding the fact that the Commerce Clause is "a power-allocating provision" of the constitution, much like the Contracts Clause. *Id*. at 447.

"[T]he Supreme Court is certainly capable of saying what it means, and it 'does not normally overturn, or so dramatically limit, earlier authority *sub silentio*.'" *Rafferty v. Denny's, Inc.*, 13 F.4th 1166, 1182 (11th Cir. 2021) (quoting *Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 18 (2000)). Here, a majority of the Supreme Court has twice now said what it means with respect to *Carter*'s holding: "This Court . . . has given that decision a narrow reading, stating that the case 'held as a matter of pleading that the particular cause of action set up in the plaintiff's pleading was in contract and was not to redress deprivation of the right secured to him by that clause of the Constitution [the contract clause], to which he had chosen not to resort.' " *Dennis*, 492 U.S. at 451 n.9 (quoting *Chapman*, 441 U.S. at 613 n.29). Or, as the Eighth Circuit has succinctly put it, "the Court has since clarified that *Carter* was a question about pleading and not about whether the plaintiff could bring a claim under the Contract Clause." *Walz*, 30 F.4th at 727. Accordingly, based on the Supreme Court's limitation on the holding in *Carter*, which the Court expressed in clear terms in both *Chapman* and *Dennis*, this Court concludes that *Carter* does not preclude Plaintiffs from bringing their Contracts Clause claim under section 1983.[6] And without belaboring the point, if the Supreme Court has

---

[6] To be clear, in reading *Carter* to stand for the proposition that Samuel Carter's claim failed under section 1983's predecessor statute as a matter of pleading—because Mr. Carter alleged a contract claim as opposed to a violation of the constitutional prohibition on the impairment of contracts—the Supreme Court in *Chapman* and *Dennis* did not affirmatively hold that a Contracts Clause claim may be brought under section 1983. But the Supreme Court also did

affirmatively recognized that the scope of section 1983 includes constitutional challenges under the Commerce Clause, this Court can conceive of no meaningful distinction for constitutional challenges under the Contracts Clause. Having so concluded, this Court turns to whether Plaintiffs are substantially likely to succeed on the merits of their Contracts Clause claim.

## II

A district court may grant a preliminary injunction if the movant shows: "(1) it has a substantial likelihood of success on the merits;" (2) it will suffer irreparable injury "unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Siegel*, 234 F.3d at 1176. Although a "preliminary injunction is an extraordinary and drastic remedy," it should be granted if "the movant 'clearly carries the burden of persuasion' as to the four prerequisites." *United States v. Jefferson Cnty.*, 720 F.2d 1511, 1519 (11th Cir. 1983) (quoting *Canal Auth. v. Callaway*, 489 F.2d 567, 573 (5th Cir. 1974)).[7] No one factor, however, is controlling; this Court must consider the factors jointly, and a strong showing on one factor may compensate for a weaker

---

not say that such claims are precluded. Accordingly, this Court rejects Defendants' assertion that *Carter* precludes Plaintiffs' Contracts Clause claim.

[7] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

showing on another. *See Fla. Med. Ass'n, Inc. v. U.S. Dep't of Health, Educ., & Welfare*, 601 F.2d 199, 203 n.2 (5th Cir. 1979). This Court begins with whether Plaintiffs have shown a substantial likelihood of success on the merits. This Court addresses this factor first because, typically, if a plaintiff cannot "establish a likelihood of success on the merits," this Court "need not consider the remaining conditions prerequisite to injunctive relief." *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1247 (11th Cir. 2002).

The Constitution prohibits the States from passing "any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts." U.S. Const. art. I, § 10. The final clause quoted, known as the Contracts Clause, "applies to any kind of contract." *Sveen v. Melin*, 138 S. Ct. 1815, 1821 (2018). It is not, however, an absolute bar to legislation that affects contracts. Rather, the Constitution recognizes that contracts reflect parties' expectations about the future, and at times it may be necessary for a government to subordinate those expectations to the needs of the public's health, safety, and welfare. *See Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 241 (1978) (explaining the Contracts Clause "does not operate to obliterate the police power of the States"). Courts analyze impairment of contracts by applying

> a two-step test. The threshold issue is whether the state law has operated as a substantial impairment of a contractual relationship. In answering that question, [courts] consider[] the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights. If such factors show a substantial impairment, the inquiry

> turns to the means and ends of the legislation. In particular, [courts] ask[] whether the state law is drawn in an appropriate and reasonable way to advance a significant and legitimate public purpose.

*Sveen*, 138 S. Ct. at 1821-22 (internal quotation marks and citations omitted). The severity of the impairment is both the focus of the first step and a means to calibrate the second step; that is, the more severe the impairment, the higher the level of scrutiny a court will apply. *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 504 n.31 (1987) (quoting *Energy Reserves Grp., Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411 (1983)). "The severity of the impairment measures the height of the hurdle the state legislation must clear. Minimal alteration of contractual obligations may end the inquiry at its first stage. Severe impairment, on the other hand, will push the inquiry to a careful examination of the nature and purpose of the state legislation." *Spannaus*, 438 U.S. at 245 (footnote omitted); *see also Chrysler Corp. v. Kolosso Auto Sales, Inc.*, 148 F.3d 892, 897 (7th Cir. 1998) (analyzing the justifications advanced for the law at issue and concluding they were "hard to take seriously"). "The requirement of a legitimate public purpose guarantees that the State is exercising its police power, rather than providing a benefit to special interests." *Energy Reserves*, 459 U.S. at 412 (footnote omitted).

Contracts Clause jurisprudence also treats impairment of contracts between private parties differently from impairment of contracts to which the state government is itself a party. "Legislation adjusting the rights and responsibilities of

contracting parties must be upon reasonable conditions and of a character appropriate to the public purpose justifying its adoption." *U.S. Trust Co. of New York v. New Jersey*, 431 U.S. 1, 22 (1977). When the State is not a party to the affected contract, however, "courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure." *Id.* at 23. But when the State impairs the obligations of its own contract, "complete deference to a legislative assessment of reasonableness and necessity is not appropriate because the State's self-interest is at stake." *Id.* at 26. The contracts before this Court involve agreements between Plaintiffs, their members, and their members' public employers. Although the employers are governmental entities—school boards, university boards of trustees, etc.—it is not entirely clear whether such collective bargaining agreements ought to be considered contracts with the State of Florida. This would be an easier question had the collective bargaining agreements been between public employees and a state agency, like the Florida Department of Corrections. Even so, given this Court's ultimate conclusion that Plaintiffs have not clearly carried their burden to demonstrate a substantial likelihood of success with respect to substantial impairment, this Court need not split hairs with respect to this wrinkle in the analysis as it is not determinative.

A

Having set out the applicable standard, this Court turns to the first step of the test—namely, this Court considers whether the payroll deduction ban has substantially impaired the Plaintiffs' collective bargaining agreements. To do so, this Court must determine to what extent the payroll deduction ban has (1) undermined the contractual bargain, (2) interfered with the parties' reasonable expectations, and (3) prevented Plaintiffs from safeguarding or reinstating their rights. These factors substantially overlap in this analysis. For example, evidence demonstrating that some Plaintiffs have taken steps to plan for the elimination of payroll deductions for the collection of membership dues also sheds light on whether Plaintiffs could have reasonably expected to have the Defendant employers facilitate their collection of dues through payroll deductions during the full term of the contracts at issue.

Here, given this overlap and a record that includes evidence that is both favorable and unfavorable to both sides in this litigation, this Court is unable to conclude that Plaintiffs are substantially likely to succeed on the merits with respect to their Contracts Clause claim. In short, Plaintiffs have not demonstrated that they

are substantially likely to establish that they have suffered a substantial impairment to their collective bargaining agreements.

1

With respect to the first factor, Plaintiffs assert the ban has substantially undermined their collective bargaining agreements with the Defendant public employers. Plaintiffs note that "[w]here even a single important provision of a contract is 'totally eliminated,' this criterion is satisfied," ECF No. 63-1 at 17 (quoting *U.S. Trust Co.*, 431 U.S. at 19), and here, the ban operates to completely eliminate a provision in each collective bargaining agreement while the agreements are currently in effect.

In response, Defendants assert the payroll deduction ban affects "only an ancillary provision in each agreement that describes how the employees' bargaining representatives receive membership dues." ECF No. 80 at 37 (citation omitted). Defendants argue that the payroll deduction provisions in the collective bargaining agreements before this Court are merely "minor contractual provisions," whose elimination has not substantially affected the contractual bargain as a whole. *Id*. at 36–37.

Both sides appear to oversimplify the inquiry with respect to this factor. However, this Court agrees with Plaintiffs that the payroll deduction ban has undermined the contractual bargains that their collective bargaining agreements

22

originally struck. It is true that, as Defendants point out, the agreements in the record contain myriad provisions governing all manner of terms for public school teachers, professors, faculty, and staff. The payroll deduction ban serves to eliminate just one of these contractual terms. Had the law eliminated any other provision pertaining to class size, disciplinary action, etc., Defendants would also likely characterize such provisions to be "ancillary" or "minor contractual provisions" as well. But "[t]otal destruction of contractual expectations is not necessary for a finding of substantial impairment." *Kansas Power*, 459 U.S. at 411; *see also Toledo Area AFL-CIO Council v. Pizza*, 154 F.3d 307, 323 (6th Cir. 1998).

Here, the payroll deduction provisions that Plaintiffs sought during the negotiation of these contracts are critical to Plaintiffs' ability to function as effective bargaining agents on behalf of the teachers, professors, and other public employees that they represent and who benefit from the collective bargaining agreements. These unions serve as the bargaining agents for the many public employees that they represent, and their members' voluntary membership dues collected through payroll deductions are the primary source of revenue for these unions. *See* ECF No. 15-6 ¶ 17 (noting that voluntary membership dues constituted about 90% of ACEA's total income in 2022); ECF No. 15-2 ¶ 13 (noting that voluntary membership dues constituted about 77% of all revenue for UFF in 2020-2021); ECF No. 63-2 ¶ 11 ("The primary source of HUSW's operating revenue is voluntary membership

dues."); ECF No. 63-3 ¶ 9 ("The primary source of PCTA's operating revenue is voluntary membership dues."). Further, Plaintiffs' evidence demonstrates that Plaintiffs consider the payroll deduction provisions to be "materially valuable terms of the overall contracts, both because it simplifies dues collection for [the union] and because it makes it more convenient for [union] members to pay voluntary membership dues they have elected to pay in any event." ECF No. 63-2 ¶ 7; *see also* ECF No. 63-3 ¶ 6; ECF No. 15-2 ¶ 10; ECF No. 15-6 ¶ 9. Indeed, these provisions guarantee a convenient way for their members to pay voluntary membership dues through payroll deduction.

Simply put, without the collection of dues, Plaintiffs would not be able to function, and thus, they would not have been able to enter into these collective bargaining agreements for the benefit of their members. When striking the bargain in these agreements, Plaintiffs sought and received provisions requiring employers to facilitate the collection of dues through payroll deductions, which served as their primary mode of collecting dues and raising revenue. Now, the challenged provision eliminates payroll deductions, and Plaintiffs are left to figure out another way to collect dues outside of what the parties agreed to in their collective bargaining agreements. In addition, the public employer Defendants face legal consequences if they continue deducting dues from payroll in accordance with the collective bargaining agreements. This Court finds that, short of entirely destroying the

contractual bargains Plaintiffs struck with the Defendant public employers, the payroll deduction ban undermines their agreements by eliminating the agreed-upon method of dues collection, which was critical to the survival of the unions at the time the bargains were struck.

2

The second factor this Court must consider is to what extent the payroll deduction ban has interfered with the parties' reasonable expectations. This is a closer question for the reasons set out below.

At the time Plaintiffs entered into their collective bargaining agreements—indeed, since as far back as the 1970s—Florida law expressly provided for the right for payroll deductions to collect voluntary public employee union membership dues. *See* § 447.303, Fla. Stat. (1977) ("Any employee organization which has been certified as a bargaining agent *shall have the right to have its dues and uniform assessments deducted by the employer from the salaries of those employees who authorize the deduction of said dues and uniform assessments*." (emphasis added)). And Plaintiffs' evidence demonstrates that they expected to have access to payroll deductions for the collection of membership dues through the full term of the relevant collective bargaining agreements, which they entered well before the challenged provision was proposed in the Legislature. *See* ECF No. 15-2 ¶ 7; ECF No. 15-6 ¶¶ 10–11; ECF No. 63-2 ¶¶ 8–9; ECF No. 63-3 ¶¶ 7–8.

25

Defendants, on the other hand, assert that Plaintiffs' collective bargaining agreements "do not give rise to any reasonable contractual expectations that implicate the Contract Clause." ECF No. 80 at 25 (quoting *S&M Brands, Inc. v. Georgia ex rel. Carr*, 925 F.3d 1198, 1203 (11th Cir. 2019). According to Defendants, Florida has regulated collective bargaining for decades, along with collective bargaining agreements and dues checkoffs in particular. *Id*. at 10. Defendants argue that this history of state regulation, in conjunction with the fact that the collective bargaining agreements before this Court include provisions that contemplate and account for changes in state law, defeats any reasonable expectations that Plaintiffs may have had about payroll deductions for membership dues under their agreements. *See id*. at 10–11.

This Court rejects Defendants' oversimplification with respect to Plaintiffs' expectations about retaining the right to collect voluntary membership dues via payroll deductions during the life of their collective bargaining agreements. Defendants are mistaken to suggest that, in this case, "regulation of the industry generally" or the subject matter of the contract more specifically is "dispositive without looking at any other factors." *See* ECF No. 80 at 29. Defendants' reliance on the Eleventh Circuit's decision in *S&M Brands* as the silver bullet to Plaintiffs' claim is misplaced. *S&M Brands* is factually distinguishable and, more importantly,

26

does not hold that state regulation of the industry or of the contract itself *automatically* defeats a showing of substantial impairment.

Instead, *S&M Brands* considered a Contracts Clause claim premised on changes to an escrow agreement that the plaintiff, a tobacco producer, was *required* by law to enter to operate in the state of Georgia. The Eleventh Circuit described the escrow-agreement regime as another way Georgia regulates tobacco producers— "by *requiring private parties to contract*." *Id*. (emphasis added). In affirming the dismissal of the tobacco producer's Contracts Clause claim, the Eleventh Circuit pointed to Supreme Court precedent holding that the case for substantial impairment of a contract is "less likely" when "an industry is already heavily regulated," and "even weaker . . . when the subject matter of the contract itself is already subject to state regulation." *Id*. (citing *Kansas Power*, 459 U.S. at 412 and *Veix v. Sixth Ward Bldg. & Loan Ass'n*, 310 U.S. 32, 38 (1940)). Given the manner by which Georgia chose to regulate certain tobacco producers—*requiring* them "to self-insure by contracting with an escrow fund into which they pay a set amount per cigarette sold," 925 F.3d at 1201—the Eleventh Circuit concluded it was "hard to say that such a contract could give rise to *any* reasonable contractual expectations . . . ." *Id*. at 1203 (emphasis in original). This was particularly true with respect to the agreements at issue in *S&M Brands*, where "*[e]very term* of the old model escrow agreement [that the tobacco producer previously used] was *specifically dictated by the Attorney*

27

*General as a condition of approval* under [Georgia law]." *Id*. (emphasis added). In other words, based on the extreme level of control that Georgia had over setting the terms of the required contracts, the tobacco producer could not demonstrate reasonable contractual expectations with respect to the escrow agreement at issue.

Here, Defendants point to the many regulations Florida has in place with respect to labor relations and collective bargaining, including requirements for (1) the certification of organizations that are allowed to negotiate agreements, (2) the scope of negotiations, (3) the parties who are responsible for collective bargaining, (4) the process involved when the parties cannot agree, and (5) the process for ratification of an agreement. Defendants also point out that the right to dues deduction has been qualified under Florida law. *See* ECF No. 80 at 28 (citing § 447.303, Fla. Stat. (2022)). According to Defendants, these limitations on collective bargaining and payroll deductions automatically eliminate Plaintiffs' expectations regarding the payroll deduction provision under *S&M Brands*.

Of course, such regulation is not the end of the inquiry. Just because Florida has set parameters for collective bargaining and provided members the ability to revoke their payroll deduction election does not mean Plaintiffs lack *any* contractual expectations with respect to the provision they negotiated for that was lawful when the agreements were entered into. This case is a far cry from *S&M Brands*— Defendants do not argue (nor can they) that Florida has dictated *every* term of the

collective bargaining agreements at issue or that anyone is forced to enter a collective bargaining agreement to operate in Florida such that public employee unions and their members lack any reasonable contractual expectations with respect to their collective bargaining agreements. However, the extent to which Plaintiffs' activities and negotiations are subject to regulation certainly weakens their claim that the challenged provision substantially interfered with their reasonable expectations regarding a contractual term that was, itself, the subject of state regulation at the time they entered the collective bargaining agreements.

As a second line of attack, Defendants argue that certain clauses in the collective bargaining agreements at issue show that the parties anticipated changes in Florida law, thus demonstrating that Plaintiffs could not have reasonably expected to retain the right to payroll deductions for dues collection. Defendants compare this case to the situation in *Kansas Power*, where a public utility entered supply contracts with a natural gas supplier that were subject to a Kansas law imposing "price controls on the intrastate gas market." 459 U.S. at 407. The gas supplier asserted the Kansas law substantially impaired its contracts with respect to operation of a price escalator clause. *Id*. at 408. The contracts specifically "included a statement of intent, which made clear that the escalator clause was designed to guarantee price increases consistent with *anticipated* increases in the value of [the supplier's] gas." *Id*. at 415 (emphasis in original). The contracts also included a provision "providing that any

contractual terms are subject to relevant present and future state and federal law." *Id*. at 416.

The supplier sought to terminate the contracts, in part because the public utility "had failed to pay the increased price" that the supplier argued "was required by the governmental price escalator clause." *Id*. In response, the public utility argued that the clause had not been triggered and the Kansas law prohibited its activation. *Id*. The Supreme Court ultimately ruled against the gas supplier, concluding that the Kansas law did not impair its reasonable expectations and that Kansas had a legitimate interest in "protect[ing] consumers from the escalation of natural gas prices caused by deregulation." *Id*. at 417.

Relevant for this Court's purposes is the Supreme Court's discussion concerning the parties' reasonable expectations. Defendants focus on language noting that the gas supply contracts "expressly recognize[d] the existence of regulation providing that any contractual terms [were] subject to *relevant* present and future state and federal law," and thus, "[t]his latter provision *could be* interpreted to incorporate all future state price regulation, and thus dispose of the Contract Clause claim." 459 U.S. at 416 (emphasis added). Here, Defendants urge this Court to expand the Supreme Court's discussion about a specific statutory provision in *Kansas Power* that "suggest[ed] that [the public utility] knew its contractual rights were subject to alteration by state price regulation," *id*., to stand

30

for a much broader rule. Defendants ask this Court to read *Kansas Power* to mean that *whenever* contracting parties recognize that *any* provision of their agreement may be altered by state or federal law, they lose any reasonable contractual expectations concerning any provision of their agreement when a future law retroactively eliminates a term of that agreement. *See* ECF No. 80 at 30. This Court rejects Defendants' reading of *Kansas Power*.

For starters, the Supreme Court found it "highly unlikely" that the gas supplier anticipated the deregulation of gas prices and thus, the gas supplier's "reasonable expectations" were limited to "nothing more than changes in value resulting from changes in the federal regulator's 'just and reasonable' rates." 459 U.S. at 415. Indeed, the Court determined that "at the time of the execution of the contracts, [the gas supplier] did not expect to receive deregulated prices." *Id*. Further, the Court noted that the contractual term "providing that any contractual terms are subject to relevant present and future state and federal law," at least suggested that the gas supplier "knew its contractual rights were subject to alteration by state price regulation," as "[p]rice regulation existed and was foreseeable as the type of law that would alter contract obligations." *Id*. at 416. But, contrary to Defendants' argument, the Supreme Court declined to determine whether that contractual term acknowledging relevant state and federal regulation should be interpreted to be dispositive of the Contracts Clause claim. *Id*.

This Court disagrees with Defendants' proposition that *Kansas Power* stands for some broad rule that could turn any contract into an illusory agreement that is subject to change at the whim of the Legislature. However, Plaintiffs' agreements appear to account for the backdrop of state regulation of collective bargaining, because they contain provisions accounting for the effect of changes in state regulation. *See, e.g.*, ECF No. 48-7 at 5 ("[I]f any provision of this Agreement or any application of this Agreement to any teacher covered hereby shall be found contrary to law, such provision or application shall have effect only to the extent permitted by law, but all other provisions or applications of this Agreement shall continue in full force and effect."); ECF No. 48-8 at 8 ("Nothing in this agreement shall require either party to act in violation of any federal, state or local law or Board policy or regulations, which shall take precedence when inconsistent with this Agreement.").

Moreover, some of the agreements even provide for reopening negotiations in the event a provision is invalidated by legislative action during the life of the contract. *See* ECF No. 48-2 at 6 ("Both parties agree to reopen negotiations on those sections of this contract which have . . . become invalid during the life of this contract through legislative action . . . ."); ECF No. 48-4 at 137 ("If a provision of this Agreement fails [because it is rendered invalid by reason of any subsequently enacted legislation], the parties shall immediately enter into negotiations for the

purpose of arriving at a mutually satisfactory replacement for such provision."). This Court does not find such language, on its own, to be dispositive of the question of whether Plaintiffs' agreements have been substantially impaired. But this Court does find such contractual language is certainly relevant evidence of the parties' expectations when they entered these agreements—namely, their expectations that Florida may further regulate collective bargaining in a manner that contradicts or overrides a term in the collective bargaining agreement.

In short, even though this Court rejects Defendants' oversimplification of this factor, Plaintiffs have not persuaded this Court that, at this juncture, the challenged provision has substantially interfered with their reasonable expectations regarding their ability to collect dues from payroll deductions. This is particularly true given the unavoidable facts that Plaintiffs (1) operate in a highly regulated realm in Florida, (2) Plaintiffs know they are subject to state regulation as evidenced by certain contractual provisions in their collective bargaining agreements, and (3) as discussed below, alternative methods of facilitating dues collection were available to Plaintiffs and in most cases, Plaintiffs acted to implement an alternative dues-collection method weeks before the payroll deduction ban became effective.

3

The third factor this Court must consider is the extent to which the payroll deduction ban prevents Plaintiffs from safeguarding or reinstating their rights. *See*

33

*Sveen*, 138 S.Ct. at 1822. Plaintiffs assert the ban operates as an unconditional limitation on their ability to collect voluntary membership dues from payroll deductions and affords them no grace period or other opportunity to restore their rights with respect to collecting dues from payroll deductions. *See* ECF No. 63-1 at 23. Defendants, on the other hand, assert that Plaintiffs have several alternative means to collect voluntary membership dues, and thus, the payroll deduction ban does not prevent them from safeguarding their rights with respect to collecting membership dues. ECF No. 80 at 34–35. In this way, the parties are talking past each other while talking about the same thing—collecting dues. Plaintiffs frame the question as one involving their right to collect membership dues through payroll deductions. Clearly, the payroll deduction ban prevents them from safeguarding or reinstating their right to collect dues through payroll deductions as the law effects a permanent ban on the practice in the middle of the lives of Plaintiffs' collective bargaining agreements. But Defendants frame the question as one involving a broader right to collect membership dues. Although the payroll deduction ban has eliminated the most effective and widely used method for collecting dues, Defendants point to several alternative methods that Plaintiffs may still use to collect dues.

Both sides have misconstrued the "right" at issue. It is not simply the collection of dues. Instead, it is the right to have the public employer facilitate the

collection of dues for the union. The collective bargaining agreements are supposed to serve the State of Florida's policy "to promote harmonious and cooperative relationships between government and its employees, both collectively and individually." § 447.201, Fla. Stat. The agreements contain "the wages, hours, and terms and conditions of employment of the public employees within the bargaining unit," as required by Florida law. § 447.309(1), Fla. Stat. While the unions are no longer entitled to collect dues from payroll deductions, the unions can certainly bargain on behalf of their members to negotiate a term of employment that requires the public employers to facilitate the collection of union dues through some other process, thus "promot[ing] the harmonious and *cooperative* relationships between government and its employees, both collectively and individually." § 447.201, Fla. Stat. Plaintiffs were permitted to do this before the challenged provision became law and are still permitted to do so—the challenged provision only eliminates one way that public employers *facilitate* the collection of union dues.

Having properly framed the right at issue, this factor appears to cut both ways but ultimately weighs in favor of Defendants. Notwithstanding Plaintiffs' attempts to mitigate the law's harmful immediate effects by switching to an outside platform like eDues, Defendants cannot avoid the fact that the payroll deduction ban imposes a permanent nullification of a contractual term—and a method of facilitating dues collection—that was the primary revenue-generating method for Plaintiffs. This is

not some minor hiccup for Plaintiffs. It bears repeating that without revenue, Plaintiffs have no voice to effectively represent their members.

Defendants make much ado about the fact that Florida has not yet barred Plaintiffs from collecting *any* membership dues and suggest this means the challenged provision does not substantially impair the agreements. But it is no answer that the State has not entirely banned the collection of dues—indeed, this Court questions whether such a measure is constitutionally permissible or allowed under Florida law. Instead, the critical issue is whether the challenged provision prevents Plaintiffs from reinstating their right to bargain for employer-facilitation of the collection of dues. The answer to that question is no. Indeed, the provision nullifies one method of facilitating dues collection, but this Court can conceive of a variety of other ways that the public employers could continue facilitating the collection of dues for Plaintiffs, which could be bargained for as a term of employment in Plaintiffs' collective bargaining agreements. And, as noted above with respect to Plaintiffs' reasonable expectations, some of the collective bargaining agreements in the record even provide for reopening negotiations upon the invalidation of a provision of the contract by legislative action. *See, e.g.*, ECF No. 48-2 at 6 ("Both parties agree to reopen negotiations on those sections of this contract which have . . . become invalid during the life of this contract through legislative action . . . ."); ECF No. 48-4 at 137 ("If a provision of this Agreement

fails [because it is rendered invalid by reason of any subsequently enacted legislation], the parties shall immediately enter into negotiations for the purpose of arriving at a mutually satisfactory replacement for such provision.").

Moreover, record evidence suggests some of these Plaintiffs expected this to happen and took action *before* the law went into effect. *See, e.g.*, ECF No. 15-5 ¶ 16 (noting that Plaintiff ACEA "rolled out the eDues platform on or about April 19, 2023"). This evidence undercuts Plaintiffs' claims concerning both interference with their reasonable expectations, as discussed above, and their ability to safeguard their rights. Plaintiffs cannot ignore the facts that (1) alternative methods for both the collection of dues and employer-facilitated dues collection existed before the challenged provision went into effect, (2) Plaintiffs' own record evidence suggests they were aware of some of these alternative methods, and (3) that some Plaintiffs chose to implement those methods sooner rather than later to ensure that they could continue collecting voluntary membership dues.

In sum, this factor substantially overlaps with the extent to which the payroll deduction ban has interfered with Plaintiffs' reasonable expectations. On balance, this Court is not persuaded that Plaintiffs are prevented from safeguarding or reinstating their right to have their members' employers agree to facilitate dues collection through some other means. While some alternative method may not be as efficient as payroll deduction, the ability to negotiate for that alternative remains.

B

Given the record and the factors this Court must consider regarding substantial impairment, this Court is not persuaded that Plaintiffs have met their burden to prove they are substantially likely to succeed on the merits of their Contracts Clause claim. For this reason, this Court need not reach the question of whether the challenged provision is drawn in an appropriate and reasonable way to advance a significant and legitimate public purpose.

This might have been a different case had the Legislature imposed a retroactive ban on payroll deduction that required Plaintiffs to reimburse their members for dues that had already been paid through payroll deductions. But that is not this case—in this sense, the law is prospective and only eliminates payroll deductions going forward from July 1, 2023. It might also have been a different case had the Legislature passed the challenged law on the very last day of session with no warning and with an immediate effective date.[8] But the parties are stuck with the facts as they are and the law as it is.

Unfortunately for Plaintiffs, neither the law nor the facts allow this Court to confidently conclude that they are entitled to preliminary injunctive relief. Instead, this Court is faced with evidence that demonstrates that Plaintiffs justifiably

---

[8] Conversely, had the Legislature assigned an effective date to the challenged provision that came *after* the lifetime of the collective bargaining agreements or allowed the parties a year-long grace period, Plaintiff's challenge would arguably be much weaker on the merits.

expected to receive dues through payroll deductions during the life of their collective bargaining agreements because, prior to July 1, 2023, the right to have public employers facilitate the collection of dues through that mechanism was enshrined in the Florida Statutes. But the evidence also demonstrates that Plaintiffs are operating in a highly regulated field in Florida, including with respect to the asserted right to payroll deductions. As Defendants point out, the now-eliminated statutory right to collect dues through payroll deduction was subject to certain qualifications. And the record shows Plaintiffs expected that the Legislature could take action that would invalidate provisions in their collective bargaining agreements. Some Plaintiffs even negotiated for provisions allowing for renegotiation upon the invalidation of a term through legislative action. Add to this the fact that the Legislature left untouched any other method by which public employers may facilitate the collection of voluntary membership dues, thus allowing Plaintiffs to safeguard or reinstate their right to employer-facilitated dues collection. Given all of these considerations, this Court cannot conclude that Plaintiffs are substantially likely to succeed on the merits of their Contracts Clause claim. As a result, this Court need not address the balance of the preliminary injunction factors. *Callahan v. U.S. Dep't of Health & Human Servs. through Alex Azar II*, 939 F.3d 1251, 1265 n.13 (11th Cir. 2019) ("Because we hold that the district court correctly concluded that plaintiffs had failed to demonstrate a substantial likelihood of success, we need not consider whether the remaining factors

weigh in favor of a preliminary injunction."). Accordingly, Plaintiffs' motion, ECF No. 63, is **DENIED**.

**SO ORDERED on September 22, 2023.**

s/Mark E. Walker
**Chief United States District Judge**