**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION**

| |
|---|
| ALACHUA COUNTY EDUCA-TION ASSOCIATION, *et al.*, |
| *Plaintiffs*, |
| v. |
| DONALD J. RUBOTTOM, in his official capacity as chair of the Florida Public Employees Relations Commission, *et al.*, |
| *Defendants*. |

Case 1:23-cv-00111-MW-HTC

**PERC DEFENDANTS' COMBINED MEMORANDUM
IN SUPPORT OF THEIR CROSS-MOTION FOR SUMMARY
JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR
PARTIAL SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................ 1

BACKGROUND ................................................................................ 2

    A.  Florida's History of Regulating Public Employment and
        SB256. ................................................................................ 2

    B.  Florida passes SB256. ................................................. 5

    C.  The Unions' Lawsuit. ............................................... 12

ARGUMENT ................................................................................ 12

  I.  Defendants are entitled to summary judgment on Plaintiffs'
    Section 3 Contracts Clause claim. (Count IV). ............................. 12

    A.  Plaintiffs have no cause of action under §1983 or directly under
        the Constitution. ................................................. 13

        1. §1983 does not provide a cause of action for a Contracts
           Clause claim. ................................................. 13

        2. Plaintiffs cannot bring a claim under the Contracts Clause
           itself. ................................................. 15

    B.  Section 3 does not substantially impair existing contract
        rights. ................................................. 16

    C.  Section 3 is justified by a significant and legitimate purpose. 22

  II.  Defendants are entitled to summary judgment on Plaintiffs' other
    Section 3 claims (Counts V-VI). ................................................. 24

    A.  Section 3 does not violate the First Amendment. ................. 25

        1. Payroll deduction is a government subsidy that does not
           implicate the First Amendment. ................................................. 25

        2. Section 3 easily passes rational-basis review. ................. 31

    B.  Section 3 does not violate the Equal Protection Clause. ......... 33

  III.  Defendants are entitled to summary judgment on Plaintiffs'
    Section 4 Contracts Clause claim (Count VII). ............................. 34

    A.  The Union Plaintiffs have not established associational
        standing to challenge Section 4. ................................................. 34

    B.  Plaintiffs challenge to the 60% threshold fails. ................. 36

1. Any challenge to the 60% threshold causing a future decertification is not ripe. ...................................................... 36

2. Section 4 categorically does not modify or impair any contract right. .......................................................................... 42

3. Section 4 does not substantially impair any CBA. .............. 45

4. The 60% threshold advances a legitimate public purpose. .. 49

C.  The Audit Requirement does not violate the Contracts Clause. ................................................................................ 54

1. Any challenge to the Audit Requirement causing a future decertification is not ripe. ...................................................... 54

2. The Audit Requirement does not violate the Contracts Clause. ................................................................................ 57

IV. Defendants are entitled to summary judgment on Plaintiffs' Section 1 claims (Counts I-III). ................................................... 60

A.  Section 1 does not harm Plaintiffs' freedom of speech. ........... 61

B.  Section 1 does not violate First Amendment freedom of association. ........................................................................ 64

C.  Section 1 does not violate the Equal Protection Clause. .......... 66

V. Plaintiffs are not entitled to permanent injunctive relief. ............ 66

CONCLUSION ....................................................................... 69

# TABLE OF AUTHORITIES

## Cases

*Allen v. Lyons & Farrar, P.A.*,
  2020 WL 10728693 (N.D. Fla.) ............................................................ 13

*Allied Structural Steel Co. v. Spannaus*,
  438 U.S. 234 (1978) .................................................................. 16, 22

*AMEX Travel Related Servs. v. Sidamon-Eristoff*,
  669 F.3d 359 (3d Cir. 2012) ............................................................ 44

*Arcia v. Fla. Sec'y of State*,
  772 F.3d 1335 (11th Cir. 2014) ........................................................ 36

*Bailey v. Callaghan*,
  715 F.3d 956 (6th Cir. 2013) ................................................ 25, 28, 31

*Bonner v. City of Prichard*,
  661 F.2d 1206 (11th Cir. 1981) ........................................................ 15

*Boyz Sanitation Servs. v. City of Rawlins*,
  889 F.3d 1189 (10th Cir. 2018) ........................................................ 45

*Broward Cnty. Police Benevolent Ass'n, Inc. v. School Bd. of Broward
  Cnty.*, 32 FPER 11, 2006 WL 6824956 (PERC 2006) ........................... 11

*Buffalo Teachers Fed'n v. Tobe*,
  464 F.3d 362 (2d Cir. 2006) ............................................................ 17

*Burns v. Town of Palm Beach*,
  999 F.3d 1317 (11th Cir. 2021) ........................................................ 35

*Cent. State Univ. v. Am. Ass'n of Univ. Professors*,
  526 U.S. 124 (1999) ..................................................................... 31

*Checker Cab Operators, Inc. v. Miami-Dade Cnty.*,
  899 F.3d 908 (11th Cir. 2018) ........................................................ 33

*City of Charleston v. Pub. Serv. Comm'n of W. Va.*,
  57 F.3d 385 (4th Cir. 1995) ............................................................ 18

*City of Delray Beach v. Professional Firefighters of Delray Beach*,
  636 So. 2d 157 (Fla. 4th DCA 1994) .................................................. 41

*City of South Miami v. Gov. of Florida*,
  65 F.4th 631 (11th Cir. 2023) ........................................................ 35

*Commc'ns Workers of Am., AFL-CIO, CLC v. City of Gainesville*,
  65 So. 3d 1070 (Fla. Dist. Ct. App. 2011) ............................................ 42

*Connecticut State Police Union v. Rovella*,
  36 F.4th 54 (2d Cir. 2022) ....................................................................... 23

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*,
  473 U.S. 788 (1985) .................................................................. 29, 30, 31

*Crosby v. City of Gastonia*,
  635 F.3d 634 (4th Cir. 2011) .................................................................. 14

*Digit. Properties, Inc. v. City of Plantation*,
  121 F.3d 586 (11th Cir. 1997) ................................................................ 37

*Dream Defenders v. Governor of Fla.*,
  57 F.4th 879 (11th Cir. 2023) ................................................................ 42

*eBay Inc. v. MercExchange*,
  *LLC*, 547 U.S. 388 (2006) ....................................................................... 66

*Energy Reserves Grp., Inc. v. Kansas Power and Light Co.*,
  459 U.S. 400 (1983) ................................................................................. 46

*FCC v. Beach Commc'ns, Inc.*,
  508 U.S. 307 (1993) ................................................................................. 32

*Flanigan's Enter. Inc. v. Fulton Cnty.*,
  242 F.3d 976 (11th Cir. 2001) ................................................................ 22

*Gary v. City of Warner Robins*,
  311 F.3d 1334 (11th Cir. 2002) .............................................................. 65

*Gen. Motors Corp. v. Romein*,
  503 U.S. 181 (1992) ..................................................................... passim

*GeorgiaCarry.Org, Inc. v. Georgia*,
  687 F.3d 1244 (11th Cir. 2012) .............................................................. 16

*Grant Thornton LLP v. Off. of Comptroller of the Currency*,
  514 F.3d 1328 (D.C. Cir. 2008) .............................................................. 60

*Hand v. Scott*,
  888 F.3d 1206 (11th Cir. 2018) .............................................................. 68

*Hawkeye Commodity Promotions, Inc. v. Vilsack*,
  486 F.3d 430 (8th Cir. 2007) .................................................................. 18

iv

*Hearth, Inc. v. Dep't of Pub. Welfare,*
   612 F.2d 981 (5th Cir. 1980) ................................................................ 15

*Houlton Citizens' Coal. v. Town of Houlton,*
   175 F.3d 178 (1st Cir. 1999) ....................................................... 22, 50

*Int'l Union v. McClelland,*
   2020 WL 5834750 (E.D. Mich.) ......................................................... 15

*Iowa State Educ. Ass'n v. State,*
   928 N.W.2d 11 (Iowa 2019) ............................................................... 33

*Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31,*
   138 S. Ct. 2448 (2018) ....................................................................... 59

*Jones v. Governor of Fla.,*
   975 F.3d 1016 (11th Cir. 2020) ....................................................... 33

*Kaminski v. Coulter,*
   865 F.3d 339 (6th Cir. 2017) ..................................................... 14, 15

*KEA v. Link,*
   No. 23-CI-00343 (Ky. Cir. Ct.) ......................................................... 33

*Leathers v. Medlock,*
   499 U.S. 439 (1991) ........................................................................... 27

*Lifestar Ambulance Serv., Inc. v. United States,*
   365 F.3d 1293 (11th Cir. 2004) ....................................................... 67

*Linton by Arnold v. Comm'r of Health & Env't, State of Tenn.,*
   65 F.3d 508 (6th Cir. 1995) .............................................................. 22

*Lujan v. Defs. of Wildlife,*
   504 U.S. 555 (1992) ........................................................................... 35

*Maryland v. King,*
   567 U.S. 1301 (2012) ......................................................................... 68

*Mercado-Boneta v. Administracion del Fondo de Compensacion al
   Paciete*, 125 F.3d 9 (1st Cir. 1997) ................................................. 17

*Metro. Life Ins. Co. v. Massachusetts,*
   471 U.S. 724 (1985) ........................................................................... 22

*Miami Beach Mun. Emps. AFSCME Local 1443 v. PERC*, 23-CA-1492
   (Cir. Ct. Leon Cnty. June 30, 2023) ("*Miami Beach I*") .............. passim

*Miami Beach Mun. Emps. AFSCME Local 1443 v. PERC*, 23-CA-1492
(Cir. Ct. Leon Cnty. Oct. 3, 2023) ("*Miami Beach II*") ........ 2, 33, 37, 38

*Monsanto Co. v. Geertson Seed Farms*,
561 U.S. 139 (2010) ................................................................ 66

*Nat'l Head Start Ass'n v. Dep't of Health & Hum. Servs.*,
297 F. Supp. 2d 242 (D.D.C. 2004) ...................................... 69

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
138 S. Ct. 2361 (2018) ...................................................... 30, 64

*NetChoice, LLC v. Att'y Gen., Fla.*,
34 F.4th 1196 (11th Cir. 2022) ............................................ 31

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
142 S. Ct. 2111 (2022) .......................................................... 16

*Nken v. Holder*,
556 U.S. 418 (2009) .............................................................. 68

*Nw. Fla. Police Benevolent Ass'n v. City of Panama City*,
2 FPER 8, 9 (PERC 1976) .................................................... 11

*O'Bryant v. Langford*,
2008 WL 906741 (N.D. Fla.) ................................................ 13

*Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*,
460 U.S. 37 (1983) ................................................................ 26

*Pleasant Grove City v. Summum*,
555 U.S. 460 (2009) .............................................................. 61

*Regan v. Taxation With Representation of Washington*,
461 U.S. 540 (1983) ........................................................ 27, 30

*Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*,
487 U.S. 781 (1988) .............................................................. 64

*RUI One Corp v. City of Berkeley*,
371 F.3d 1137 (9th Cir. 2004) ........................................ 19, 45

*Rumsfeld v. Acad. and Institutional Rts., Inc.*,
547 U.S. 47 (2006) ................................................................ 61

*S&M Brands, Inc. v. Georgia ex rel. Carr*,
925 F.3d 1198 (11th Cir. 2019) ...................................... 46, 58

*Sch. Bd. of Orange Cnty. v. Palowitch,*
  367 So. 2d 730 (Fla. Dist. Ct. App. 1979) ............................................. 41

*Summers v. Earth Island Inst.,*
  555 U.S. 488 (2009) ................................................................................ 36

*Sveen v. Melin,*
  138 S. Ct. 1815 (2018) ................................................................... passim

*Teamsters Loc. Union No. 385 v. Orange County,*
  25 FPER 30072, 1999 WL 35114734 (PERC 1999) ............................. 40

*Trump v. New York,*
  141 S. Ct. 530 (2020) ...................................................................... 38, 56

*U.S. Tr. Co. of N.Y. v. New Jersey,*
  431 U.S. 1 (1977) .................................................................................... 17

*United Auto., Aerospace, Agr. Implement Workers of Am. Int'l Union v.
  Fortuno,* 633 F.3d 37 (1st Cir. 2011) ............................................ 23, 49

*United States v. Texas,*
  143 S. Ct. 1964 (2023) ........................................................................... 34

*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.,*
  576 U.S. 200 (2015) ................................................................................ 61

*Watters v. Bd. of Sch. Dirs. of City of Scranton,*
  975 F.3d 406 (3d Cir. 2020) ................................................................... 23

*Williamson v. Lee Optical of Oklahoma,*
  *Inc.,* 348 U.S. 483 (1955) ..................................................................... 32

*Wisconsin Educ. Ass'n Council v. Walker,*
  705 F.3d 640 (7th Cir. 2013) ......................................................... passim

*Wooley v. Maynard,*
  430 U.S. 705 (1977) ................................................................................ 63

*Wreal, LLC v. Amazon.com, Inc.,*
  840 F.3d 1244 (11th Cir. 2016) ............................................................. 67

*Ysursa v. Pocatello Educ. Ass'n,*
  555 U.S. 353 (2009) ............................................................ 25, 26, 29, 30, 31

**Statutes**

Fla. Stat. §1012.2315 ................................................................................... 8

Fla. Stat. §110.227 ......................................................................... 10

Fla. Stat. §111.065 ......................................................................... 10

Fla. Stat. §112.044 ......................................................................... 10

Fla. Stat. §112.532 ......................................................................... 10

Fla. Stat. §112.82 ........................................................................... 10

Fla. Stat. §121.0515 ....................................................................... 11

Fla. Stat. §447.201 ...................................................................... 2, 3

Fla. Stat. §447.207 ........................................................................... 3

Fla. Stat. §447.301 .................................................................... 6, 63

Fla. Stat. §447.303 ........................................................... 3, 7, 18, 28

Fla. Stat. §447.305 .................................................................. passim

Fla. Stat. §447.307 .................................................................. passim

Fla. Stat. §447.3075 ....................................................................... 10

Fla. Stat. §447.308 ........................................................................... 7

Fla. Stat. §447.309 ......................................................................... 49

## Other

Floor Statement, Committee on Governmental Oversight and
   Accountability (Mar. 7, 2023) ........................................... 11, 53

Floor Statement, Constitutional Rights, Rule of Law and Government
   Operations Committee (Mar. 16, 2023) .............................. 10

Floor Statement, House State Affairs Committee (Apr. 11, 2023) .... 6, 11

Public Employees Relations Commission, PERC Forms ....................... 62

## Rules

Fla. Admin. Code r. 60CC-1.101 ................................................... 6

Fla. Admin. Reg. 193 ...................................................................... 9

## Constitutional Provisions

Fla. Const. Art. 1, §6 ..................................................................... 2

## INTRODUCTION

There are roughly a million public employees in Florida. The State has long taken it upon itself to regulate those employees' work to ensure their health, safety, and financial well-being. And SB256 tweaks the law to further that goal. To that end, public employees are often unaware of their right to join (or not join) their unions and their right to pay (or not pay) dues to those unions. Because unions use the government's payroll to draw their dues automatically, employees are often unaware of how much they pay in dues every year. They also are often unaware of how their unions use those dues. SB256 seeks to fix these problems by informing public employees of their rights, removing the government's payroll apparatus from the equation, and strengthening the union's preexisting reporting requirements to ensure transparency and accountability.

The Union Plaintiffs dislike these new regulations and have proffered various theories spanning from the First Amendment to the Contracts Clause to the Equal Protection Clause to avoid their import. This Court and Judge Marsh have rejected many of these claims (or their

state-law analogs) at earlier stages.[1] As a result, the Court has already seen most of Plaintiffs' challenges at least once already. This should be the last time the Court sees them because, for the reasons outlined below, the PERC Defendants are entitled to summary judgment on each claim.

## BACKGROUND

### A. Florida's History of Regulating Public Employment and SB256.

Florida has regulated the terms of union representation for decades. Article 1, Section 6 of the Florida Constitution—first adopted in 1944—provides that "[t]he right of persons to work shall not be denied or abridged on account of membership or non-membership in any labor union or labor organization." Fla. Const. Art. 1, §6. In 1974, the Legislature enacted chapter 447 to implement this constitutional provision for public employees. Public Employees Relations Act, 1974 Fla. Laws 134 (codified at Fla. Stat. §§447.201-609) (PERA). The law established the Public Employees Relations Commission (PERC), which is responsible for resolving

---

[1] *See Miami Beach Mun. Emps. AFSCME Local 1443 v. PERC*, 23-CA-1492 (Cir. Ct. Leon Cnty. June 30, 2023) ("*Miami Beach I*") (ECF 115-18); *Miami Beach Mun. Emps. AFSCME Local 1443 v. PERC*, 23-CA-1492 (Cir. Ct. Leon Cnty. Oct. 3, 2023) ("*Miami Beach II*") (ECF 115-19).

disputes between public employees, public employers, and unions. Fla. Stat. §§447.201(3), 447.207.

Florida allowed unions "to have [their] dues and uniform assessments deducted and collected by the employer from the salaries of those employees who authorize the deduction." *Id.* §447.303(2)(a). But "such authorization[s]" were always "revocable at the employee's request upon 30 days' written notice to the employer and employee organization." *Id.*

Despite these provisions, public employees are often in the dark about their rights, the nature of their relationship with the unions, and the unions' use of their dues. A recent survey of teachers, for example, found that most didn't know they could refuse to pay dues if they don't join the union. ECF 115-3, at 4. That study also found that 83% of teachers do not fully understand their rights with respect to union membership. *Id.* at 11; *see also* ECF 115-1, at ¶9. This aligns with other reporting that shows many public employees do not know they have the right to refuse joining the union. *See, e.g.*, ECF 115-4, 115-5.

Many of Florida's public employees also don't realize that they have authorized their unions to deduct dues from their paychecks. ECF 115-1, at ¶10. And because the dues are automatically deducted, that leads to

many public employees being ignorant of the total amounts they pay the union. *Id*.

It is no surprise, then, that union members are also in the dark on how their unions use those dues. Another recent survey of public-school teachers revealed that 43% of union members had not even consulted their union contract in the previous year. *See* ECF 115-5, at 112. Half of the union members only "somewhat" understood the contracts' provisions. *Id*. at 114. And another 19% responded they understood the contracts' provisions "not very much" or "not at all." *Id*.; ECF 115-1, at ¶12.

The way employees join unions—and authorize dues deduction—is often what leads to these issues. Unions' primary recruitment occurs when public employees first start their jobs. ECF 115-1, at ¶5. Indeed, CBAs typically provide that union representatives are given access to new employees to advocate for union membership. *See, e.g,* ECF 97-2 at 28 (granting ACEA access to employees at "new employee orientation."); ECF 115-1, at ¶5. During that onboarding process, new employees meet with HR, IT, and other departments relevant to their employment, as well as union representatives. ECF 115-1, at ¶¶5-6. When making their pitch, unions typically highlight only the perceived benefits of union

membership and do not reveal that employees can refuse to join. *Id.* at ¶8. Employees who agree to join the unions sign only a card that does not explain the union's role. ECF 115-6; *see also* ECF 97-2, at 109; ECF 97-3, at 134, 155; ECF 97-4, at 9, 11-13. Instead, the cards state only that the employee agrees to join the union and that the employee authorizes the union to deduct its dues directly from the employees' paycheck. *Id.* Sometimes, the text on the form is tiny:

Alachua County Education Association, FEA, NEA, AFT #3749 Payroll Deduction

| Last Name | | First | | Middle | | Job Title | |
|---|---|---|---|---|---|---|---|
| Home Address | | City | | Zip | | Phone (Home) | Cell |
| School Center/Worksite | | | Personal Email (NOT SBAC) | | SBAC ID # | | |

I hereby authorize the School Board of Alachua County, according to arrangements agreed upon with the Alachua County Education Association to deduct from my salary and transmit to the Association such assessments as annually certified by the Association according to the Association's By-laws. I hereby waive all rights and claims to said monies so deducted and transmitted in accordance with this authorization, and relieve the School Board and all its officers from liability thereof. This authorization shall remain in full force and in effect while I am employed by this district. In order to be revoked by me, I must contact the Association in writing. It is the member's responsibility to contact ACEA if said member becomes ineligible for union membership. According to ACEA's By-laws, ACEA will only reimburse dues under these circumstances up to three months or six pay periods. Dues will be discontinued within 30 days upon receipt of written verification to the Association.

**PLEASE CHECK ONE:**
[ ] FULL-TIME  [ ] PART-TIME

| Signature | Date | ACEA Authorization | Amount of Deduction |
|---|---|---|---|

ECF 115-6, at 1. And in this context, these cards are presented on orientation days along with many other, extensive employment documents that new employees are asked to sign. ECF 115-1, at ¶¶6-7.

### B. Florida passes SB256.

SB256 was enacted on May 9, 2023, to fix these problems. **Section 1** requires public employees to sign a government form if they join or stay

a member of a union. *See* SB256 §1(1)(b)(1) (codified at Fla. Stat. §447.301(1)(b)(1)). Section 1 does not require unions to do anything; the employees bear the obligation to fill out the form. *See id.* That form includes a 91-word statement that recounts the key provisions of Florida law.

> THE STATE OF FLORIDA WANTS YOU TO KNOW THE FOLLOWING:
>
> The State of Florida is a right-to-work state. Membership or non-membership in a labor union is not required as a condition of employment, and union membership and payment of union dues and assessments are voluntary. Each person has the right to join and pay dues to a labor union or to refrain from joining and paying dues to a labor union. No employee may be discriminated against in any manner for joining and financially supporting a labor union or for refusing to join or financially support a labor union.

SB256 §1(1)(b)(3); *see* Fla. Admin. Code r. 60CC-1.101; ECF 115-7. This notice is intended to educate public employees of their rights under Florida law. *See, e.g.,* Floor Statement, House State Affairs Committee 1:12:42 (Apr. 11, 2023), https://tinyurl.com/4249umje. The form also discloses the salary of the five highest-paid officers or employees of the union. SB256 §1(1)(b)(2). That is information unions must already publicly report. *See* Fla. Stat. §447.305(2)(c).

**Section 3** prohibits unions from using the government's payroll apparatus to collect employee dues directly from public employees' paychecks. SB256 §3(1) (codified at Fla. Stat. §447.303).

**Section 4** amends the annual reporting requirements for unions. SB256 §4 (codified at Fla. Stat. §447.305). Florida requires unions to first register with PERC and become certified as a bargaining agent before it can represent employees in collective bargaining. Certification requires the union to petition PERC and win a majority vote of employees in an election. Fla. Stat. §§447.307(2), (3). Once a union has been certified as a bargaining agent, it must renew its registration every year with PERC. *Id.* §447.305(2). That renewal application requires the union to submit, for example, an annual financial statement and similar information. *Id.* In addition, a union could become decertified if 30% of the public employees in the bargaining unit petitioned PERC to conduct an election for that purpose. *Id.* §§447.307(3)(d), §447.308. The incumbent union would be decertified if it failed to obtain a majority vote. *Id.* Fla. Stat. §447.308(2).

In 2018, Florida passed a law that added a path to decertification for unions representing K-12 personnel. That law provided that "an employee organization whose dues paying membership is less than 50

7

percent of the employees eligible for representation in the unit … must … petition … for recertification … within 1 month after the date on which the organization applies for renewal of registration." Fla. Stat. §1012.2315(4) (2022) (repealed by SB256). Similar to the preexisting regime, that recertification process required first that the union petition PERC with support from 30% of the employees in the bargaining unit. Fla. Stat. §447.307(2). The union would then need to win a bare-majority vote of the employees that choose to participate in a secret-ballot election to maintain its certification. Plaintiffs Alachua County Education Association (ACEA), Pinellas Classroom Teachers Association (Pinellas CTA), and Lafayette Education Association (Lafayette) were subject to this law starting in 2018.

Section 4 of SB256 built on these requirements. The annual financial statements now must be audited by a certified public accountant. *Id.* §447.305(2). Unions must also disclose the number of employees in their bargaining unit who are eligible for representation and the number of employees who have paid dues to the union. *Id.* §447.305(3)(a), (c).

Section 4 also extended the K-12 recertification requirements to more unions and raised the threshold to 60%. It provides that if "less than

60 percent of the employees eligible for representation in the bargaining unit pay dues," then the union "must petition the commission … for recertification as the exclusive representative of all employees in the bargaining unit." *Id.* §447.305(6). To retain its certification, the union must win a majority of the votes cast by bargaining unit employees in a recertification election. *See id.* §§447.307(2), (3). Unlike Section 3's prohibition on dues deduction, none of Section 4's provisions supersede any provisions of any existing CBAs.

PERC has issued several regulations implementing Sections 1, 2, and 4 over the last several months. Relevant here, PERC proposed a regulation addressed in the briefing and decision on Plaintiffs' first motion for preliminary injunction. It provided that "[i]f a public employee has not delivered a signed and dated [the Section 1 form] to the employee organization," then "the employee may not be counted as an employee in the bargaining unit who paid dues to the employee organization under" Section 4. ECF 115-8, at 2 (preliminary text of proposed r. 60CC-6.104). PERC has slightly modified the proposed regulation's language. *See* ECF 115-9, at 1; *see also* 49 Fla. Admin. Reg. 193 (Oct. 4, 2023). PERC intends

to move forward with formally adopting that regulation, subject to the procedures, deliberations, and considerations required under state law.

SB256's new provisions will ensure that public employees are fully aware of the dues amounts that they pay, provide some transparency on how those dues are used, and ensure accountability. *See, e.g.*, Floor Statement, Constitutional Rights, Rule of Law and Government Operations Committee 8:45 (Mar. 16, 2023), https://tinyurl.com/34tbpded.

These provisions apply to virtually all unions in Florida, including unions representing teachers, nurses, other healthcare workers, and municipal workers. There is an exemption, however, for "law enforcement officers, correctional officers," "correctional probation officers," and "firefighters." SB256 §§1(6), 3(2)(a). This exemption accords with longstanding Florida policy that distinguishes between public-safety employees and other types of public employees. *See, e.g.*, Fla. Stat. §§112.532, .82; *id.* §§112.044(2)(a); *id.* §111.065; *id.* §447.3075; *id.* §§110.227(2)(a), (3), (6)(c), (7). Both PERC and the Florida Legislature have explained these distinctions. Since 1976, PERC has emphasized the need for "harmonious collective bargaining"—*i.e.*, the need to prevent labor strife because of the nature of their jobs protecting the public—and the "special and peculiar

dangers" that police face on the job as reasons for treating them differently. *Nw. Fla. Police Benevolent Ass'n v. City of Panama City*, 2 FPER 8, 9 (PERC 1976). Florida's legislature has recognized the "peculiar and special" risk to the community when police, corrections officers, and firefighters suffer diminishing physical or mental ability. Fla. Stat. §121.0515(1). This "policy" has now "stood inviolate for almost [five] decades whether the employer is a municipality, a county, a school board, or the state." *Broward Cnty. Police Benevolent Ass'n, Inc. v. School Bd. of Broward Cnty.*, 32 FPER 11, 2006 WL 6824956 (PERC 2006). SB256's exemption of these unions is a continuation of this longstanding policy. *See, e.g.*, Floor Statement, House State Affairs Committee 1:07:53 (Apr. 11, 2023), https://tinyurl.com/4249umje. The exemption also recognizes that these employees typically work long shifts that keep them away from a "one centralized location" where, unlike other public employees, they could readily meet with union representatives to pay their dues. *See, e.g.*, Floor Statement, Committee on Governmental Oversight and Accountability 48:03 (Mar. 7, 2023), https://tinyurl.com/yvy7e7u5.

## C. The Unions' Lawsuit.

Plaintiffs—a collection of unions and one individual union member—sued PERC officials and public employers to enjoin enforcement of SB256. In total, Plaintiffs bring seven claims alleging that different sections of SB256 violate the First Amendment, Fourteenth Amendment, and Contracts Clause of the United States Constitution. ECF 48 (Second Amended Complaint). Plaintiffs have sought summary judgment only on their Section 3 and Section 4 claims. PERC Defendants move for summary judgment on each of Plaintiffs' claims and oppose Plaintiffs' motion for partial summary judgment on the same grounds.

## ARGUMENT

Summary judgment is appropriate when, as here, "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Here, the law and facts establish that the PERC Defendants are entitled to summary judgment on each claim.

## I. Defendants are entitled to summary judgment on Plaintiffs' Section 3 Contracts Clause claim. (Count IV).

This is the third time the parties have presented their arguments on Plaintiffs' Section 3 Contracts Clause claim (Count IV). And PERC

Defendants recognize the Court issued an opinion just 14 days ago ana-

lyzing those arguments in depth. *See* ECF 106. PERC Defendants revive

their arguments here but focus on addressing the opinion's analysis for

efficiency's sake. *See Allen v. Lyons & Farrar, P.A.*, 2020 WL 10728693,

at *2 n.1 (N.D. Fla.) (Walker, C.J.) (crediting arguments more fully ex-

plained in another brief that were "incorporated by reference"). *O'Bryant

v. Langford*, 2008 WL 906741, at *9 (N.D. Fla.) (same).

## A.  Plaintiffs have no cause of action under §1983 or directly under the Constitution.

### 1. §1983 does not provide a cause of action for a Contracts Clause claim.

The Court held at the preliminary-injunction phase "that *Carter*

does not preclude Plaintiffs from bringing their Contracts Clause claim

under section 1983." ECF 106, at 16. The PERC Defendants disagree

with that decision, but there is no need to belabor that disagreement by

repeating all the arguments the Court has already analyzed and rejected.

Two points in response to the Court's decision:

First, the Court's opinion could be read to suggest that the PERC

Defendants argued only that *Carter* settled the issue and not that *Carter*

(as the PERC Defendants read it) was correct as an original matter.

*See* ECF 106, at 16-17 n.6. It was. The Contracts Clause is in Article I,

and is a structural limitation placed on the States. *Kaminski v. Coulter*, 865 F.3d 339, 346 (6th Cir. 2017). And §1983 was enacted "to afford a federal right in federal courts … to enforce the claims of citizens to the enjoyment of rights, privileges, and immunities guaranteed by the Fourteenth Amendment that might be denied by state agencies." *Id.* at 345-46 (quoting *Monroe v. Pope*, 365 U.S. 167, 180 (1961) (cleaned up)). A structure limitation is not one of those "rights, privileges, or immunities secured by the Constitution." 42 U.S.C. §1983. "[T]his view better reconcile[s] the Supreme Court's holdings in *Carter* and *Dennis* with the text and history of § 1983." *Kaminski,* at 347.

Second, Justice O'Connor's decision to join the majority in *Crosby v. City of Gastonia*, 635 F.3d 634 (4th Cir. 2011), would be bizarre if *Carter* didn't decide this issue. *Crosby* held that "[t]he Supreme Court in *Dennis* recognized a § 1983 cause of action for the deprivation of rights secured by the Commerce Clause; as such, the continuing vitality of *Carter* and its precedent with respect to the Contracts Clause was not before the *Dennis* Court." *Id.* at 640. "There is little doubt, however, that *Carter* stands even today for the proposition that an attempted § 1983 action alleging state impairment of a private contract will not lie." *Id.* at

14

641. It makes no sense for Justice O'Connor to have (1) joined an opinion that implicitly overruled *Carter* and then (2) later joined an opinion holding there was "little doubt" that *Carter* was good law (and decided that §1983 does not provide a cause of action under the Contracts Clause).

### 2. Plaintiffs cannot bring a claim under the Contracts Clause itself.

Plaintiffs also assert a cause of action "directly under the Contracts Clause of the United States Constitution." ECF 63, at 1. Other unions have tried this tack away from §1983 in the same circumstances and failed. *Int'l Union v. McClelland*, 2020 WL 5834750, at *3 (E.D. Mich.) (rejecting "Plaintiffs attempt to avoid the import of *Kaminski* by arguing that the court has inherent authority in equity to issue a declaratory judgment that the state has violated the Contracts Clause."). With good reason. "[T]he federal courts, and this Circuit in particular, have been hesitant to find causes of action arising directly from the Constitution." *Hearth, Inc. v. Dep't of Pub. Welfare*, 612 F.2d 981, 982 (5th Cir. 1980); *see Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) (Fifth Circuit decisions before 1981 are binding in the Eleventh Circuit). The Supreme Court's willingness to find such causes of action in narrow circumstances "were necessitated primarily by the absence of

15

alternative remedies. In each case, there simply was no other means of seeking redress." *Hearth*, at 982. As a result, the Eleventh Circuit has explained, when a plaintiff has "an adequate remedy, we will not imply a judicially created cause of action under the Constitution." *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1253 n.15 (11th Cir. 2012), *abrogated on other grounds by New York State Rifle & Pistol Ass'n, Inc. v. Bruen,* 142 S. Ct. 2111 (2022). And Plaintiffs have "an adequate remedy" for their alleged harm: an action in state court seeking specific performance of the contract. A direct claim under the Constitution is unavailable.

## B. Section 3 does not substantially impair existing contract rights.

The Court is also aware of, and has analyzed closely, the arguments the parties have proffered on whether there has been a "substantial impairment of a contractual relationship." *Sveen v. Melin*, 138 S. Ct. 1815, 1817 (2018) (quoting *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244 (1978)). As with the cause-of-action question, the PERC Defendants focus on the Court's prior decision rather than retread ground already covered twice at length.

To begin, deferential review is appropriate because SB256 does not impair the State's own contracts to serve the State's pecuniary self-interest. The Court observed that "it is not entirely clear whether [the CBAs] ought to be considered contracts with the State of Florida." ECF 106, at 20. "[T]he real issue in determining the level of deference given," however, "is not so much whether the state is arguably a nominal party to the contract, but whether the state is acting in its own pecuniary or self-interested capacity by impairing a contractual obligation it has undertaken." *Mercado-Boneta v. Administracion del Fondo de Compensacion al Paciete*, 125 F.3d 9, 16 (1st Cir. 1997); *accord Buffalo Teachers Fed'n v. Tobe*, 464 F.3d 362, 370 (2d Cir. 2006). Florida's Legislature did not pass SB256 out of financial self-interest. To the contrary, SB256 is quintessential "economic and social regulation," so the Court should "defer to legislative judgment as to the necessity and reasonableness" of its requirements. *U.S. Tr. Co. of N.Y. v. New Jersey*, 431 U.S. 1, 23 (1977).

First on the merits, the Court correctly concluded that the "reasonable expectations" factor points in PERC Defendants' favor. *See Miami Beach I* ¶23 (accord). It is right that "the extent to which Plaintiffs' activities and negotiations are subject to regulation certainly weakens their

17

claim that the challenge provision substantially interfered with their reasonable expectations regarding a contractual term that was, itself, the subject of state regulation at the time they entered the collective bargaining agreements." ECF 106, at 33. Perhaps most importantly on this issue, Florida law previously allowed public employees to authorize unions to deduct dues from their paychecks. But "such authorization" was always "revocable at the employees request upon 30 days' written notice to the employer and employee organization." Fla. Stat. §447.303. In other words, unions' access to public payrolls was always conditional.

Plaintiffs also knew "they are subject to state regulation as evidenced by certain contractual provision in their collective bargaining units." ECF 106, at 33. Each CBA expressly contemplated a change in the law and, for example, provided those changes "shall take precedence when inconsistent with this agreement." ECF 97-6, at 15; *see also* ECF 97-7, at 12; ECF 97-2, at 19; ECF 97-3, at 147. Courts have explained that provisions like these show "the contracts themselves demonstrate [the parties'] diminished expectations." *Hawkeye Commodity Promotions, Inc. v. Vilsack*, 486 F.3d 430, 438 (8th Cir. 2007); *accord City of Charleston v. Pub. Serv. Comm'n of W. Va.*, 57 F.3d 385, 394 (4th Cir. 1995); *RUI*

*One Corp v. City of Berkeley*, 371 F.3d 1137, 1150 (9th Cir. 2004). Judge Marsh agreed in the parallel case under Florida's Contract Clause, which itself tracks its federal counterpart. *See Miami Beach I* ¶23 ("Local 1554's and Local 3293's collective bargaining agreements expressly contemplate changes in state law and agree to be bound by those changes.").

Second, Plaintiffs have "ample other ways to safeguard their interests in the collection of union dues." *Miami Beach I* ¶23; *see also Sveen*, 138 S. Ct. at 1822. Practically, as PERC Defendants have already outlined at length, Plaintiffs have multiple other avenues by which they can collect their dues. *See* ECF 80, at 33-35; *see also* ECF 115-10, at 1-3; ECF 115-11, at 1. And record evidence shows that "some of these Plaintiffs expected this to happen and took action *before* the law went into effect." ECF 106 at 37; *see also* ECF 97-8, at ¶16; ECF 115-12 (showing Plaintiffs' national affiliate started using eDues in 2019). And the law gave Plaintiffs time to make that changeover. *Sveen*, 138 S. Ct. at 1824 (noting that when a party has "several months" to safeguard their interests that weighs against substantial impairment).

Plaintiffs have already made substantial progress in that endeavor. Lafayette's percentage of dues payers is at 100% and ACEA's is already

at 91%. *See* ECF 115-13, at 4, 6. Just over the course of the last few months, UFF has increased its percentage of dues payers from 35% to 52% to now 63%. ECF 97-3, at 7 ¶19; ECF 97-15, at ¶9(b); ECF 115-13, at 4, 6 (5,963 dues payers out of 9,479 members). Pinellas went from 43% to 67% between July 17 and September 11. ECF 97-15, ¶9(c); ECF 115-13, at 4, 6 (2,625 dues payers out of 3,906 members). And for its part, FEA has transitioned over 100,000 members (69%) to alternative payment options. ECF 115-13, at 4, 6.

Plaintiffs can also safeguard their interests via collective bargaining as the Court explained in its prior decision. ECF 106, at 35-37. Plaintiffs apparently have no interest in doing so, however. Despite ACEA and UFF-UF having the right to "reopen negotiations" when a provision becomes "invalid during the life of this contract through legislative action," ECF 97-2, at 19; *see also* ECF 97-3, at 147, they have not "taken any action to exercise" those rights, ECF 115-14, at 10.

Third, Section 3 also does not "undermine[] the contractual bargain." *Sveen*, 138 S. Ct. at 1822. Plaintiffs argue (again) that this factor is satisfied because "[t]he Plaintiff Unions considered these dues-deduction provisions to be important aspects of their contracts, and would have

20

demanded concessions elsewhere as consideration for removing them from their CBAs during bargaining." ECF 99-1 ("Mot."), at 27-28. They argue "[t]hat is sufficient to establish that the Legislature's complete invalidation of the payroll-deduction upset the parties' contractual bargain." *Id.* at 28. But the analysis cannot turn on whether the aggrieved party thinks the bargain has been undermined. Otherwise, this factor would be satisfied in every single case.

Even so, the very basis supporting this assertion—that the unions "would have demanded concessions elsewhere," Mot. 20—is completely illusory. When asked what concessions Plaintiffs would have "demanded," they responded "that there is no way to answer this hypothetical question with specificity." ECF 115-14, at 9. Plaintiffs' self-serving statements about dues-deductions' importance in the entire scheme of these CBAs—which cover "myriad provisions governing all manner of terms" for employees, ECF 106, at 23—should not be credited. This is particularly true because Section 3 "affects only an ancillary provision in each agreement that describes how the employees' bargaining representatives receive membership dues," *Miami Beach I* ¶23, and because dues deductions are immaterial to public employees, ECF 115-1, at ¶12.

## C. Section 3 is justified by a significant and legitimate purpose.

Even if Section 3 substantially impairs the CBAs in the record, the impairment is justified by a significant and legitimate public purpose. *See Sveen*, 138 S. Ct. at 1822. The Contracts Clause "does not operate to obliterate the police power of the States." *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 241 (1978). Under the police power, Florida has "great latitude" to pass laws aimed at promoting the "lives, limbs, health, comfort, and quiet of all persons." *Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 756 (1985). A law that falls within the state's police power does not violate the Contracts Clause, even if it substantially impairs a contract. *See, e.g., Flanigan's Enter. Inc. v. Fulton Cnty.*, 242 F.3d 976, 989 (11th Cir. 2001).

"Normally, [courts] defer to a state's judgment as to the necessity of a measure in question." *Linton by Arnold v. Comm'r of Health & Env't, Tenn.*, 65 F.3d 508, 519 (6th Cir. 1995). This is particularly true where, as here, "no appreciable danger exists that the governmental entity is using its regulatory power to profiteer or otherwise serve its own pecuniary interests." *Houlton Citizens' Coal. v. Town of Houlton*, 175 F.3d 178, 191 (1st Cir. 1999); *see supra* 17. Plaintiffs bear the burden to show

Section 3 lacks a legitimate purpose. *United Auto., Aerospace, Agr. Implement Workers of Am. Int'l Union v. Fortuno*, 633 F.3d 37, 43-45 (1st Cir. 2011). They have not carried that burden.

Florida's purpose for passing Section 3 is to increase transparency and ensure public employees are fully informed about the dues they are paying their unions. *See supra* 10. Courts have readily concluded similar public purposes justify state laws that substantially impair public contracts. *See Watters v. Bd. of Sch. Dirs. of City of Scranton*, 975 F.3d 406, 413 (3d Cir. 2020) (school district's economic hardship justified state law suspending teachers without pay despite tenure contract); *Tobe*, 464 F.3d at 371 (same for teacher wage freezes). If states can pass laws suspending teachers or reducing their pay to alleviate the *government*'s financial difficulty, then Florida can pass a law seeking to bring some transparency to its *public employees'* financials. Indeed, a "fiscal emergency … is not the only context in which [courts] have held that a law serves a legitimate public purpose." *Connecticut State Police Union v. Rovella*, 36 F.4th 54, 63 (2d Cir. 2022). The Second Circuit has held that "ensuring … transparency and accountability" is a "legitimate public purpose[]" that justifies superseding provisions in an existing CBA. *Id.* So too here.

Plaintiffs argue that Section 3 doesn't fit the State's interest in transparency. Mot. 45. They suggest that a law's justification is not enough; there must be a s "separate justification for … retroactive application." Mot. 39. There is no "separate justification" requirement because that would turn the analysis on its head. The question is whether the proffered reasons are enough to justify retroactive application. At any rate, employees subject to existing CBAs over the next few years are entitled to the same transparency as those entering new ones. They don't have that transparency today and it shows. *See supra* 10.

Plaintiffs briefly argue (at 40-41) that Section 3's purpose is not legitimate because it is supposedly "under-inclusive" by not applying to public safety employers. The reason for the exception is that Florida has long treated its first responders differently in employment regulation because of the nature of their jobs in protecting the public. *See supra* 10-11. Section 3 fits the State's interest.

## II.  Defendants are entitled to summary judgment on Plaintiffs' other Section 3 claims (Counts V-VI).

Defendants are also entitled to judgment as a matter of law on Plaintiffs' challenges to Section 3 under the First Amendment (Count V), and Equal Protection Clause (Count VI).

## A. Section 3 does not violate the First Amendment.

Plaintiffs claim that Section 3's application to most unions but not all of them violates the First Amendment. This theory "presents the question whether the [First Amendment] *compels*" Florida's public employers "to collect membership dues for unions that represent public[] employees." *Bailey v. Callaghan*, 715 F.3d 956, 957 (6th Cir. 2013) (emphasis added). "The problem with this theory is that the Supreme Court has already rejected it." *Id.* at 958. "[T]hat the state gave one category of public employees the benefit of payroll dues deduction does not run afoul of the First Amendment." *Wisconsin Educ. Ass'n Council v. Walker*, 705 F.3d 640, 647 (7th Cir. 2013) (citing *Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 355 (2009)).

### 1. Payroll deduction is a government subsidy that does not implicate the First Amendment.

Plaintiffs concede much of the ground on this claim. They admit this case is about speech subsidies rather and speech restrictions. Mot. 42. They agree that "speech-subsidy laws are judged by different criteria from speech-restrictive laws." *Id.* at 44. And they "recognize that making payroll deduction available to unions is a form of 'subsidy' of expressive

activities that can be withdrawn across the board without facing heightened scrutiny." *Id.* at 42.

There is good reason for treating subsidies differently. "The First Amendment … protects the right to be free from government abridgement of speech." *Ysursa*, 555 U.S. at 358. That means "[w]hile in some contexts the government must accommodate expression, it is not required to assist others in funding the expression of particular ideas, including political ones." *Id.* "A legislature's decision not to subsidize the exercise of a fundamental right," then, "does not infringe on that right, and thus is not subject to strict scrutiny." *Id.* (alteration accepted). Applied in this context, "the State's decision not to [allow payroll deductions] is not an abridgment of the unions' speech; they are free to engage in such speech as they see fit." *Id.* at 359.

Plaintiffs also recognize that "when the government subsidizes speech without restricting it, it can permissibly discriminate between classes of speakers who have different statuses relevant to the need for the subsidy." Mot. 42-43 (citing *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 48 (1983); *Walker*, 705 F.3d at 648). That rule, too, is with good reason. A legislature's "selection of particular entities or

persons for entitlement" of a subsidy "is obviously a matter of policy and discretion and not [ordinarily] open to judicial review." *Regan v. Taxation With Representation of Washington*, 461 U.S. 540, 549 (1983). A government subsidy "that discriminates among speakers does not implicate the First Amendment." *Leathers v. Medlock*, 499 U.S. 439, 450 (1991) (citing *Regan,* 461 U.S. 540).

These rules doom Plaintiffs' First Amendment challenge. Payroll deductions are a subsidy; the First Amendment allows governments to take away subsidies; and the First Amendment also allows governments to choose which speakers receive a subsidy. When a "state g[ives] one category of public employees the benefit of payroll dues deduction," that "does not run afoul of the First Amendment." *Walker*, 705 F.3d at 647. That should be the end of the matter.

But the problem with Section 3, according to Plaintiffs, is not that it subsidizes certain *classes* of speakers and not others; it is that it subsidizes certain *ideas* and not others. Mot. 43-46. That claim fails for several reasons. Most immediately, Section 3 is viewpoint neutral on its face. "[I]t does not tie public employees' use of the state's payroll system to speech on any particular viewpoint." *Walker*, 705 F.3d at 648. "It does not, for

27

example, grant certain unions access to the payroll-deduction process, and deny access to others, based upon whether a union supports or opposes a particular policy position." *Bailey*, 715 F.3d at 959. It instead ties the use of the payroll system based on employee classes. *See* Fla. Stat. §§447.303(1)-(2)(a).

Plaintiffs suggest that the statute facially discriminates based on viewpoint because it distinguishes between types of unions. The "design and structure" of the statute, they argue, "make clear that SB 256 is precisely the type of *speaker*-discriminatory law that must be subjected to heightened scrutiny." Mot. 44 (emphasis added). Plaintiffs cite no case (at 44) to support the view that courts may look at the "design and structure" of a statute to determine the legislature's motivation was illicit. That is because governments can choose between classes of speakers, and that choice is always part of the statute's "structure."[2]

---

[2] Plaintiffs attempt to distract (at 46) with a pull quote from PERC's state court brief discussing rational-basis review. That standard of review provides that "those attacking the rationality of the legislative classification have the burden 'to negate every conceivable basis which might support it,'" *Beach Commc'ns*, 508 U.S. at 315. It is common, then, for defendants to proffer theoretical justifications for a law. And that is what PERC did in the state-court action. Along with others, PERC noted that a potential justification for the law is that "public employers should not

What Plaintiffs appear to be arguing is that unions covered by Section 3 supported Democrats and the exempted unions supported Republicans. So treating them differently is viewpoint discrimination. *See* Mot. 42 (citing *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 811 (1985)). But this theory fails on Plaintiffs' own terms. Plaintiffs have wisely walked back their reliance on political donations. They instead conclusorily allege (at 47) that whether SB256 applies to a union is largely correlated with whether that union "support[ed] the Governor." That doesn't work because Plaintiffs' prior exhibits show that teachers unions made substantial donations to Republicans. *See* ECF 41-14, at 4 ¶8, 6 (Appx. A); *Walker*, 705 F.3d at 651 (noting that, "as a factual matter, the public safety category includes several unions that did not endorse Governor Walker"). The facts do not support Plaintiffs' favored-disfavored distinctions.

It makes no difference anyway because this theory merely "recycles" the "assertion that speaker-based discrimination in the subsidy

---

be in the business of facilitating a union's political speech by collecting dues for them." ECF 97-19, at 16. And "nothing in the First Amendment prevents a State from determining that its political subdivisions may not provide payroll deductions for political activities." *Ysursa*, 555 U.S. at 355.

context requires heightened scrutiny. It does not." *Walker*, 705 F.3d at 648 (citing *Regan*, 461 U.S. at 549-50). This view also "proves too much: if different speakers necessarily espouse different viewpoints, then any selective legislative funding decision would violate the First Amendment as viewpoint discriminatory." *Id.* at 649. That "interpretation of the First Amendment would leave legislatures with the unpalatable choice of funding all expressive activity or none at all." *Id.*

To avoid this conclusion, Plaintiffs would instead have the Supreme Court's decision in *Cornelius* control. That case, however, dealt with the rules regulating public versus nonpublic forums and applied higher scrutiny based on the type of forum at issue. *Cornelius*, 473 U.S. at 797 (considering a grant of access to federal workplaces for solicitations). Payroll access is not a "forum." Rather, *Ysursa* is directly on point and makes clear payroll deductions are at most subsidies. *Ysursa*, 555 U.S. at 359. And subsidies have nothing to do with the cases that Plaintiffs point to concerning heightened scrutiny. *See Cornelius*, 473 U.S. at 797; *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2371 (2018) (striking down "a content-based regulation of speech" that had nothing to do with speech subsidy).

Even so, *Cornelius* did not decide whether, as Plaintiffs argue here (at 41), the law was a "façade for viewpoint discrimination." Instead, the Court merely noted that there was some evidence the law was being applied *inconsistently*, which could speak to an as-applied challenge but not Plaintiffs' facial challenge. *See Cornelius*, 473 U.S. at 797. On that score, the Eleventh Circuit has said "'many times'—that 'when a statute is facially constitutional, a plaintiff cannot bring a free-speech challenge by claiming that the lawmakers who passed it acted with a constitutionally impermissible purpose.'" *NetChoice, LLC v. Att'y Gen., Fla.*, 34 F.4th 1196, 1224 (11th Cir. 2022) (quoting *In re Hubbard*, 803 F.3d at 1312). And other "virtually identical cases[s]" have reached the same conclusion in this very context. *Bailey*, 715 F.3d at 960; *Walker*, 705 F.3d at 649-50.

## 2. Section 3 easily passes rational-basis review.

Because Section 3 is not viewpoint discriminatory, it does not implicate the First Amendment and requires only rational basis review. *Ysursa*, 555 U.S. at 359. Under that review, legislation carries "a strong presumption of constitutionality," *Cent. State Univ. v. Am. Ass'n of Univ. Professors*, 526 U.S. 124, 126 (1999), and "those attacking the rationality of the legislative classification have the burden to negate every

31

conceivable basis which might support it," *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993) (cleaned up).

Plaintiffs cannot carry their heavy burden to negate "every conceivable basis" for Section 3's legislative classifications. *Id.* There are ample reasons why Florida's legislature may have written Section 3 to exempt unions that public-safety officials. Here again, Florida has long recognized that public safety officials face different job demands than other public-sector workers—their job is dangerous and they protect the public—and it has treated them differently because of those demands. *See supra* 10-11. The "differential treatment of general and public safety unions is [also] supported by [Florida's] concern for labor peace among public safety employees." *Walker*, 705 F.3d at 657; *see supra* 10. Another justification is that exempted employees typically work long shifts away from "one centralized location" where they could readily meet with union representatives to pay their dues. *See supra* 11. Any of these rationales is enough to satisfy the deferential rational basis test because legislatures may choose to regulate different occupations differently. *See, e.g., Williamson v. Lee Optical of Oklahoma, Inc.*, 348 U.S. 483, 489 (1955) (optometrists versus opticians).

**B. Section 3 does not violate the Equal Protection Clause.**

Plaintiffs also contend (at 47-48) that Section 3 violates the Fourteenth Amendment's Equal Protection Clause because it distinguishes between different unions. "Under the Equal Protection Clause, classifications that neither implicate fundamental rights nor proceed along suspect lines are subject to rational basis review." *Jones v. Governor of Fla.*, 975 F.3d 1016, 1029 (11th Cir. 2020). "Not surprisingly, rational basis scrutiny is 'easily met.'" *Checker Cab Operators, Inc. v. Miami-Dade Cnty.*, 899 F.3d 908, 921 (11th Cir. 2018) (cleaned up).

Plaintiffs agree that rational-basis review applies to this claim, and they spend less than two pages supporting it. Mot. 47-48. That is likely because this claim has been litigated across the country with many courts agreeing that dues deductions provisions like Section 3 do not violate equal protection. *See, e.g.*, *Iowa State Educ. Ass'n v. State*, 928 N.W.2d 11, 18 (Iowa 2019) (collecting cases). This includes Judge Marsh's rejection of other unions' parallel challenge under Florida's Constitution earlier this week. *See Miami Beach II* ¶¶13-15. The one state trial court case that went the other way is ripe for reversal and distinguishable. *See KEA v. Link*, No. 23-CI-00343 (Ky. Cir. Ct.) (ECF 97-20). The *Link* plaintiffs

relied on the fact that Kentucky's distinction between unions "does not turn on a distinction found elsewhere in Kentucky law." ECF 97-20, at 12. But that distinction has been a bedrock of Florida policy for over 50 years. *See supra* 10-11. And as just explained, there are ample reasons why Section 3 is justified under rational-basis review. *See supra* 32-33.

## III. Defendants are entitled to summary judgment on Plaintiffs' Section 4 Contracts Clause claim (Count VII).

Section 4 of SB256 requires covered unions to conduct a recertification election if they cannot show that 60% of bargaining unit employees are dues-paying members annually ("60% threshold"). It also requires them to submit audited financial information to PERC ("Audit Requirement"). Defendants are entitled to summary judgment on Plaintiffs' Contracts Clause challenge to Section 4 because, for reasons explained above and in earlier briefing, Plaintiffs lack a cause of action to assert this claim. *See supra* 13-16. Plaintiffs' claim fails for the other reasons outlined below.

## A. The Union Plaintiffs have not established associational standing to challenge Section 4.

Standing requires (1) an injury in fact; (2) that is fairly traceable to the challenged action of the defendant; and (3) that is redressable by a court order. *United States v. Texas*, 143 S. Ct. 1964, 1970 (2023). At this

stage, Plaintiffs may not rest on "'mere allegations,'" but must "'set forth'
by affidavit or other evidence 'specific facts'" showing certainly impend-
ing injury. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (quoting
Fed. R. Civ. P. 56(e)).

An organization can establish standing "'through its own injury in
fact'" or "'through its members.'" *City of South Miami v. Gov. of Florida*,
65 F.4th 631, 637 (11th Cir. 2023). The Union Plaintiffs cannot take the
first route because, by their own admission, Section 4 does not injure
their contract rights. When asked to identify which provisions of their
CBAs—other than the provisions authorizing dues deduction—are for
their benefit, Plaintiffs responded that "[t]here are no provisions of the
CBAs that are for the benefit of the Unions and not for employees." ECF
115-13, at 9. If no CBA provisions are for their benefit, then they cannot
be injured by the threatened termination of the CBAs. A party "not in-
jured" by a regulation does "not have standing" to challenge it. *Burns v.
Town of Palm Beach*, 999 F.3d 1317, 1329 (11th Cir. 2021).

The Union Plaintiffs also cannot rely on associational standing. "An
organizational plaintiff has standing to enforce the rights of its members
'when [1] its members would otherwise have standing to sue in their own

35

right, [2] the interests at stake are germane to the organization's purpose, and [3] neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1342 (11th Cir. 2014). To meet the first prong of that test, an organizational plaintiff must "establish that 'at least one member faces a realistic danger' of suffering an injury." *Id*. Yet here, neither Plaintiffs' operative complaint nor any exhibits have identified any specific union members who are allegedly threatened with injury from Section 4. That is fatal to Plaintiffs' associational standing. *See, e.g.*, *Summers v. Earth Island Inst.*, 555 U.S. 488, 495 (2009) (requiring affidavits or other evidence from individual members showing "threaten[ed] imminent and concrete harm"). Accordingly, the Court lacks jurisdiction over the Union Plaintiffs' challenge to Section 4.[3]

### B. Plaintiffs challenge to the 60% threshold fails.

#### 1. Any challenge to the 60% threshold causing a future decertification is not ripe.

Plaintiffs' theory is that their CBAs implicitly adopted the pre-SB256 regulatory regime, and Florida immediately impaired those CBAs

---

[3] Plaintiff Schueller is a member of UFF-UF but has not identified a specific contractual right she allegedly has lost because of Section 4.

when it changed that regime under Section 4. *See* Mot. 52-56; *infra* 54-

57. In places, however, Plaintiffs suggest that the real problem is Section

4 could nullify their CBAs at some point in the future. And that future

nullification, if it were to happen, would violate the Contracts Clause.

*See, e.g.*, Mot. 56 ("Section 4 threatens to nullify the entire CBA prior to

its scheduled termination date, thus negating *everything that the union*

*bargained for*."). To the extent Plaintiffs are pressing a claim based on

that potential future injury, it is not ripe—as Judge Marsh concluded

earlier this week in a parallel challenge to Section 4. *See Miami Beach II*

¶¶8-13.

     "Article III of the United States Constitution limits the jurisdiction

of the federal courts to cases and controversies of sufficient concreteness

to evidence a ripeness for review." *Digit. Properties, Inc. v. City of Plan-*

*tation*, 121 F.3d 586, 589 (11th Cir. 1997). "The ripeness doctrine protects

federal courts from engaging in speculation or wasting their resources

through the review of potential or abstract disputes." *Id.* At bottom, the

doctrine "seeks to avoid entangling courts in the hazards of premature

adjudication." *Id.* "Any prediction how" Section 4 may harm these Union

Plaintiffs "is 'no more than conjecture' at this time" for four reasons. *Trump v. New York*, 141 S. Ct. 530, 535 (2020).

*First*, "[t]here are several preconditions that must happen before a union becomes decertified under Section 4." *Miami Beach II* ¶¶8-13. Section 4 can affect a CBA only if a union fails to have "60 percent of the employees eligible for representation in the bargaining unit pay dues during its last registration period." Fla. Stat. §447.305(6). Experience signals this will not be a problem. ACEA, Pinellas CTA, and Lafayette have all be subject to the 50% threshold since 2018 under the K-12 law. And every year their reports to PERC have represented they've exceeded that threshold. ECF 115-2, at ¶9. In fact, only one union has fallen below that threshold since the law was in effect. *Id.* ¶8. That trend should continue under Section 4. ACEA has already hit 65% dues paying members. *See* ECF 115-13, at 5, 6 (2,200 dues paying employees out of 3,369). Lafayette is almost there too at 57%. *Id.* (78/138). Pinellas CTA is already at 38% (2,625/6,897) and its next registration date is February 9, 2024. *Id.*; *see also* Mot. 19. So it has plenty of time to get that number up. UFF-UF

is at 21% and has until March 9, 2024, to increase its number. ECF 115-13, at 5, 6; *see also* Mot. 19.[4]

*Second*, even if these Plaintiffs fail to reach the 60% threshold by sometime next year, they still would not be decertified. Instead, Section 4 requires only that the unions win an election to maintain certification. *See* Fla. Stat. §447.305(6). Such an election involves the union petitioning for recertification with support from just 30% of public employees in the bargaining unit. *Id.* §447.307(2). Once accepted, an election is held and the unions need only a bare majority of those voting to be recertified. *Id.* §447.307(3). And these Plaintiffs are very likely to win that bare majority.

Florida's experience here is telling as well. The union subject to the K-12 law that fell below the 50% threshold has won the recertification election each time. ECF 115-2, at ¶8. Over the last ten years, in fact, unions have prevailed in analogous certification elections 80% of the time. *Id.* at ¶¶5-6. For its part, Plaintiff UFF-UF last held a certification

---

[4] For its part, Hernando USW is sitting at 0% but that is because, as of September 5, it has yet to adopt or set up a system for collecting dues outside of now-barred payroll deduction. ECF 115-13, at 10 (accepting only payroll deduction as of September 11, 2023); ECF 97-12, at ¶8.

election in 2010 and the employees "voted overwhelmingly to serve as their bargaining agent." ECF 115-13, at 8. It is unlikely, then, that Plaintiffs will fail to be recertified if they fall below the 60% threshold for dues-paying members.

*Third*, a union's failure to win recertification doesn't automatically nullify a CBA. No provision in SB256 requires automatic nullification. Nor does any provision of PERA require it. To be sure, PERC stated in passing that, in a particular adjudication, decertification would cause that CBA to "no longer exist." *Teamsters Loc. Union No. 385 v. Orange County*, 25 FPER 30072, 1999 WL 35114734 (PERC 1999). But no statute directed that potential outcome. It was something PERC thought could be appropriate in that case's unique circumstances. And *Orange County* has limited import here because it arose in a different context,[5] and it

---

[5] In *Orange County*, there was a raid petition for certifying a competing union that was filed two weeks before the CBA was ratified. *Orange County*, 1999 WL 35114734. That meant there needed to be an election to choose between the incumbent union and the challenging union. The issue presented to PERC was whether the ballot should also have included an option for "no representation." *Id*. In discussing that issue, PERC stated in passing its point about whether the newly ratified CBA would remain in place depending on the election's outcome. *Id*. And had the raiding union won the election, that union could have stuck with the existing CBA or negotiated a new one with the employer. In all events,

came before SB256's changes to the existing structure. Whether decertification nullifies a particular CBA will depend on the circumstances presented to PERC.

*Fourth*, even if decertification automatically nullifies a CBA, Plaintiffs' members will still be entitled to the "status quo" of their rights under that CBA. *See, e.g.*, *City of Delray Beach v. Professional Firefighters of Delray Beach*, 636 So. 2d 157, 161 (Fla. 4th DCA 1994). To that end, "during the period of time that follows the contract's termination, but prior to a new agreement, an employer is prohibited from unilaterally altering wages, hours, and other terms and conditions." *Id.* That is because "the bargaining table is the statutorily mandated forum for accomplishing all changes in the Status quo." *Sch. Bd. of Orange Cnty. v. Palowitch*, 367 So. 2d 730, 732 (Fla. Dist. Ct. App. 1979). "It is settled law that a public employer's unilateral alteration of the status quo of a mandatory subject of bargaining, *i.e.*, wages, hours, and terms and conditions of employment of its employees, is a per se violation" of PERA. *Commc'ns Workers of Am., AFL-CIO, CLC v. City of Gainesville*, 65 So. 3d 1070,

---

however, the employees would have been entitled to the CBA's status quo.

1074 (Fla. Dist. Ct. App. 2011). Public employees, in other words, effec-

tively retain their contractual rights even after a CBA expires. And Plain-

tiffs assert that Section 4 modifies or impairs *only* their employees' con-

tractual rights. ECF 115-13, at 9.[6]

For Section 4 to nullify a CBA requires a "sequence of uncertain

contingencies involving multiple independent actors … that must occur

before the plaintiffs' members would experience this harm." *Dream De-

fenders v. Governor of Fla.*, 57 F.4th 879, 888 (11th Cir. 2023). That se-

quence of events is too speculative to support standing for a potential

future decertification. If a concrete dispute does arise—*i.e.*, a Union

Plaintiff is decertified and employee CBA protections are somehow abro-

gated—Plaintiffs may raise their Contracts Clause challenge at that

time. But it is premature at this stage to litigate to do so.

### 2. Section 4 categorically does not modify or impair any contract right.

Plaintiffs' proffered theory fails at the starting line because Section

4 doesn't modify any contractual provisions. A Contracts Clause claim

---

[6] It is doubtful that Section 4 could ever cause a Contracts Clause violation for Florida's public employees. Because those employees are entitled to the "status quo" when a CBA expires, they are entitled to the CBA's provisions even without the CBA.

has "three components: [1] whether there is a contractual relationship, [2] whether a change in law impairs that contractual relationship, and [3] whether the impairment is substantial." *Gen. Motors Corp. v. Romein*, 503 U.S. 181, 186 (1992). "Normally, the first two are unproblematic, and we need address only the third." *Id*. That is true for Section 3, which immediately superseded the CBAs' dues deductions when the law went into effect on July 1.

But it is not true for Section 4. Long before SB256, Florida law required public-sector unions to submit a renewal application every year. *See* Fla. Stat. §447.305(2) (2022); *see also supra* 7-9. Section 4 merely tweaks that registration requirement and imposes additional conditions on the union remaining certified. *See* Fla. Stat. §447.305(2). It does not modify or supersede the provisions of any existing CBAs. After Section 4 went into effect on October 1, every provision of every CBA in the record remains exactly as it did on September 30. Section 4 hasn't touched a single contractual provision.

Despite this, Plaintiffs argue (at 49-56) that Section 4 *today* has impaired their CBAs. It takes almost eight pages for Plaintiffs to articulate this theory, which is telling in and of itself. But the gist of it is that

the CBAs "incorporated as an implied term" the pre-SB256 regulatory structure. Mot. 54. And Florida has impaired that implied term by changing that structure.

The Supreme Court has rejected this theory. In *Romein*, as here, the plaintiffs argued that a prior regulatory regime was "an implied term of their contracts, because the parties bargained for other" issues with the prior regime "in mind." *Romein*, 503 U.S. at 187. "Contrary to petitioners' suggestion," the Court countered, "we have not held that all state regulations are implied terms of every contract entered into while they are effective." *Id.* at 189. "[C]hanges in the laws that make a contract legally enforceable" or unenforceable "may trigger Contract Clause scrutiny if they impair the obligation of pre-existing contracts." *Id.* The new laws there "did not change the legal enforceability of the … contracts." *Id.* at 190. "The parties still have the same ability to enforce the bargained-for terms of the … contracts that they did before the … statute was enacted." *Id.* Following *Romein*, courts have roundly rejected Contracts Clause claims when the plaintiff cannot point to specific contractual terms abrogated by the challenged law. *See, e.g.*, *AMEX Travel Related Servs. v. Sidamon-Eristoff*, 669 F.3d 359, 370 (3d Cir. 2012); *RUI*

*One Corp*, 371 F.3d at 1147; *Boyz Sanitation Servs. v. City of Rawlins*, 889 F.3d 1189, 1196 (10th Cir. 2018).

The same is true here. The Union Plaintiffs have additional *regulatory* obligations that they may not like. But they cannot avoid those obligations by bootstrapping the old regulations into their CBAs as "implied terms." *See Romein*, 503 U.S. at 190. Were it otherwise, the Contracts Clause would "read every … regulation into the private contractual arrangements" and "expand the definition of contract so far" that the Contracts "Clause would protect against all changes in legislation, regardless of the effect of those changes on bargained-for agreements." *Id.* That "would severely limit the ability of state legislatures to amend their regulatory legislation. Amendments could not take effect until all existing contracts expired, and parties could evade regulation by entering into long-term contracts." *Id.* Plaintiffs' theory, if adopted, would cause precisely that outcome. Plaintiffs instead have not established an impairment.

### 3. Section 4 does not substantially impair any CBA.

Section 4 does not violate the Contracts Clause even under Plaintiffs' theory because it (1) does not interfere with the party's reasonable

expectations; (2) does not prohibit public employees from safeguarding or reinstating their rights; and (3) does not undermine the contractual bargain. *Sveen*, 138 S. Ct. at 1822.

**1.** To start, Section 4 does not undermine plaintiffs' reasonable contractual expectations. "If an industry is already heavily regulated, regulatory changes that abrogate industry players' contract rights are less likely to be considered substantial impairments." *S&M Brands, Inc. v. Georgia ex rel. Carr*, 925 F.3d 1198, 1203 (11th Cir. 2019) (citing *Energy Reserves Grp., Inc. v. Kansas Power and Light Co.*, 459 U.S. 400, 413 (1983)). "And when the subject matter of the contract itself is already subject to state regulation, the substantial-impairment case is even weaker." *Id.* Plaintiffs' CBAs fall under both factors.

All agree that Florida has heavily regulated collective bargaining for decades. *See* ECF 106, at 29. Florida has also specifically regulated the "subject matter" on which this claim relies: union certification and decertification. *See supra* 7-9; Fla. Stat. §§447.307(2), (3) (outlining requirements for certification); *id.* §§447.307(3)(d), .308(1), (2) (2022) (providing ways for a union to be decertified). Section 4 merely alters that very same regime.

Most devastating, however, is that ACEA, Pinellas CTA, and Lafa-yette were *already* subject to a 50% dues-paying threshold via the K-12 law when they entered their existing CBAs. *See supra* 7-8, 38. Moving that threshold from 50% to 60%, as a result, cannot upset any of their reasonable expectations. And the fact that Florida had imposed threshold requirements on other unions put Hernando USW and UFF-UF on notice that it may do the same for them before they entered their existing CBAs.

Plaintiffs try to brush the K-12 law away as "unavailing." They ar-gue that Florida's certification requirements are somehow different. While preexisting laws "that regulate primary conduct in the market-place" may put a party on notice of future regulation, that is not true for "laws like those analyzed in *Romein*" that are "implied into private con-tracts regardless of the assent of the parties." Mot. 59. It isn't clear that the Supreme Court has made an express distinction between those two buckets of rights. Or that such a distinction would be relevant to this factor. But to the extent Supreme Court has distinguished them, it has *disfavored* the idea that regulatory regimes can be implied into private contracts. *Romein*, 503 U.S. at 190. At any rate, the only state laws that can be "implied" into every contract are those that "affect the validity,

construction, and enforcement of contracts." *Id.* at 189. In other words, the new law must alter the terms of the relevant contract on Day 1. And Section 4 doesn't do that.

**2.** Section 4 also allows Plaintiffs to safeguard their interests. *Sveen*, 138 S. Ct. at 1822. Plaintiffs may prevent decertification by showing that 60% of bargaining unit employees are dues-paying union members. They may also prevent decertification by winning a majority of votes cast in any recertification election.

Plaintiffs counter (at 57) that these outcomes are not "within the union's control." Yet experience has shown that unions typically exceed the required threshold and win certification elections. *See supra* 40. Because Plaintiffs have proven mechanisms to prevent impairment of their contracts, this is not a case where the challenged law "prevents the [plaintiff] from safeguarding or reinstating his rights." *Sveen*, 138 S. Ct. at 1822.[7]

---

[7] Plaintiffs rely (at 57-58) on *Equip. Mfrs. Inst. v. Janklow*, 300 F.3d 842, 855 (8th Cir. 2002), but that case didn't address this factor at all. And unlike here, the law at issue impaired an express provision of an existing contract right on the Day 1—the manufacturer's right to terminate a dealership agreement when there is a change in ownership.

**3.** Finally, Section 4 does not undermine Plaintiffs' contractual bargain. Even if (1) the CBAs' implicitly adopted the pre-SB256 regulatory regime and (2) SB256 modified that implicit contractual provision, the modification was minor. ACEA, Pinellas CTA, and Lafayette were already subject to a nearly identical regime before SB256 so the change to their bargain is small. The change to UFF-UF's and Hernando USW's "implicit" contract rights are also small. All Section 4 does is open them to the *possibility* for recertification where that possibility did not previously exist. The CBAs otherwise remain in place in their entirety, including their hundreds of provisions governing "the wages, hours, and terms and conditions of employment." Fla. Stat. §447.309(1).

### 4. The 60% threshold advances a legitimate public purpose.

Even if Section 4 did substantially impair a CBA, it still doesn't violate the Contracts Clause because it "is drawn in an 'appropriate' and 'reasonable' way to advance 'a significant and legitimate public purpose.'" *Sveen*, 138 S. Ct. at 1822. Plaintiffs bear the burden to show that Section 4 lacks a legitimate purpose. *United Auto.*, 633 F.3d at 43-45. And substantial deference to the legislature's judgment is appropriate because "no appreciable danger exists that the governmental entity is using its

49

regulatory power to profiteer or otherwise serve its own pecuniary interests." *Houlton Citizens*, 175 F.3d at 191.

The 60% threshold reasonably furthers Florida's interest in ensuring that certified public-employee unions are supported by, and responsive to, the employees in the bargaining unit that they represent. Unions carry a big responsibility: they exclusively negotiate all aspects of employment on behalf of public employees. And that exclusivity displaces every individual employee's ability to negotiate on his or her own behalf. As a result, it reasonable to require unions to be accountable to those employees by ensuring they maintain a bare majority support.

Plaintiffs and the PERC Defendants share common ground on much of this. Plaintiffs agree that "the state has a legitimate interest in ensuring that an exclusive bargaining representative enjoys the support of a majority of its bargaining unit." Mot. 60. They also agree "that objective is achieved through the initial certification of the union as a bargaining unit," *id.*, which itself requires garnering a majority vote, *see* Fla. Stat. §447.307(3). And they agree "that objective is achieved through … the opportunity for th[e union's] status to be challenged through a decertification election near the end of the CBA's term or when no CBA is in

effect." Mot. 60. What makes the Section 4 objectionable, Plaintiffs argue, is (1) it allows for a recertification election before a CBA expires; (2) it triggers a recertification based on the percentage of dues-paying members; and (3) it sets the threshold at 60% dues-paying members. *See* Mot. 60-62. These objections fail.

On the first one, Florida has an interest in ensuring that public employees support their union every year, not just once every three years. Plaintiffs may disagree that they should be held accountable every year rather than every three years. But that disagreement is not a basis for striking down the law. And as for applying Section 4 "retroactively" to existing CBAs, *see* Mot. 62, public employees in bargaining units with CBAs negotiated a year ago are entitled to hold their unions accountable no less than employees in units negotiating their CBAs right now.

On the second objection, Plaintiffs argue that "the percentage of bargaining-unit members who pay union dues is never a reliable gauge of support for the union as a collective-bargaining agent." Mot. 61. It is hard to see why that measure can't be a *gauge* of support. People who pay a business that does work for them—as unions do for employees—often *support* that work. Those who refuse to pay for the same work are less

likely to support it. Florida admits that is not always the case because, for example, dues payers may not know they can elect against paying dues. *See supra* 3-4. But dues payment can surely serve as a proxy for support.

In addition, Florida had to choose *some* metric to accomplish its goal of ensuring employees still support their exclusive bargaining agent. Of course, Florida could simply have required a recertification election every year to accomplish that goal. That would have been a more burdensome approach. Florida instead chose an easier path for unions: recertification elections are required only if the number of dues-paying members falls below a certain threshold. And reporting those numbers is a much simpler task than requiring a yearly recertification election.

On the third objection, Plaintiffs' problem with the 60% threshold largely rests on a red herring. They argue that threshold is meant "to make it easier for unions to be stripped of their certification." Mot. 55. Yet it doesn't do that. The only way a Plaintiff can be "stripped of their certification" is if it fails to obtain a majority vote in the recertification election. And three Plaintiffs—ACEA, Pinellas CTA, and Lafayette—

were already subject to that reality when they entered the CBAs. The 60% merely triggers the election; it doesn't cause decertification.

Setting the threshold at 60%, in any event, encourages union representatives to make sure they have the employees' support. *See, e.g.*, Floor Statement, Committee on Governmental Oversight and Accountability 1:06 (Mar. 7, 2023), https://tinyurl.com/yvy7e7u5 (explaining that the 60% threshold is intended to encourage union representatives "to go out and talk to the people who are electing them and having those conversations so they can advocate for them better. The higher the bar, the better the union representation will be."). It also accounts for the employees who are not aware they are even paying dues. *See supra* 3-4. It was thus reasonable for the legislature to conclude that a bare majority of dues-paying bargaining unit employees does not necessarily reflect majority support for the union. The threshold is a proxy that accounts for that.

Finally, Plaintiffs object that Section 4's requirements are subject to an exception for unions representing first responders. Mot. 55-56. As the PERC Defendants have already explained at length, Florida has long treated its first responders differently in employment regulation because

of the nature of their jobs in protecting the public and the wish to avoid labor strife. *See supra* 10-11. Section 4's exemption of these unions is a continuation of that longstanding policy.

## C. The Audit Requirement does not violate the Contracts Clause.

### 1. Any challenge to the Audit Requirement causing a future decertification is not ripe.

Similar problems plague Plaintiffs' challenge to the Audit Requirement. Here too, Plaintiffs claim that the Audit Requirement violates the Contracts Clause because their CBAs implicitly adopted the pre-SB256 regulatory regime, and the Audit Requirement changes that regime. Mot. 48-49. Like with the 60% threshold, however, Plaintiffs suggest in places that they are challenging the effect of a potential decertification in the *future* because they cannot comply with the requirement. Any challenge on that basis is not ripe.

To start with, only Lafayette is pressing this challenge. Lafayette argues the Audit Requirement may lead to its decertification because Plaintiffs' counsel could not "locate a CPA willing to take on LEA as a new client." Mot. 25. And even if a CPA were available, retaining a CPA to perform the required audit "would not be financially feasible for a local union of LEA's size and resources." *Id*. The latter is true, Lafayette

argues, because its "per capita dues" in 2022-23 "was only about $10,000" and FEA obtained a quote for "approximately $10,000." *Id.*

Discovery has now led Plaintiffs to walk back much of these assertions. They acknowledged a few days ago that "[d]ocuments came to counsel's attention after [Plaintiffs'] filing show that a different CPA had quoted different FEA affiliates a rate of $1,000-1,500 to complete their audits." ECF 109, at 1. An FEA staff member told others at FEA that different CPA firm could serve "*any* of your locals that might be in need of a reasonably priced audit." ECF 115-15, at 1 (emphasis added). The "$1000-$1500" audits were for "small locals without many transactions in a year of membership 300 or less" up to $2500-$3000" for "1000 Membership." *Id.*; ECF 115-14, at 7-9 (confirming these quotes). The cost of an audit is thus easily feasible for all the Union Plaintiffs, including Lafayette with its 78 members. *See, e.g.*, ECF 97-5 ¶19; ECF 115-16 (LEA Budget Spreadsheet showing a $6,792 surplus for 2022-2023 year).[8]

---

[8] Plaintiffs may point the Powell Declaration to assert Lafayette could not obtain an audit at these rates. *See* ECF 97-16. The basis of that declaration, however, is one of Lafayette's litigation lawyers here calling CPAs on Lafayette's behalf during this litigation. *See id.* And that lawyer proffered a declaration—as a *fact* witness—conveying what he purportedly learned in phone conversations. *Id.* There are no documents

Discovery has also revealed that Lafayette's "per capita dues" in fact were *not* "only about $10,000." *See* Mot. 25. Lafayette collected $27,612 in dues in 2022-23. ECF 115-14, at 3. The problem is that it sent $22,492 of that to FEA. *Id.* Lafayette can't transfer funds to a co-Plaintiff (FEA) and then claim it has no money to comply with the regulatory obligation it is challenging. It's a manufactured injury.

Yet it would make little or no difference even if Lafayette could not afford the audit. As with the 60% threshold, decertification for failure to comply with the Audit Requirement would not automatically nullify Plaintiffs' CBAs, and even if it did, Plaintiffs' members would still be entitled to the status quo of those CBAs. *See supra* 40-43. Because Plaintiffs assert only that Section 4 modifies or impairs their employees' contractual rights, *see* ECF 115-13, at 9, even the prospect of decertification would not create a ripe Contracts Clause dispute because decertification does not threaten those rights. Any Contracts Clause challenge based on speculation that the Audit Requirement will lead to Plaintiffs' decertification in the future is therefore unripe. *See Trump*, 141 S. Ct. at 535.

--------

corroborating those conversations. The only support is inadmissible hearsay elicited by Lafayette's attorney and washed through his declaration. *Id.*

**2. The Audit Requirement does not violate the Contracts Clause.**

Plaintiffs argue that the Audit Requirement violates the Contracts Clause because it "diminish[es] the value of the unions' collective-bargaining agreements" by conditioning their validity on a "costly new audit." Mot. 48-49. This theory fails at every step.

**1.** The Audit Requirement does not implicate the Contracts Clause because it does not modify any provision of Plaintiffs' contracts. *See Romein*, 503 U.S. at 189-90. As with the 60% threshold, "[t]he parties still have the same ability to enforce the bargained-for terms of the … contracts that they did before [Section 4] was enacted." *Id.* at 190. And again, Plaintiffs' CBAs did not generally incorporate and ossify the pre-SB256 regulatory status quo. *See id.*; *supra* at 44-46.

Plaintiffs' only response is that the Audit Requirement is "costly." Mot. 56. The Contracts Clause, however, does not "protect against all changes in legislation" that could impose costs on a party, such as "workplace safety regulations, employment tax obligations, and laws prohibiting workplace discrimination." *Romein*, 503 U.S. at 190. The same goes for Section 4's Audit Requirement.

**2.** Even if the Audit Requirement did impair Plaintiffs' contracts, any impairment is not substantial. The Audit Requirement does not undermine any reasonable expectations because Florida has long regulated public-employee unions. *See Kansas Power*, 459 U.S. at 414-16; *supra* 2-3. Florida has also specifically imposed disclosure and transparency obligations. Before SB256's enactment, Florida law required many disclosures—including a "current annual financial statement"—from any union seeking to be certified to represent public employees. Fla. Stat. §447.305(1)(d) (2018). Every union's annual renewal application also had to include a detailed "current annual financial report" signed by the union's president and treasurer. *Id.* §447.305(2).

SB256 merely refines this regime by requiring an "independent certified public accountant" to certify the union's financial reports. Fla. Stat. §§447.305(1)(d), (2). The substantive reporting requirements remain unchanged, except for information which must be reported to show compliance with the 60% threshold. These small changes cannot upset Plaintiffs' reasonable expectations. *See S&M Brands*, 925 F.3d at 1203.

Nor does the Audit Requirement prevent plaintiffs from "safeguarding or reinstating [their] rights." *Sveen*, 138 S. Ct. at 1822. As with the

60% threshold, the Audit Requirement does not invalidate any provision in Plaintiffs' CBAs. And any risk to Plaintiffs' CBAs can be fully mitigated by simply conducting the required audit— something easily within Lafayette's capabilities (and those of the other Plaintiffs).

Finally, the Audit Requirement does not undermine Plaintiffs' contractual bargain. It does not even impose new disclosure obligations on Plaintiffs. It simply requires preexisting disclosures to be verified by an independent third-party auditor. This simple change to the extensive regulatory scheme governing public-employee unions—a change not addressed, implicitly or explicitly, by Plaintiffs' CBAs—cannot be said to meaningfully undermine the bargains struck by those agreements.

**3.** Any impairment the Audit Requirement causes is justified by Florida's legitimate interest in requiring unions to provide financial transparency to public employees and the State. The Supreme Court has observed that evaluating the propriety of a union's categorization of its expenses is a "laborious and difficult task." *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2482 (2018). Likewise, there is abundant evidence that union members often have little

information about how unions use their dues. *See supra* 3-4. Section 4 addresses those issues.

Finally, this sort of regulatory requirement is as unremarkable as it gets. It is a common reason justifying many other laws. *Cf., e.g.*, Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, 116 Stat. 745; *Grant Thornton LLP v. Off. of Comptroller of the Currency*, 514 F.3d 1328, 1334 (D.C. Cir. 2008) (discussing congressional plan aimed at "enhancing transparency" through improved audits). Nor is it remarkable that failure to comply with the Audit Requirement may lead to the revocation of a union's certification. *Cf., e.g.*, 17 C.F.R. §240.10A-3 (certification to be listed on a publicly traded stock exchange requires compliance with Sarbanes-Oxley audit requirements).

## IV. Defendants are entitled to summary judgment on Plaintiffs' Section 1 claims (Counts I-III).

Plaintiffs challenge Section 1's requirement that public employees sign the PERC-designed and distributed form on three grounds: First Amendment Freedom of Speech (Count I), First Amendment Freedom of Association (Count II), and Fourteenth Amendment Equal Protection (Count III). *See* SB256 §1(b)(1). The Court should enter judgment on PERC's behalf for each one.

### A. Section 1 does not harm Plaintiffs' freedom of speech.

The content of a state-issued form is quintessential government speech that does not implicate the First Amendment. The "freedom of speech prohibits the government from telling people what they must say." *Rumsfeld v. Acad. and Institutional Rts., Inc.*, 547 U.S. 47, 61 (2006). The First Amendment thus "restricts government regulation of private speech; it does not regulate government speech." *Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009). But "[a] government entity has the right to 'speak for itself,'" "'say what it wishes,'" and "to select the views that it wants to express." *Id.* at 467-68. When the "government speaks, it is not barred by the Free Speech Clause from determining the content of what it says." *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 2007 (2015).

Plaintiffs previously *conceded* that the form contains only government speech, noting it that is "self-evident." ECF 42, at 4.[9] They instead focused on "whether unions are effectively compelled by SB256 to

---

[9] Because all agree the form contains only government speech, the requirement that Plaintiff Schueller sign the form causes no viable First Amendment injury. *See B.W.C. v. Williams*, 990 F.3d 614, 617-20 (8th Cir. 2021); *Anderson Fed'n of Teachers v. Rokita*, --- F. Supp. 3d ---, 2023 WL 2712267, at *10 (S.D. Ind. 2023).

disseminate the form, and whether such compulsion triggers First Amendment scrutiny." *Id.* at 5. Plaintiffs' view that the form is "compelled speech" misunderstands how the form operates. Section 1 does not force Plaintiffs to disseminate the 91-word script. *See* SB256 §1(1)(b)(1). In fact, it doesn't require unions to help the employee at all. It requires only that a "public employee" must "sign and date" the form. Fla. Stat. §447.301(1)(b)(1). And public employees have all they need to comply with that obligation. The form is posted on PERC's website for public employees to download and fill out themselves. *See* Public Employees Relations Commission, PERC Forms, https://tinyurl.com/4kc85jjc. The salary information the form requires is already "publicly available" for public employees to access, as Plaintiffs have acknowledged. *See* ECF 15-1, at 22. It is true, of course, that unions may *choose* to help the employees complete the form; and the form expressly allows for that. *See* ECF 115-7, at 2. But the unions need not do so.

For these reasons, Section 1 does not require that the union act as a courier of the form and deliver it to the public employee. Nor is there any requirement that the form be "interject[ed] … directly into their communications aimed at persuading prospective members to join." *See* ECF

15-1, at 19. Unions may persuade prospective members using their own forms, materials, and speech. ECF 115-17, at 1 ("While an organization is free to use PERC Form 2023-1.101 as part of its membership application, it is not required to do so."). All Section 1 requires is that, after an employee decides to join, he or she fill out and sign the form. Fla. Stat. §447.301(b)(1).

The Court has recognized all this. "[T]he problem with Plaintiffs' claim is that the plain language of the provision at issue does not command [the unions] to speak at all." ECF 45, at 5. Instead, "the challenged provision commands *employees* who desire to join a union to sign and date the government-drafted form." *Id.* "By the terms of the statute, [the unions] are not directly penalized if they fail to convey the state's message to members through the required form. In this way, this case is unlike each of the compelled speech cases Plaintiffs cite in support of their claim." *Id.* (citing *Wooley v. Maynard*, 430 U.S. 705, 717 (1977); *NIFLA v. Becerra*, 138 S. Ct. 2361 (2018); *Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781 (1988).

As they did at the preliminary-injunction stage, Plaintiffs are likely to point to PERC's implementing regulations as causing First

Amendment harms. That regulation provides that where an employee has not signed the Section 1 form, "the employee may not be counted as an employee in the bargaining unit who paid dues to the employee organization under" Section 4. ECF 115-9, at 1. The Court correctly rejected the notion that the regulation matters. "[B]y the terms of the statute," the Court explained, "Plaintiffs are not directly penalized if they fail to convey the state's message to members through the required form." ECF 45, at 11-12. Section 1 "commands *employees* who desire to join a union to sign and date the government-drafted form. That they must do so 'with the bargaining agent' does not mean the bargaining agent must disseminate the form, post the state's message, or otherwise communicate any message on the state's behalf." *Id.* at 6. "At most, Plaintiffs are commanded to retain the forms once they are submitted. But this does not compel them to speak." *Id.* at 7. The implementing regulation thus changes nothing.

### B. Section 1 does not violate First Amendment freedom of association.

Defendants are also entitled to judgment on Plaintiffs' freedom of association challenge to Section 1. *See* SB256 §1(1)(b)(1). The First Amendment guarantees the right to freely associate, or course.

*See, e.g.*, *Gary v. City of Warner Robins*, 311 F.3d 1334, 1338 (11th Cir. 2002). That right protects "'expressive association,'" which is the "right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for redress of grievances, and the exercise of religion." *Id.*

As with their compelled speech claim, Plaintiffs' association claim largely misunderstands how Section 1 will work. Both Plaintiff Schueller's and the Union Plaintiffs' theories rely on the notion that signing the form is a precondition to employees becoming members of a union. *See* ECF 48, at ¶¶105-06. That is incorrect. An employee can become a member of a union without signing the form. And PERC has made clear that an organization "is not required" to use the PERC Form "as part of its membership application." ECF 115-17, at 1. Rather, the form is used "to fulfill the statutory mandate" of SB256 and "[c]ompletion and delivery of the PERC Form does not guarantee membership" because "an organization is free to establish its own membership requirements" and "is free to require a completely distinct membership application form." *Id.* Because the entire basis for this claim is that the form *is* a prerequisite to

membership, the claim fails and PERC Defendants are entitled to judgment.

### C. Section 1 does not violate the Equal Protection Clause.

Defendants are also entitled to judgment on Plaintiffs' claim that Section 1 the Equal Protection Clause because it distinguishes between different unions. This claim fails for the same reason as it does for Section 3. *See supra* 33-34.

### V. Plaintiffs are not entitled to permanent injunctive relief.

"An injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010). The same four factors governing preliminary injunctions govern permanent ones. *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).

**1. Irreparable harm.** Plaintiffs have not shown irreparable injury. They cite the "reduction in dues revenue" they have experienced because of Section 3's ban on dues deduction as evidence of irreparable harm. Mot. 65. That "contention," however, "rests on a false premise." *Miami Beach I* ¶25. "Section 3 does not bar the Plaintiffs from receiving dues; it bars them only from receiving dues via government-administered paychecks." *Id.* In addition, "recoverable monetary loss does not

constitute irreparable injury." *Lifestar Ambulance Serv., Inc. v. United States*, 365 F.3d 1293, 1296 n.5 (11th Cir. 2004). Plaintiffs' members continue to owe dues and Plaintiffs may recover them through any number of permissible methods, including eDues.

Plaintiffs now claim that Section 4 is also causing irreparable harm because of the threat that decertification will make "their contract protections vanish." Mot. 66. Plaintiffs' failure to move for preliminary injunctive relief against Section 4—while doing so on their other claims—casts doubt on their novel contention that it has been irreparably harming them all along. *See Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016) (delay in moving for injunctive relief "undermines a finding of irreparable harm"). Apart from their delay, Plaintiffs cannot show present irreparable injury because their alleged injuries from Section 4—decertification and loss of CBA protections—have not materialized and could only do so (if at all) after a speculative chain of events involving the unforeseeable conduct of third parties. *See supra* 37-43.

**2. Remedy at law.** Plaintiffs claim that they have no remedy at law because Eleventh Amendment immunity would bar any attempt to recover money damages from Florida. Mot. 66. Their discussion of the

Eleventh Amendment is a red herring because Plaintiffs are concerned about money owed by their members, not by the State of Florida. And as Plaintiffs have acknowledged, they have a cause of action—the quintessential remedy at law—to recover unpaid dues from their members. ECF 48, at ¶81.

**3. Balance of equities and the public interest.** Because the State is a party, the balance-of-equities and public-interest factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Florida would be harmed by an injunction because whenever "a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Hand v. Scott*, 888 F.3d 1206, 1214 (11th Cir. 2018) (quoting *Maryland v. King*, 567 U.S. 1301, 1301 (2012) (Roberts, C.J., in chambers)); *see also Miami Beach I* ¶30 (similar). And the public interest further weighs against injunctive relief because an injunction would stifle SB256's ability to bring transparency to public employees who often lack information about their payment of dues and unions' use of those dues. *Cf. Nat'l Head Start Ass'n v. Dep't of Health & Hum. Servs.*, 297 F. Supp. 2d 242, 251 (D.D.C. 2004) (noting "that the public's interest in

68

transparency is predominant"). The equities thus weigh against an injunction.

## CONCLUSION

This Court should grant the PERC Defendants' cross-motion for summary judgment and deny Plaintiffs' partial motion for summary judgment.

Dated: October 6, 2023

Amber S. Nunnally
Florida Bar No. 109281
amber@lawsonhuckgonzalez.com
Jason Brent Gonzalez
Florida Bar No. 146854
jason@lawsonhuckgonzalez.com
LAWSON HUCK GONZALEZ PLLC
215 S Monroe St., Ste. 320
Tallahassee, FL 32301
(850) 241-1717

Respectfully submitted,

 /s/ Bryan Weir
Jeffrey M. Harris*
Bryan Weir*
David Rosenthal*
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
jeff@consovoymccarthy.com
bryan@consovoymccarthy.com
david@consovoymccarthy.com

*Admitted pro hac vice

## CERTIFICATE OF COMPLIANCE

Under Local Rule 7.1(F) and the Court's order granting additional words, ECF 100, undersigned counsel for the PERC Defendants certifies that the above memorandum, excluding those portions excluded by Local Rule 7.1(F), consists of 13,976 words.

<u>  /s/ Bryan Weir          </u>
Bryan Weir

## CERTIFICATE OF SERVICE

I hereby certify that on October 6, 2023, I electronically filed the foregoing via CM/ECF, which automatically serves all counsel of record for the parties who have appeared.

_/s/ Bryan Weir_
Bryan Weir
